[ORAL ARGUMENT NOT SCHEDULED]

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

THE HERITAGE FOUNDATION et al.,

Appellants,

v.

DEPARTEMENT OF JUSTICE,

Appellee.

Nos. 23-5168 & 23-5171

# PLAINTIFFS-APPELLANTS' EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA (FRIEDRICH, J.)

Plaintiffs-Appellants move for an injunction pending appeal pursuant to Federal Rules of Appellate Procedure 8 and 27 compelling the Department of Justice ("DOJ" or "Department") to produce any non-exempt records responsive to Specification 1 of Appellants' FOIA Request (ECF No. 1-5) ("Request") that reflect, memorialize, or explain any decision on a request for regulatory or statutory Special Counsel Status by U.S. Attorney David C. Weiss ("Weiss") by **July 24, 2023**.[1] The Department opposes such relief.

The records sought by this Motion are of exceptional importance. They go directly to resolving contradictions between the Attorney General, a U.S. Attorney, and Whistleblowers over the conduct of the investigation of Robert Hunter Biden. Appellants are entitled to production of these records in time to make use of them prior to Hunter

[1] Appellants refer to appointment pursuant to 28 U.S.C. § 515 as "statutory Special Counsel" and appointment pursuant to 28 C.F.R. § 600.1 *et seq.* as "regulatory Special Counsel." Appellants note that the Department itself uses the term "Special Counsel" interchangeably to refer to both appointments. *See, e.g.*, *Oversight of the Department of Justice: Hearing Before the Sen. Comm. on the Judiciary*, 118th Cong., CQ Trans. at *31 (Mar. 1, 2023) (ECF No. 1-10) (Senator Chuck Grassley asking a question concerning regulatory Special Counsel authority and the Attorney General appearing to answer as to statutory Special Counsel authority).

Biden's July 26, 2023 plea hearing and in fast-moving Congressional investigations. Moreover, if Appellants do not receive these records prior to July 26, 2023, they will suffer irreparable informational harm; the records will have lost substantial value to that event.

## BACKGROUND

The son of the President of the United States, Robert Hunter Biden, was being investigated for serious crimes, many of which revolve around allegations of *at best* unsavory influence peddling to at least one hostile foreign power (the Chinese Communist Party). The allegations involve not only many other members of the President's family, but the President *himself*. Because the Attorney General of the United States was appointed by the President, one would expect the appointment of a Special Counsel. Other Administrations appointed Special Counsels in cases where the possible conflict of interest was much more attenuated. And yet, the Biden Administration steadfastly refuses to do so.

The Administration's answer to date has been that Weiss—retained from the prior Administration—had supposedly "complete authority" over the case. The Attorney General repeatedly testified under oath before Congress to that effect. *See, e.g.*, *Oversight of the Department of*

*Justice: Hearing Before the Sen. Comm. on the Judiciary*, 118th Cong., CQ Trans. at \*138 (Mar. 1, 2023) (ECF No. 1-10) ("[A]ll the matters involving Mr. Hunter Biden are the purview of the US attorney in Delaware. He's not restricted in his investigation in any way."). As the Attorney General told the press on June 23, 2023: "Mr. Weiss had in fact more authority than a special counsel would have had. He has and had complete authority, as I said, to bring a case anywhere he wants in his discretion." ECF No. 7-1 at \*19 (June 28, 2023); *see also id.* at \*18 ("I say, [Weiss] was given complete authority to make all decisions on his own.")

But on June 22, 2023, the House Committee on Ways and Means released transcribed bipartisan staff interviews of two Internal Revenue Service whistleblowers, Gary Shapley ("Shapley") Joseph Zeigler ("Zeigler") (collectively "Whistleblowers"). ECF No. 1 at ¶ 56 ("Compl."). Those transcripts paint a picture of a different world. *See* ECF Nos. 1-21 & 1-22.

Both Whistleblowers are career criminal investigators in an elite government unit. *Id.* at ¶¶ 58–59, 62. Both Whistleblowers testified they had no political axe to grind. *Id.* at ¶¶ 60, 63–64. Indeed, Zeigler testified he is a Democrat and that he had even been attacked online for his role

in the investigation because, as a gay man, many assumed he was a reliable "far left liberal" who would favor the Biden Administration. *Id.* at ¶ 63.

The Whistleblowers offered more specific testimony:

- The Whistleblowers testified that Weiss stated he was not the deciding official as to whether charges are brought against Hunter Biden, contrary to the Attorney General's sworn testimony.

- Shapley testified that at an October 7, 2022 meeting, Weiss told those present:

  o That he sought to bring felony tax charges against Hunter Biden for the tax years 2014 and 2015 in the District of Columbia (which had sole venue), but the Biden-appointed U.S. Attorney for the District of Columbia, Matthew Graves, refused to proceed.

  o That he requested Special Counsel status from Main Justice, but the request was denied. Instead, he was told to "follow the process."

  o That he sought to bring felony tax charges for the tax years 2017 and 2018 in the Central District of California (which had sole venue).

  o That if the Central District of California refused to bring the felony tax charges referred to them, he had no authority to bring those charges absent authorization from the Attorney General or the Deputy Attorney General.

- Shapley documented Weiss's statements at the October 7, 2022 meeting in a contemporaneous memorandum sent to and confirmed as accurate by his supervisor who was also present at the meeting.

- Shapley testified that the U.S. Attorney for the Central District of California refused to bring the felony tax charges. *The New York Times* reported on June 27, 2023 that "this episode was confirmed independently to *The New York Times* by a person with knowledge of the situation." ECF No. 7-11 at 3.

The conflict between the Whistleblowers' testimony on pain of felony and the emphatic position delivered under oath by the Attorney General is direct and obvious.

On July 19, 2023, the Whistleblowers testified before the House Committee on Oversight and Accountability. At that hearing some Members of Congress attacked the Whistleblower's testimony for want of credibility (App. B006), want of corroboration (App. B103), and declining memory with the passage of time (App. B059).

Weiss initially released a letter on June 7, 2023 that appeared to corroborate the Attorney General. ECF No. 1-18 ("June 7 Letter"). But Weiss sent subsequent letters to Congress on June 30, 2023 (ECF No. 14-2) ("June 30 Letter") and July 10, 2023 (ECF No. 14-3) ("July 10 Letter"). (collectively "Weiss Letters") that are in direct conflict with both the Attorney General and Weiss's prior statements.

- Weiss stated he lacked "charging authority" outside of the District of Delaware. June 30 Letter at 2. Instead, Weiss explained that he would have to follow "common Departmental practice" and work with the local U.S. Attorneys with venue to

see if they wanted to "partner on the case." *Id.* Weiss then stated that if the local U.S. Attorney declined to partner, he "*ha[d]* been assured that, *if necessary*, after the above process" he "*would* be granted" authority to prosecute that case under 28 U.S.C. § 515. *Id.* (emphases added). It defies the English language to say that Weiss *has* "complete authority" over the Hunter Biden matter and can charge cases outside the District of Delaware if that authority is *conditioned* upon: (1) following a complicated internal Department process to bring charges outside of Delaware; (2) incurring the substantial political and opportunity costs of doing so; (3) having a coordinate officer reject his request to bring charges outside of Delaware; (4) requesting additional authority from the Attorney General; and (5) (again) incurring the political and opportunity costs of doing so.

- Necessarily if the local U.S. Attorney agreed to "partner on the case" (*id.*) Weiss would not have "complete authority" over the matter because he would be in partnership.

- The Weiss Letters stated Weiss had only been conditionally assured authority under 28 U.S.C. § 515 to *file charges*—not over the entire matter (*e.g.*, investigative steps such as seeking a search warrant).

- Because Weiss stated he was assured he would be appointed a statutory Special Counsel under 28 U.S.C. § 515. Even if such an appointment occurred, he would still be subject to the general plenary control of the Attorney General and the Deputy Attorney General. Contrast that to a regulatory Special Counsel. *See, e.g.*, *United States v. Concord Mgmt. & Consulting LLC*, 317 F.Supp.3d 598, 609–11, 614–15 (D.D.C. 2018).

Someone is not telling the truth. Something is gravely wrong with the

conduct of the Hunter Biden investigation.

Despite this, on June 20, 2023, it was announced Hunter Biden will plead guilty approximately one month later on July 26th in Delaware to two misdemeanors and apparently receive no jail time. According to Hunter Biden's attorneys, this plea deal resolves all outstanding charges. ECF No. 7-8. This deal has been met with widespread criticism as a "sweetheart" deal and calls by experts for the Delaware Court to consider delaying or rejecting the plea deal. *See* ECF No. 6-1 at 18–19.

The Records sought by Appellants' FOIA Request (ECF No. 1-5) ("Request") go directly to sorting this mess out by informing answers to four key questions:

(1) Was Weiss's investigation truly independent?

(2) Did the Attorney General mislead the American public when he assured them Weiss's investigation was independent?

(3) Was Weiss blocked from bringing felony charges against Hunter Biden in the District of Columbia or the Central District of California?

(4) Did the Department refuse requests from Weiss for statutory or regulatory Special Counsel status?

These questions have immense political salience; they are continuously in the press.

Congress has opened a rare joint, multi-Committee investigation

into the Whistleblowers' allegations. *See* ECF No. 14-6, at ¶ 17. This investigation has been fast moving, with transcribed interviews of key witnesses scheduled to begin on July 13, 2023 and a public hearing with the Whistleblowers just having occurred on July 19, 2023. *Id.* at ¶ 9, 18. Future major investigative actions are imminent.

The Department presumably has these records in hand. They presumably care about public confidence in the justice system. But the Department's response to date has been to say "nothing to see here" and stonewall any effort to obtain similar records sought by Congress. Appellants' initial FOIA Request was made on March 10, 2023. And the agency granted it expedited processing, thereby recognizing the importance. Yet to date, not a single record has been produced.

## PROCEDURAL HISTORY

Appellants filed this action on June 26, 2023. After filing the Complaint, Appellants and Appellee met and conferred in an attempt to obtain the timely and voluntary release of a subset of records. The Parties were unable to reach an agreement and Appellants filed a Motion for a Preliminary Injunction on June 29, 2023 seeking the production of a subset of records sought by the Request by July 21, 2023. *See* ECF No.

6.

Appellants argued the records sought would lose value if they are not produced prior to the Hunter Biden plea hearing on July 26, 2023 allowing Appellants to use those records to inform Congress and the public as to both that hearing and the on-going and fast-moving Congressional investigations. Appellants submitted that the District Court had ample authority under FOIA's expedited processing provision (5 U.S.C. § 552(a)(6)(E)(iii)) and its inherent authority to set a date certain production as to records urgently needed for an important event or pending crisis and Congressional Investigation. Appellants only sought production of non-exempt records; they did not raise any claims concerning litigation of exemptions. Appellants explained that highly salient records would likely be non-exempt.

The District Court issued an Order denying the Motion for a Preliminary Injunction on July 19, 2023.

On July 20, 2023, Appellants submitted a Motion for an Injunction Pending Interlocutory Appeal to obtain a narrower subset of the records sought in the initial motion by July 24, 2023. ECF No. 21. Specifically, the Motion sought any non-exempt records responsive to Specification 1

of Appellant's' FOIA Request that reflect, memorialize, or explain any decision on a request for regulatory or statutory Special Counsel Status by Weiss. *Id.* The Court denied that motion by a Minute Order issued July 20, 2023.[2]

**OPINION BELOW**

The District Court's Opinion denying Appellants' Motion for a Preliminary Injunction rests on three points: Appellants failed to show irreparable harm; Appellants failed to meet the burden of demonstrating a likelihood of success on the merits; and the balance of the equities/public interest favors the Defendant.

The District Court found Appellants did not have a high likelihood of success on the merits because FOIA's guarantee of production of an expedited request "as soon as practicable" (5 U.S.C. § 552(a)(6)(E)(iii)) is merely an ordering mechanism—all that matters is that DOJ placed the

---

[2] The District Court's Minute Order held that because the Motion for An Injunction Pending Appeal sought relief by July 24, 2023 and not July 21, 2023, it was procedurally improper as such relief could only be sought by a new motion for a preliminary injunction. The District Court stated it would deny such a motion. In an abundance of caution, Appellants appealed that Minute Order as an effective denial. As such, regardless of how this Court views the procedural issues, the present Motion is properly presented in this Court.

Request in an expedited queue and is devoting the resources DOJ deems appropriate to production. Op. at 8–9.

As to a failure to show irreparable harm, and the Hunter Biden plea hearing on July 26, the District Court found "plaintiffs are not party to [the case]; they cannot themselves 'use [the information] in relation to [the] plea hearing.'" *Id*. at 6. Further, the District Court noted that the Delaware Court's decision is not a political decision, but a legal question for the presiding judge. *Id*.

Turning to the need for records before Congress, the District Court found "the plaintiffs cannot show irreparable harm simply because '[t]he information sought by this Motion goes to the heart of on-going House investigations and raging political controversy.'" Op. 4. The District Court held that as there was no singular date certain event after which the utility of the requested records would be lessened or lost, it was possible "the issue may become even more salient over time as relevant investigations continue." *Id*. at 5.

The District Court concluded its discussion on irreparable harm by noting that the requested records are likely subject to FOIA exemptions and thus Appellants could not be irreparably harmed as the records

11

would not be released.  *Id.* at 7.

Lastly, as to the merged elements of the balance of the equities and the public interest, the District Court found that "extra-expedited status" requested and jumping line militate against granting a preliminary injunction as "[t]he inevitable delay in processing those requests that would result from entering a preliminary injunction here further tilts the scale in DOJ's favor."  Op. at 10.

## STANDARD OF REVIEW

In evaluating a motion for an injunction pending appeal, the D.C. Circuit asks:

> (1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal?[ . . . ](2) Has the petitioner shown that without such relief, it will be irreparably injured? . . . (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? . . . (4) Where lies the public interest?

*Wash. Metro. Area Trans. Comm. v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (internal citation and quotations omitted); *see also John Doe Co. v. CFPB*, 849 F.3d 1129, 1131 (D.C. Cir. 2017); D.C. Cir. Rule 8(a)(1).  That said, a movant need only show a "substantial case on the merits" if the "other three factors strongly favor interim relief." *Wash. Metro. Area Trans. Comm.*, 559 F.2d at 843.

The normal standard of review applied to preliminary injunctions governs in FOIA cases: "We 'review the district court's weighing of the preliminary injunction factors under the abuse of discretion standard, and its findings of fact under the clearly erroneous standard. [T]o the extent the district court's decision hinges on questions of law, however, our review is essentially de novo.'" *Al-Fayed v. CIA*, 254 F.3d 300, 303–304 (D.C. Cir. 2001) (citation omitted)

## ARGUMENT

### I.    Appellants Have a Likelihood of Success on the Merits.

The District Court acknowledged that "all parties" "agree[d]" that the request "carries exceptional importance", but none the less held that it lacked authority under FOIA's expedited processing provision (5 U.S.C. § 552(a)(6)(e)(iii)) (or any other authority) to accelerate the actual *timing* of production. That was error. Courts have ample authority to do so.

FOIA requires prompt production while information has its full value—it is not simply a tool for academics. *See, e.g., Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value"); *EPIC v. DOJ*, 416 F.Supp.2d 30, 40 (D.D.C. 2006) ("Not only is public awareness a necessity, but so too is timely public awareness.

For this reason, Congress recognized that delay in complying with FOIA requests is 'tantamount to denial'" (citation omitted)). Courts have power to enforce this mandate via scheduling order and that power clearly intersects with implementation of 5 U.S.C. § 552(a)(6)(E)(iii) and provides an independent basis for the relief sought here. *See Am. Oversight v. U.S. Dep't. of State*, 414 F.Supp.3d 182, 186–87 (D.D.C. 2019). The District Court did not grapple with this argument at all nor address *Am. Oversight*.

Moreover, 5 U.S.C. § 552(a)(6)(E)(iii)'s provision must have *some* substantive meaning as to expedition beyond ordering; terms ought not be read out of a statute. Moreover, as a basic matter of statutory construction, FOIA's expedited processing provision cannot be read in isolation as a pure ordering mechanism; it must be read in light of FOIA's broader demands that information be produced expeditiously when it is needed before an important event or as part of an on-going crisis or Congressional investigation. Additionally, under standard usage, "practicable" is fact specific-operating on the specific facts in each case. *See, e.g.*, *Brennan Ctr. v. Dep't of Com.*, 498 F.Supp.2d 87, 99 (D.D.C. 2020), *Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32, 37 (D.D.C. 2020);

*Elec. Priv. Info. Ctr. v. DOJ*, 416 F.Supp.2d 30, 41 (D.D.C. 2006); *cf. Judicial Watch v. U.S.S.S.*, 895 F.3d 770, 789 (D.C. Cir. 2018) (Pillard, J., concurring) ("In short, the statute does not condone agency personnel sitting behind accumulating mounds of FOIA requests and requiring each requester to "take a number" and wait many months or years for the agency to comply.").

The District Court's contrary construction would allow the Department to effectively neutralize any right to expedition by managing queue assignments and deliberately under resourcing its FOIA offices. Under such a construction, no matter how important a request was, it must wait in line. For example, non-exempt "smoking gun" evidence that a hypothetical President committed treason would be forced to wait in queue.

The District Court's statement "[t]he plaintiffs provide no authority for the proposition that within the category of expedited requests, DOJ has an obligation to prioritize productions based on their 'gravity and urgency'" (Opp. at 9) is just wrong. Appellants provided authority directly on point. *See Brennan Ctr.*, 498 F.Supp.2d at 99; *Am. Immigr. Council*, 470 F.Supp.3d at 37. It was the *District Court* that provided no

authority for *its* construction and failed to engage with Appellants'
authority to boot.

The District Court also concluded it must defer to DOJ's self-
serving explanation of the resources it *chose* to bring to bear on EOUSA
requests in determining what is "practicable", by stating Appellants must
prove their production schedule is practicable. Op. at 8 n.7. But that
again defines what is "practicable" in a vacuum, divorcing the question
of allocation of resources from the specific facts of each case. The more
urgent the situation, the more resources that must be allocated. Thus,
the District Court stands basic principles of administrative law on its
head. It is presumed agencies will devote necessary resources to comply
with their statutory obligations. *See, e.g.*, *In re Aiken Cnty*, 725 F.3d 255,
259 (D.C. Cir. 2013) (Kavanaugh, J.); *Fiduccia v. DOJ*, 185 F.3d 1035,
1041 (9th Cir. 1999). Moreover, the District Court's conclusion that
Appellants must somehow show the Department has sufficient resources
(under the Department's subjective view) is virtually impossible to meet.
How can Appellants possibly prove a point of fact as to internal subjective
resource allocations that are not public? Moreover, such an approach
would effectively render FOIA a dead letter. *See, e.g.*, *Stevens v. Dep't of*

*Health & Hum. Servs.*, __F.Supp.3d__, No. 22-cv-5072 (MFK), 2023 WL 2711830, at \*8 (N.D. Ill. Mar. 30, 2023). The District Court again did not address any of Appellants' submissions on this point.

## II. Absent the Requested Relief, Appellants Will Suffer Irreparable Harm.

1. Hunter Biden's July 26, 2023 hearing is a matter of exceptional national importance—as a perusal of any news source will show. The District Court itself acknowledged its salience and controversial nature. *See* Op. at 5. Appellants will be irreparably harmed if the records sought herein are not produced in time to educate Congress and the public about, and for use in, that proceeding.

The Opinion's stated basis for concluding Appellants will not suffer irreparable harm if they are unable to make use of the requested records to inform the public and Congress in advance of Hunter Biden's July 26, 2023 hearing is that "plaintiffs have not established how their access to this information would have any bearing on a judicial plea proceeding." Op. at 6. This holding rests on clear factual and legal errors.

As an initial matter, Appellants *will* use the information they seek in Court in Delaware. *See* Reply at 13–14. The Court's statement to the contrary is simply wrong. Op. at 6. Appellants are concretely, directly,

and irreparably harmed without this essential information for use in the Delaware Court.

The District Court also erred in finding that "whether that court should accept Hunter Biden's guilty plea is not a political question subject to public debate that could be sparked by the production of documents under FOIA; it is a legal question for the presiding judge to determine under Rule 11 of the Federal Rules of Criminal Procedure." *Id.* at 6. But FOIA turns on *informational* injury. *See, e.g.*, *Nat. Sec. Counselors v. CIA*, 898 F.Supp.2d 233, 254 (D.D.C. 2012) ("Anyone whose request for specific information has been denied has standing to bring an action [under FOIA].") (quoting *Zivotofsky ex. Rel. Ariz. v. Sec'y of State*, 444 F.3d 614, 617 (D.C. Cir. 2006)). Here, the specific informational harm turns on a need to have information in time to use it in highly expedited and important proceedings. *See Am. Immigr. Council*, 470 F.Supp.3d at 37; *Am. Oversight*, 414 F.Supp.3d at 187; *Ctr. for Pub. Integrity v. DOD*, 411 F.Supp.3d 5, 13 (D.D.C. 2019). That is all that need be shown—that the records are relevant and can be used by Congress and interested parties to petition on a matter of paramount national importance.

The District Court's conclusion that "[t]he plaintiffs have provided no reason to think that the court in Hunter Biden's case is incapable of deciding for itself whether it has sufficient information to determine whether to accept the plea or whether it must demand more" is correct in so far as it goes.  Op. at 6.  But it is beside the point.  What matters is the *informational* injury to the Appellants as to ability to *use* the information; not if the recipient would find it helpful.  *Cf. Am. Oversight*, 414 F.Supp.3d at 187 (fact that Congress subpoenaed records but may not receive the records, and in any event may not make subpoena returns public underscores Appellants' showing of irreparable harm); *Ctr. for Pub. Integrity*, 411 F.Supp.3d at 13–14 (similar).  Congress does not find much of the information it is lobbied with helpful; but that does not destroy urgency or informational harm in denying information relevant to petitioning the Legislative Branch on a time sensitive and urgent matter.  Moreover, the entire point of the massive public concern here is that the adversarial process has apparently broken down.  In that situation, no party before the Delaware Court has any interest in presenting that court with reasons to seek more information.  Absent

amicus participation, the Delaware Court may not even be aware of which specific questions to ask.

The District Court's holding that the "justifiability of DOJ's prosecution decisions with respect to Hunter Biden and any influence the President and his appointees exerted on that decision—will continue to have the same salience long after the July 26, 2023 plea hearing" misses the point. Op. at 6. What is the paramount issue here is the conduct of the case *itself*. That is a matter of national controversy—not merely the downstream implications of the conduct of that case. And the plea is final as to that issue; the utility of the information to that case will likely be entirely extinguished if the plea is accepted. *See* Reply at 14. Furthermore, the conduct of that specific case cannot be divorced from the policy debate. The documents are certainly relevant to the policy debate intertwined in asking the Delaware Court to delay or reject the plea in part in order to allow Congress time to consider whether to remove the conduct of that case from the Department of Justice, as was done in response to a similar scandal—Teapot Dome. *See* ECF No. 6-1 at 6. To be sure, some value will remain, but all that is required to show

irreparable harm is the loss of "substantial" value. *See Brennan Ctr.*, 498 F.Supp.3d at 92; *Ctr. for Pub. Integrity*, 411 F.Supp.3d at 12.

2. Appellants will be irreparably harmed if they cannot use the records sought to petition Congress and inform the public about the on-going Congressional proceedings *now* rather than later after the fast-moving investigative events have come and gone. Absent relief now the information sought will lose value every day.

Indeed, such harm already has come to pass with the July 19, 2023 House Oversight hearing. Certain Congressional members attacked the Whistleblowers's testimony by arguing, among other things, that it was not sufficiently corroborated, or was mistaken. *See supra* at 6. The records Appellants seek would have gone directly to allowing Appellants to speak to that issue and either corroborate or disprove an important narrative in an ongoing Congressional inquiry. Appellants would have done so. That Appellants could not is a direct—and necessarily irreparable—informational injury.

The District Court concluded to the contrary based on the its predictive judgement that "the issue may become even more salient over time as relevant investigations continue" and that "plaintiffs have not

provided probative, concrete evidence—beyond alleging generally that some committee investigations have begun—that the documents they seek will lose their utility in these congressional proceedings and their accompanying debates after July 26, 2023." Op. at 5, 5.n3.

As an initial matter, this is plainly erroneous. The District Court simply ignored Appellants' two expert declarations explaining in detail how the records would lose utility as the pending Congressional investigations continue without them. *See* Reply at 15–16, 26–27. The declarations explain that Congressional investigations usually have no end date but are fast moving and are composed of a number of key dates. ECF 14-6 at ¶¶ 20–21; ECF No. 14-11, at ¶ 8. They also explained in reference to this specific investigation how records received after set dates for known investigative steps would lose substantial salience. (*E.g.*, the July 19, 2023 Oversight hearing and transcribed interviews likely commencing as of July 13, 2023.). *Id.* at ¶¶ 11, 17–24. The District Court erred by entirely ignoring the contrary factual record precisely on this point and yet faulting Appellants for supposedly failing to provide evidence based a predictive factual judgement. *See, e.g., Winter v.*

*Natural Resources Def. Council*, 555 U.S. 7, 28–29 (2008); *Begley v. HHS*, 966 F.2d 196, 199 (6th Cir. 1992).

Moreover, the District Court's Opinion also directly contradicts other opinions holding that the need for information for use in a fast-moving crisis response or Congressional investigation is irreparable. *See, e.g.*, *Am. Immigr. Council*, 470 F.Supp.3d at 38 ("Defendants attempt to downplay the urgency of Plaintiff's request, asserting that Plaintiff 'cannot point to any concrete deadline by which it needs the records' because '[t]he COVID-19 pandemic continues.' Opp'n at 16. But the fact that the COVID-19 pandemic is an ongoing public health crisis only bolsters Plaintiff's claim of irreparable harm."); *Ctr. for Pub. Integrity*, 411 F.Supp.3d at 13 ("The Court finds that the lack of a precise end-date for the impeachment proceedings is not detrimental to Plaintiff's claim of irreparable harm. The impeachment proceedings are ongoing. And, in order to ensure informed public participation in the proceedings, the public needs access to relevant information. As such, irreparable harm is already occurring each day the impeachment proceedings move forward without an informed public able to access relevant information."). The District Court's view simply does not reflect the on-

the-ground reality. It would bar relief as to the most storied of Congressional investigations as they had no fixed end date. (*E.g.*, Watergate).

**3.** The District Court's concern regarding potential exemptions simply is not present as to the records at issue here. *Cf.* Op. at 6–7. Because the records sought in this Motion are decisions as to prosecutorial authority, they simply do not implicate Exemptions 5 and 7(A). *See* Reply at 21–23. FOIA does not permit withholding who has what prosecutorial authority from the American people.

## III. The Equities Favor Appellants.

**1.** The District Court did not address Appellants' submission that there is overwhelming public interest in this case in transparency. Resolution of this crisis and scandal is only a good thing. The Department has control of the records that would provide an answer one way or the other, controls the timing of the production of those records, and controls much of the exigency present here. That the Department seems to be doing everything possible to prevent or delay transparency is relevant to the equities and should cut against the Department on this narrow motion where the records sought do not even arguably implicate

24

any legitimate Departmental interests in withholding. On this basis alone this factor weighs heavily towards granting the requested relief. Doubly so if this Court agrees that Appellants are likely to succeed on the merits.

2. The number of documents at issue here should be well below 2,500 and should be non-exempt. Moreover, core records concerning authority should be easily available and likely are being presently reviewed to respond to Congress. Therefore, the resources needed to accelerate production of this narrow subset of records should be minimal.

3. The Opinion assumes that there will be "delay" in processing other requests if the order of queued requests is altered, but that assumes that the Department would not supplement available resources to comply with court orders and statutory mandates. Op. at 9–10. It also takes an approach that would render FOIA (at least to expedition) a dead letter. *See supra* at 17–18. Under the District Court's approach, the agency would have complete discretion to manufacture resource limitations to allow delay. FOIA allows and permits flexible production orders when necessitated by the urgency of the underlying request and events.

Respectfully submitted,


/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

DANIEL D. MAULER
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

July 21, 2023

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD-COUNT LIMITATIONS**

I, Samuel Everett Dewey, counsel for Appellants and a member of the Bar of this Court, certify pursuant to Federal Rules of Appellate Procedure 27(d) and 32(g) that the foregoing Emergency Motion to Stay is proportionally spaced, has a serif typeface of 14 points or more, and contains 5,196 words.

 /s/ Samuel Everett Dewey
Counsel for Plaintiffs-Appellants

# CERTIFICATE OF SERVICE

I certify that on July 21, 2023 I caused the foregoing to be filed through this Court's CM/ECF system which effected service on all parties.

 /s/ Samuel Everett Dewey
Counsel for Plaintiffs-Appellants

# RULE 28(a)(1) CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties and Amici.** Plaintiffs-appellants are The Heritage Foundation and Mike Howell. The Heritage Foundation has no parent entity and no entity has a greater than 10 percent ownership interest in The Heritage Foundation. The Heritage Foundation is a 501(c)(3) nonprofit organization whose mission "is to formulate and promote public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."

Defendant-appellee is the Department of Justice No amici curiae appeared before the district court or have entered appearances before this Court.

**B. Rulings Under Review.** Plaintiffs appeal from the July 19, 2023, order (ECF No. 18) of the District Court (Friedrich, J.) that denied Appellants' motion for a preliminary injunction and the July 20, 203 Minute Order in so far as it treated Appellants' motion for an injunction pending appeal (ECF No. 21) as a renewed motion for a preliminary injunction and denied the same.

**C. Related Cases.** This case has not previously been before

1

the Court.  Plaintiffs-appellants are not aware of any related cases

within the meaning of Circuit Rule 28(a)(1)(C).

# Appendix A
# No. 23-5168

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF JUSTICE,<br><br>    *Defendant.* | No. 23-cv-1854 (DLF) |

**<u>ORDER</u>**

Plaintiffs the Heritage Foundation and one of its officers, Mike Howell, bring this action against the U.S. Department of Justice under the Freedom of Information Act ("FOIA"), seeking the production of certain documents related to DOJ's investigation of Robert Hunter Biden, the son of the President of the United States, Joseph R. Biden.[1]  *See* Compl., Dkt. 1.  The plaintiffs' request, dated March 10, 2023, seeks (1) "[a]ll documents and communications sent or received by . . . any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to Special Counsel status for the investigation concerning Hunter Biden" and (2) "[a]ll documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction."  FOIA Request at 1 (March 10, 2023), Pls.' Ex. 1, Dkt. 1-5.  The plaintiffs also contemporaneously sought expedited processing, *id.* at 6–11, which was granted on March 27, 2023, Pls.' Ex. 10, Dkt. 1-14.  As such, by statute, DOJ is required to process the plaintiffs' request "as soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).

---

[1] For clarity, the Court will refer separately to "Hunter Biden" and "President Biden."

Roughly three months after the plaintiffs filed their request, on June 20, 2023, Hunter Biden was charged by information in the U.S. District Court for the District of Delaware with one count of knowingly possessing a firearm while an unlawful user of and addicted to a controlled substance, 18 U.S.C. §§ 922(g)(3), 924(a)(2), and two counts of willful failure to pay income tax, 26 U.S.C. § 7203. *See* Information, *United States v. Biden*, No. 23-cr-61 (D. Del. June 20, 2023), Dkt. 2; Information, *United States v. Biden*, No. 23-mj-274 (D. Del. June 20, 2023), Dkt. 2. That same day, the government and Hunter Biden jointly requested that the court schedule an initial appearance at which Hunter Biden would plead guilty to the tax charges and enter a pretrial diversion agreement as to the firearm charge. *See* Letter, *Biden*, No. 23-cr-61, Dkt. 1 (June 20, 2023); Letter, *Biden*, No. 23-mj-274, Dkt. 1 (June 20, 2023). The hearing was subsequently scheduled for July 26, 2023. Order, *Biden*, No. 23-cr-61, Dkt. 3 (June 21, 2023).

The plaintiffs filed this suit on June 26, 2023. Their complaint references the statements of two "IRS whistleblower[s]" regarding alleged efforts from within DOJ to block, delay, or otherwise hinder the criminal investigation of Hunter Biden. Compl. ¶¶ 47–51; *see id.* ¶¶ 56–94. In particular, the complaint alleges that according to the whistleblowers, "U.S. Attorney [for the District of Delaware David] Weiss sought to charge Hunter Biden with felony tax charges in the District of Columbia and Northern District of California, but in each case, the local U.S. Attorney—both appointed by President Biden—blocked him from doing so." *Id.* ¶ 4. Similarly, according to the whistleblowers and as alleged, "U.S. Attorney Weiss further stated . . . that he then requested Special Counsel authority from Main Justice to allow him to bring such charges directly, but was denied." *Id.*

Before the Court is the plaintiffs' Motion for a Preliminary Injunction, Dkt. 6, which seeks, in light of recent developments and Hunter Biden's forthcoming plea hearing, to "compel the

production by July 21, 2023, of a narrowed subset of the records sought by the" original request. Pls.' Memo. in Support at 5, Dkt. 6-1.[2] The scope of requested documents for purposes of the preliminary injunction is "narrowed" only modestly:  As to only the second category of information originally requested, the plaintiffs now seek records only for which the U.S. Attorney for the District of Delaware is the custodian.  Mot. for Prelim. Inj. at 1, Dkt. 6.

## I.     Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted).  The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).

Failure to show a likelihood of irreparable harm is sufficient to defeat a motion for a preliminary injunction. *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit "has set a high standard for irreparable injury." *Mdewakanton Sioux Indians of Minn. v. Zinke*, 255 F. Supp. 3d 48, 52 (D.D.C. 2017) (quoting *Chaplaincy*, 454 F.3d at 297).  "First, the injury must be both certain and great; it must be actual and not theoretical.

---

[2] Although the Court appreciates the concerns raised by DOJ as to the acceptance of the plaintiffs' proposed reply brief, the Court will grant the motions to file a reply and accompanying affidavits due to the arguments raised in DOJ's opposition that were not fully addressed in the plaintiffs' opening brief.

The moving party must show the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.  Second, the injury must be beyond remediation." *Chaplaincy*, 454 F.3d at 297 (cleaned up).

## II.      Analysis

On the existing record, the plaintiffs have not made a sufficient showing of irreparable harm.  Nor have they shown that they are sufficiently likely to succeed on the merits, or that the balance of the equities or the public interest weigh in favor of an entering an injunction. Accordingly, and for the reasons stated below, the Court will deny their motion for a preliminary injunction without prejudice.

### A.      Irreparable Harm

Because a failure to make a sufficient showing of irreparable harm is alone grounds to deny a motion for a preliminary injunction, *see Chaplaincy*, 454 F.3d at 297, the Court considers this factor before analyzing the other three.  Here, the plaintiffs provide two reasons why failure to produce responsive documents ahead of their proposed deadline would cause irreparable harm. Neither is persuasive.

First, the plaintiffs cannot show irreparable harm simply because "[t]he information sought by this Motion goes to the heart of on-going House investigations and raging political controversy."  Pls.' Memo. at 32.  Undoubtedly, all FOIA requesters prefer to receive responsive records sooner rather than later.  And in certain cases—including the one here—an agency will accelerate processing of a request because of a "compelling need" to do so.  5 U.S.C. § 552(a)(6)(E)(i)(I).  But for the extraordinary remedy of a preliminary injunction ordering an agency to fulfill its obligations *by a date certain*, "[c]ourts in our district have generally found irreparable harm . . . only where the requested documents are 'time-sensitive and highly probative,

4

or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Foundation v. EPA*, No. 23-cv-748, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (quoting *N.Y. Times Co. v. Def. Health Agency*, No. 21-cv-566, 2021 WL 1614817, at *8 (D.D.C. Apr. 25, 2021)).  This fact alone distinguishes many of the cases cited by the plaintiffs.  As Chief Judge Boasberg has ably explained:

> For example, courts have granted preliminary injunctions in cases seeking documents regarding potential political interference with mail-in voting ahead of the imminent 2020 Presidential election, *see Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 141 (D.D.C. 2020); documents relevant to the 2020 census where "the value of the information sought . . . would be materially lessened or lost" once the census process concluded, [*Brennan Ctr. for Just. at NYU Sch. of Law v. Dep't of Com.*, 498 F. Supp. 3d 87, 100 (D.D.C. 2020)]; documents related to an ongoing and time-limited impeachment process, [*Ctr. for Pub. Integrity v. DOD*, 411 F. Supp. 3d 5, 7, 11 (D.D.C. 2019)]; and documents related to a requester's role as a confidential FBI informant ahead of an imminent evidentiary hearing.  *Aguilera v. FBI*, 941 F. Supp. 144, 151 (D.D.C. 1996); *see also generally New York Times*, 2021 WL 1614817, at *8 n.9 (canvassing these cases).  By contrast, courts have denied preliminary injunctions in cases without a definite impending or time-limited event, such as where plaintiffs sought documents related to FISA surveillance generally, *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 15 F. Supp. 3d 32, 35, 39–40 (D.D.C. 2014); an already existing Consumer Financial Protection Bureau rule, [*Allied Progress v. CFPB*, No. 17-cv-686, 2017 WL 1750263, at *6 (D.D.C. May 4, 2017)]; records related to former Secretary of State Hillary Clinton's use of a private email server well before the election, *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 8–13 (D.D.C. 2015); or records concerning an individual's termination after the event.  *Wadelton v. Dep't of State*, 941 F. Supp. 2d 120, 121 (D.D.C. 2013).

*Id.* at *4.  The public debate inside and outside of Congress over Hunter Biden's actions, his criminal prosecution, and any involvement therein by the President of the United States will not end on July 26, 2023.[3]   Indeed, the issue may become even more salient over time as relevant investigations continue.

---

[3] Some case law suggests that, in order to secure a preliminary injunction for production by a date certain, a plaintiff need not point to a definite date after which the information's value diminishes. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 38 (D.D.C. 2020).  But here, the plaintiffs specifically state in their reply brief that the "correct standard" "to justify injunctive relief" is whether the "utility of the records would be lessened or lost by a date certain."  Pls.' Reply at 26,

Second, as to the only specific event on a particular date on which the plaintiffs rely—Hunter Biden's scheduled July 26, 2023 plea hearing—the plaintiffs have not established how their access to this information would have any bearing on a judicial plea proceeding. The plaintiffs are not party to Hunter Biden's criminal case in the U.S. District Court for the District of Delaware; they cannot themselves "use [the information] in relation to Robert Hunter Biden's plea hearing set for July 26, 2023." Mot. for Prelim. Inj. at 2. And whether that court should accept Hunter Biden's guilty plea is not a political question subject to public debate that could be sparked by the production of documents under FOIA; it is a legal question for the presiding judge to determine under Rule 11 of the Federal Rules of Criminal Procedure. The plaintiffs have provided no reason to think that the court in Hunter Biden's case is incapable of deciding for itself whether it has sufficient information to determine whether to accept the plea or whether it must demand more. And the broader questions that are indeed the subject of public debate—the justifiability of DOJ's prosecution decisions with respect to Hunter Biden and any influence the President and his appointees exerted on that decision—will continue to have the same salience long after the July 26, 2023 plea hearing.[4]

Moreover, further undermining a claim of irreparable harm, DOJ has provided substantial reason to think that the requested records "are highly likely to be exempt in whole or significant

---

Dkt. 15-1 (cleaned up). In any event, even if the plaintiffs were not required to identify such a specific date, they have not shown that the information is likely to lose its relevance to public debate in roughly the timeframe they propose. That is, it may be that, at some future point, the delays in processing will have significantly lessened the utility of the records sought. But the plaintiffs have not provided probative, concrete evidence—beyond alleging generally that some committee investigations have begun—that the documents they seek will lose their utility in these congressional proceedings and their accompanying debates after July 26, 2023.

[4] Because the Court finds that the plaintiffs have not established irreparable harm, it need not consider whether, as DOJ argues, Def.'s Opp'n at 12–13, Dkt. 10, the plaintiffs' delay in filing their complaint and motion for preliminary injunction undermines their claim of irreparable harm.

part."  Def.'s Opp'n at 9; *see Elec. Privacy Info. Ctr.*, 15 F. Supp. 3d at 46 (explaining that a party

"cannot claim to be injured—much less 'irreparably' so—if the [agency] withholds documents

that [the requester] is not entitled to access in the first instance").  For example, Exemption 5

protects "inter-agency or intra-agency memorandums or letters that would not be available by law

to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5); *see, e.g.*,

*CREW v. DOJ*, 45 F.4th 963, 971–72 (D.C. Cir. 2022) (deliberative-process privilege); *Jud. Watch,*

*Inc. v. DOJ*, 432 F.3d 366, 369 (D.C. Cir. 2005) (work-product privilege).  And Exemption 7(A)

protects "records or information compiled for law enforcement purposes . . . to the extent that the

production of such law enforcement records or information . . . could reasonably be expected to

interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7).  On its face, the plaintiffs' request

appears to call for the production predominantly of documents that would fit squarely within these

and other exemptions.  Of course, none of this is to prejudge any legal issues that may arise if and

when the agency ultimately asserts these exemptions when producing responsive records.  As in

all cases, these FOIA exemptions do not give the agency a blank check to refuse to produce

documents; instead, they simply authorize the withholding of documents in specific circumstances,

subject to review by the Court.  At least at this stage, however, it appears to the Court that the

documents most likely to vindicate the plaintiffs' asserted interests justifying injunctive relief are

those that are also most likely to be exempt from disclosure under FOIA.[5]

---

[5] Indeed, even if the Court were to order the plaintiffs' proposed production deadline, the Court would have to resolve any dispute over these exemptions before a final production.  It is thus difficult to conceive of any scenario in which the plaintiffs would receive much of the information they seek by July 26, 2023, the date of the Hunter Biden plea hearing.

### B.      Likelihood of Success on the Merits

In addition, DOJ has raised serious doubts about the plaintiffs' likelihood of success on the merits.  Both parties agree that the relevant merits question is whether DOJ is "*actually* processing the request as soon as practicable," Pls.' Memo. at 16 (cleaned up); *accord* Def.'s Opp'n at 8, and so whether it would be "practicable" to process the request in full by July 21, 2023.  The plaintiffs have not met their burden of showing a likelihood of success on the merits of this question.

DOJ submitted along with its opposition an affidavit stating that there are "2,523 pages of potentially responsive records," Cain Aff. ¶ 15, Dkt. 10-1,[6] and attesting to several factors contributing to possible delays in processing the plaintiffs' request.  Among those factors is the requirement that, for records that contain communications between the U.S. Attorney's Office for the District of Delaware and another DOJ component, the Executive Office for U.S. Attorneys ("EOUSA") must "forward . . . records to th[at] component[]."  *Id.* ¶ 18.  In addition, and for reasons already explained above, the processing time will be further lengthened by the agency's need to determine withholding and redactions for a high volume of potential exemptions.  *See id.* ¶ 19.  And in the EOUSA alone, there are "14 expedited requests that were received before" the one at issue in this case.  *Id.* ¶ 20.[7]  None of this is to say that the Court specifically endorses or tacitly accepts DOJ's proposed production schedule; that will be determined in the near future, after DOJ answers the complaint.  But it does cast substantial doubt on the plaintiffs' claim—for which they marshal virtually no supporting evidence—that the "as soon as practicable" standard

[6] To be sure, that number might be reduced based on the modest narrowing of the plaintiffs' request for the purposes of this preliminary injunction motion.

[7] That DOJ might reallocate resources from other units to the EOUSA, use up more funding, or otherwise "surge the necessary resources when it considers a matter a priority," Pls.' Reply at 10–12, does not change the fact that the plaintiffs have not met their burden of showing that the production schedule they request would be, at a minimum, "practicable."

demands production on or before July 21, 2023, just 22 days after the filing of the plaintiffs' preliminary injunction motion and just a week after the plaintiffs' last filing in support of it.

It is not enough to respond that production must occur at breakneck speed because of "the extreme gravity and urgency of this case." Pls.' Memo. at 17. DOJ does not contest—for good reason—that the plaintiffs' request involves "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence." 28 C.F.R. § 16.5(e)(1)(iv); *see* Def.'s Opp'n at 4 n.1. But all the statute requires is that, once a request is expedited, the agency process it as soon as practicable. The plaintiffs provide no authority for the proposition that *within* the category of expedited requests, DOJ has an obligation to prioritize productions based on their "gravity and urgency." To the contrary, an agency faces the same obligation for "*any*" expedited request: namely, to process it "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added).

### C.     Balance of the Equities and the Public Interest

Finally, the balance of the equities and the public interest militate against entering a preliminary injunction here. Both parties agree that when the government is a party, these two factors merge. Pls.' Memo. at 34; Def.'s Opp'n at 15; *see Nken v. Holder*, 556 U.S. 418, 435 (2009). Granting this preliminary injunction would mean effectively granting the plaintiffs' request extra-expedited status, jumping the line ahead of other requests deemed similarly time-sensitive under FOIA's expedition standards. *See Nation Mag. v. Dep't of State*, 805 F. Supp. 68, 74 (D.D.C. 1992) (noting as against the public interest that the reordering of request processing under a FOIA preliminary injunction "would severely jeopardize the public's interest in an orderly, fair, and efficient administrative of FOIA"). For that reason, the Court must consider the inherent tradeoffs involved in ordering an agency to complete a particular FOIA request ahead of the rest

of the queue—all without the benefit of hearing from the nonparty requestors whose productions would be delayed.

Here, DOJ has explained that other expedited requests before the EOUSA include "sensitive matters such as the January 6th Capitol riots, the search on Mar-A-Lago, classified records and communications related to the Special Counsel's Office, and criminal case files for a Capital Habeas case." Cain Aff. ¶ 23. The inevitable delay in processing those requests that would result from entering a preliminary injunction here further tilts the scale in DOJ's favor.

\* \* \*

The plaintiffs have brought a FOIA request that all parties involved agree carries exceptional importance, and they have raised many arguments, legal and factual, that DOJ will be required to address over the course of this litigation. The plaintiffs have not shown, however, at least at this juncture, that they are entitled to the extraordinary preliminary injunctive relief they seek.

Accordingly, it is

**ORDERED** that the plaintiffs' Motions for Leave to File Reply Declarations and Reply Memorandum, Dkts. 14, 15, are **GRANTED**; and it is further

**ORDERED** that the plaintiffs' Motion for a Preliminary Injunction, Dkt. 6, is **DENIED WITHOUT PREJUDICE**.

**SO ORDERED.**

_____
DABNEY L. FRIEDRICH
United States District Judge

July 19, 2023

10

# Appendix B
No. 23-5168

CQ CONGRESSIONAL TRANSCRIPTS
Congressional Hearings
July 19, 2023 - Final

# House Oversight and Accountability Committee Holds Hearing on IRS Whistleblowers Investigation

## LIST OF PANEL MEMBERS

JAMES COMER:
The Committee on Oversight and Accountability will come to order. I want to welcome everyone here today. Without objection, the chair may declare a recess at any time. Without objection, chairman of the Ways and Means Committee, Mr. Jason Smith of Missouri, is waived on to the committee for the purpose of making an opening statement and questioning the witnesses at today's committee hearing.

I want to thank Chairman Smith and Chairman Jordan for their cooperation and working with the oversight committee on this investigation. This is an important joint effort that shows the American people that accountability matters regardless of your last name. For this hearing, opening statements will be limited to ten minutes for the chair and ten minutes for the ranking member.

I now recognize myself for the purpose of making an opening statement. Since assuming our Republican majority in January, the House Oversight Committee has made historically fast progress in our investigation into the Biden family's influence peddling schemes. In just six months, we have obtained thousands of pages of financial records.

This includes bank records for Biden family associates and suspicious activity reports generated by the Bidens and their associates high dollar or foreign business transactions. What these records reveal is astonishing. The Bidens created over 20 shell companies, most of which were created when Joe Biden was vice president.

Bank records so far show the Biden family, their business associates and their companies received over $10 million from foreign nationals and related companies. A lot of this money poured in while Joe Biden was vice president. Despite creating many companies after vice president took office, the Biden family used associates companies to receive millions of dollars from foreign companies in China, Ukraine and Romania.

After foreign companies sent money to business associates companies, the Bidens then received incremental payments over time to various different bank accounts. These complicated financial transactions were used deliberately to conceal the source of funds and total amounts. No normal business operates like this.

What were the Bidens selling? Nothing but influence and access to the Biden network. This is an influence peddling scheme to enrich the Bidens. We need to know whether Joe Biden is compromised by these schemes and if our national security is threatened. During our investigation, our committee became aware through whistleblower disclosures provided to Senator Chuck Grassley that the FBI had an unclassified record that details an extortion and bribery scheme involving then-Vice President Biden and a Burisma executive.

This record was generated by a trusted confidential human source that the FBI has used for over a decade. It memorializes the sources conversations with the Burisma executive who claimed that he paid Joe Biden $5 million in exchange for certain actions. The Burisma executive told the confidential human source that he didn't pay the, quote, "big guy," end quote, directly, but that he used so many bank accounts that it would take ten years to unravel.

Now that sounds an awful lot like how the Bidens conduct business, using multiple bank accounts to hide the source and total amount of the money. Today we have two brave and credible IRS whistleblowers who have risked their careers to come forward and provide important testimony. Thank you all for being here today.

I know it was not an easy decision. Their testimony about the DOJ, FBI and IRS investigation of Hunter Biden confirms the committee's findings, that there is nothing normal about the Biden family's business activity. The White House and Democrats would have. Americans believe that our investigation is based on five years of conspiracy theories.

But we have facts and new evidence continues to be uncovered by our committee revealing the first family's corruption. The Bidens have put themselves first and Americans last. We will continue to follow the money trail and provide the answers, transparency and accountability that Americans demand and deserve.

With that, I yield to the chairman of the Ways and Means Committee, Jason Smith.


JASON SMITH:
Thank you, Chairman Comer. The Ways and Means Committee is charged with ensuring that the tax code is enforced fairly. Clearly, the president only believes in making making taxpayers pay their fair share if they don't share his last name. These two courageous whistleblowers provided my committee with devastating testimony showing that the government is not treating all taxpayers equally.

And the DOJ and the IRS gave preferential treatment to the president's son during a criminal investigation into his taxes. These individuals in front of us today are credible and set for nearly 15 hours of interviews with both Republicans and Democrats. I personally took part in the interview with Mr. Ziegler.

Here's what we learned from the interviewees. The IRS recommended multiple -- the IRS recommended multiple felony charges against Hunter Biden for tax years 2014 through 2019 relating to at least $8.3 million in income from foreign companies, including one based in and -- including companies based in China, Romania and Ukraine.

And that is the only amount discovered despite the roadblocks and obstruction their investigation faced. The Department of Justice engaged in a campaign to delay, divulge and deny that investigation. They delayed investigators for years leading to the expiration of the statute of limitations for many of the crimes involved.

They divulged key investigative details to Biden's attorneys and even the president's transition team and they denied investigators the ability to authenticate evidence, serve warrants, question witnesses and bring charges. This led to Hunter Biden's sweetheart agreement announced five years after the investigation started.

But mere days before my committee voted to publicly release this testimony. Would

Americans in my Congressional district or any other Congressional district ever receive this same treatment? After raising their concerns internally at the IRS, these whistleblowers were discouraged and demoralized and turned to Congress as a last resort.

They bravely reported wrongdoing to us and what have President Biden's allies, including Hunter Biden's lawyers done? They've responded with a vicious, a vicious smear campaign to discredit these whistleblowers and discourage others from coming forward and may have even coordinated with the White House on this effort.

This is a disgrace. I urge any IRS employee watching today. If you know of misconduct, please come to the Ways and Means Committee so we can hold accountable those who are responsible and let me be clear, there will be zero tolerance for any retaliation against whistleblowers by DOJ and the IRS. The American people expect answers about whether the federal government is treating all taxpayers equally or if the wealthy and politically connected get special treatment.

Our committees are working together to get to the bottom of this abuse of power and will work tirelessly to do so and to make sure it doesn't ever happen again. Americans should not have to accept two tiers of justice in this country. One, if your last name is Biden and one for everybody else. I want to thank both whistleblowers for coming forward publicly and for your testimony today.

I yield to Mr. Jordan.


JIM JORDAN:
I thank the gentleman for yielding. The question is who are you going to believe. April 26th in front of the United States Senate the attorney general said David Weiss is in charge of the investigation. October 7th, in a meeting with Gary Shapley, one of the whistleblowers David Weiss said I'm not the deciding official.

Who are you going to believe? On February 28th, I wrote the attorney general asking him why there's no special counsel in the Hunter Biden investigation. He didn't respond, which is unusual in and of itself. They always respond to the Treasury committee when we write something to them. I wrote again on May 25th. Again, the attorney general didn't respond, but David Weiss did.

And here's what he said, June 7th, he said this, "I have been granted ultimate authority over the matter including responsibility for deciding where, when and whether to file charges." That's what the US attorney said on June 7th, three weeks later, Mr. Weiss wrote me again and he said this, "I stand by what I wrote, but I wish to expand." Wow, already changing this story 23 days later and he said this, "My charging authority is geographically limited to my home district." Well, wait a minute, you just told me 23 days before you have ultimate authority.

Now you change it. Then again on July 10th, Mr. Weiss wrote Senator Graham and he said this paragraph two, "To clarify, I have not requested special counsel designation. Rather, I had discussions with departmental officials." Mr. Weiss can't get his story straight, three different stories in a five week time frame.

On June 7th he's -- he's Tarzan, he's super, I got ultimate authority. I can do what I want, file charges where I want -- when I want and how I want. June 30th, well, actually no, I can't. And then of course on July 10th, he says to clarify, I haven't requested special counsel status, but

I've been talking to the folks at Main Justice, three different positions and a little over a month.

You know whose story hasn't changed? These two guys. Their testimony has been consistent. Throughout their testimony has been the same and guess what? Two days ago an FBI agent confirmed their testimony. Who are you going to believe? The Justice Department can't get their story straight changed three times in 33 days?

Or these two guys? The Justice Department that was found to censor Americans just two weeks ago from the federal court in Louisiana, the Justice Department that said moms and dads are terrorists, the Justice Department that said, if you're a pro-life Catholic, you're an extremist. The Justice Department that can't get his story straight or these two guys?

Ten years over a decade of experience for each of them. The go to guys in international tax evasion cases, the A-Team when it comes to investigating these matters all over the world, they've done this. And have been consistent throughout, I think I'll believe these guys, I think they're the ones telling the truth and that is -- that is fundamentally what this comes down to. So God bless you guys for the work you've done, the courage you have and for being here today stepping forward because you care about equal treatment under the law.

That's what's at stake, plain and simple. I yield back.

JAMES COMER:
I now yield to the ranking member, Mr. Raskin to Maryland, for his opening statement.

JAMIE RASKIN:
Thank you, Mr. Chairman. Good afternoon to the witnesses. I thought we might be here today on the matter that the chairman declared his top priority, the crusade to find evidence of wrongdoing by President Biden. But now the majority's long-promised star witness turns out to be a fugitive from American justice and arms trafficker indicted on eight federal criminal felony counts and an unregistered foreign agent for China who tried to trade Chinese arms for Iranian oil.

So I guess he's not going to be a witness for the majority anytime soon. Well, after the failed SARS reports, bank records, Form 1023, we can conclude that this Inspector Clouseau-style quest for something that doesn't exist has turned our committee into a theater of the absurd, an exercise in futility and embarrassment.

And now we can finally definitively say why the committee's efforts have run dry time and again. Just yesterday, Mr. Chairman, you and I got a letter from Lev Parnas, the Ukrainian-born American businessman, who was at Rudy Giuliani's side as his right-hand man for a year between November 2018 to October 2019 as Giuliani and then President Trump tried to smear Joe Biden before the 2020 election with the very same allegations we're still running through the political spin cycle every week in this committee.

I request unanimous consent to enter the Parnas letter into the record.

JAMES COMER:
Without objection, so ordered.

JAMIE RASKIN:

Now, in this extraordinary ten page letter, Parnas painstakingly describes the campaign orchestrated by Giuliani and Trump to quote, "dig up dirt on the Bidens and spread misinformation about them through various networks including government officials, journalists and Fox News personnel." After explaining this campaign to fabricate corruption charges against Biden, Parnas concludes his letter by saying, "Throughout all these months of work, the extensive campaigns and networking done by Trump allies and Giuliani associates, including the enormously thorough interviews and assignments that I undertook," quote, "There has never been any evidence that Hunter or Joe Biden committed any crimes related to Ukrainian politics.

Never during any of my communications with Ukrainian officials or connections to Burisma, did any of them confirm or provide concrete facts linking the Bidens to illegal activities." As Mr. Parnas concludes, "here has never been any factual evidence only conspiracy theories spread by people who knew exactly what they were doing." And then he calls on this committee to end its wild goose chase and offers to come and testify.

Remember, this is Mr. Giuliani's guy. This is his interpreter and right hand man who spent a year out there trying to cook the books against Joe Biden and he offers to come testify. So if anyone doubts anything he's saying let's bring him in as a witness and let's hear about that crusade that they were on to smear President Biden by promoting the same baseless conspiracy theories that this committee serves up as moldy leftovers every day.

At today's hearing, we're going to hear about wrongdoing by Hunter Biden, who's pleading guilty on two tax charges and a gun charge next week. We'll hear about the back and forth among investigators, prosecutors and a Trump-appointed US attorney, over a dozen people who spent four years investigating the president's son.

We'll hear about how they disagreed on investigative steps and what criminal charges to bring, all normal stuff in government investigations that doesn't usually lead to a Congressional hearing. But one thing you will not hear today is any evidence of wrongdoing by President Joe Biden or his administration.

Like every other try by our colleagues to concoct a scandal about President Biden this one is a complete and total bust. In fact, the ongoing case that the majority invites -- invites us to interfere with today is actually a striking illustration of the success of the American system of independent prosecutors operating under the rule of law and outside the realm of the kind of political influence my colleagues are trying to exercise today.

So, what happened? Well, the son of the sitting president of the United States, lost his brother and then lost his way badly back in 2015. As too many families around the country know, drug addiction is a dark and powerful affliction and like other addicts, Hunter Biden made foolish and criminal choices including failing to pay his taxes and owning a firearm in violation of federal law.

And he's now being held criminally accountable for it. His investigation began under the Trump administration. It was conducted by a US attorney for Delaware, David Weiss, who Donald Trump appointed to his office and who Attorney General Barr, chose for this assignment to conduct this investigation. In his final press conference in December of 2020, Attorney General Barr expressed full confidence in Weiss's work saying it was quote, "being handled responsibly and professionally within the department.

And to this point, I have seen no reason to appoint a special counsel and I have no plan to

do so before I leave." Furthermore, Joe Biden never publicly questioned or challenged this prosecution. When it began, he did not decry it as a witch hunt by Donald Trump. He placed his trust in the fairness of the American justice system.

When he became president, not only did he not use his power to halt the investigation, he kept in place Trump's handpicked US attorney Mr. Weiss overseeing it, even though incoming presidents usually replace US attorneys with their own appointees. And his attorney general Merrick, Garland, made sure that Mr. Weiss appointed by Donald Trump had full authority and resources to pursue this probe and charge it however and whenever he saw fit in any district in the country.

And in the past few weeks, as Hunter Biden accepted a guilty plea, the president and his attorney general have done nothing to interfere with the case, which is overseen by a federal judge appointed by, yes, Donald Trump. Now, can you imagine Donald Trump saying nothing about a witch hunt or not trying to quash the prosecution if it were his son being prosecuted?

Indeed, President Biden's traditional and scrupulous respect for the independence of the Justice Department stands in sharp contrast to Trump's spectacular disrespect for the rule of law and his serial efforts both in office and outside office to get prosecutors to go after and lock up his political rivals and to suspend accountability in specific criminal cases when it comes to his friends.

When Michael Flynn was investigated for lying to the FBI and later convicted for it about communicating with the Russians or when Paul Manafort was investigated and later convicted for bank and tax fraud or when Roger Stone was investigated and later convicted for lying to Congress and witness tampering an outraged President Trump repeatedly denounced the Department of Justice for prosecuting his cronies and reportedly got Attorney General William Barr to pressure prosecutors to recommend more leniency in their cases.

Trump also went to FBI Director James Comey and pushed him to pledge absolute loyalty to Trump and to find a way to let Flynn go. Ultimately, Trump used the power of the presidency to pardon all of these convicted criminals. Now, unlike President Trump's blatant abuse of the rule of law and the relationship between the president and DOJ, there's no evidence that President Biden has involved himself in any way in the investigation into his own son, an investigation that's been overseen by Trump's appointed US attorney.

No matter what my GOP colleagues say and I appreciate the testimony of our witnesses today, there is no evidence that Hunter Biden has received any kind of official favoritism in this prosecution for being Joe Biden's son. On the contrary. There are more than 10 million Americans who have filed taxes but failed to pay them, the exact crime Hunter Biden is pleading guilty to the vast majority of these cases are resolved administratively or through civil settlement.

Indeed every year the IRS and DOJ obtained convictions and sentences in fewer than 700 cases for tax crimes of any kind, a minuscule percentage. The fact that Hunter Biden faced a four-year criminal probe involving dozens of agents and prosecutors from the IRS, the FBI, the US Attorney's Office in Delaware, DOJ tax demonstrates to my mind, at the very least, that he received no special treatment but arguably selectively tougher treatment than the millions of the people who never face criminal investigation for doing the same thing.

If my GOP colleagues think that the treatment of millions of tax scofflaws or even the handful who face criminal prosecution like Hunter Biden is too lenient, I invite them to join us democrats in supporting the $80 billion in funding for the IRS that we passed in Inflation

Reduction Act last year. This money will enable the IRS to make long overdue improvements in customer service, but will also enable the agency to restore lost capabilities and enforcement to identify and prosecute tax cheats.

But the very first thing, House Republicans did this Congress was vote to rescind that funding while disparaging these future IRS employees who will do the same kind of work today's witnesses do. Senator Cruz called them Biden's shadow army. Senator Grassley said they will be going around, ready to shoot some small business person in Iowa.

Today, we get to witness MAGA Republicans take the side of IRS -- IRS agents from the deep state against a Trump-appointed US attorney and a rich guy exercising his Second Amendment rights, but now facing criminal gun charges and tax charges that would call -- that they would call in any other circumstance purely technical.

We are about to hear testimony from two IRS criminal investigators. They will describe their frustrations and disagreements with their supervisors as well as with Mr. Weiss and his team of prosecutors who they consider junior varsity and not up to snuff during the Trump administration generally. We will also hear about their confusion and profound misunderstandings about Mr. Weiss and how he reviewed the evidence and made the ultimate decision about charging Hunter Biden.

A lot of the controversy here relates to the agent's failure to distinguish between special counsels and special lawyers, but we will clear that up today. The key point, Mr. Chairman, is that America needs to understand is that the only political interference at play here is coming from Donald Trump and my Republican colleagues/ We'll listen carefully to the testimony and I thank you, Mr. Chairman.


JAMES COMER:
The ranking member yields back. I'd like to remind the members in the public that Section 6103 of the tax code makes taxpayer information confidential, except in certain circumstances. One of those exceptions is the process the Ways and Means Committee used to receive testimony from these whistleblowers and report transcripts of their testimony to the full House of Representatives to make that information public.

These whistleblowers have gone above and beyond to submit information to Congress in accordance with the law and we are grateful to them for that. The witnesses can only testify to tax information that has already been released through proper procedures through the Ways and Means Committee. This means that in some instances they may have to decline to answer a question and instead submit additional information to the Ways and Means Committee at a later date through the appropriate process.

They are each accompanied by counsel to address questions that arise on section 6103 and are not present today to provide testimony or answer members' question. I ask members to respect that process and requirements of section 6103 and look forward to hearing what our courageous witnesses have to say. Further due to the complex nature of the matter at hand, each of the witnesses shall have ten minutes for their opening testimony.

I would now like to introduce our witnesses, Mr. Joseph Ziegler is a special agent with the Internal Revenue Service Criminal Investigation Division specifically assigned to the International Tax and Financial Crimes Division. This is a group of 12 elite special agents who are subject matter experts in complex international tax and other related crimes.

He started his career with the IRS in 2010 as a special agent and has developed successfully -- and has developed and successfully completed a multitude of complex financial investigations. The types of investigations include money laundering, bank fraud, wire fraud, mail, fraud, health care, fraud violations of the Bank Secrecy Act, income tax evasion and income tax related charges such as identity theft and filing false claims for income tax refunds.

Mr. Ziegler has won multiple performance awards throughout his career in recognition for his work. Mr. Gary Shapley. Mr. Shapley is the supervisory special agent of the International Tax and Financial Crimes Group. Mr. Shapley started his career with the IRS in July 2009. He was detailed to the Department of Justice's Tax Division from 2013 to 2018 investigating foreign institution -- foreign financial institutions.

He was also assigned to the Joint Terrorism Task Force working as a task force officer at both the FBI Washington field office and the FBI Baltimore field office. Mr. Shapley was promoted to supervisory special agent of the elite ITFC group in 2018. He also served as the assistant special agent in charge of both the New York field office and the Chicago field office.

I want to again thank both gentlemen for their willingness to come forward and share their testimony today for the members of this committee and for the American people. Pursuant to committee Rule 9G, the witnesses will please stand and raise the right hands. Do you solemnly swear or affirm that the testimony you are about to give is the truth, the whole truth and nothing but the truth so help you God. Yes, I.


UNKNOWN:
Yes, I do.


JAMES COMER:
Let the record show that the witnesses all answered in the affirmative. We appreciate you being here today and look forward to your testimony. Let me remind the witnesses that we have read your written statements and they will appear in full in the hearing record. Please press the button on your microphone in front of you so that it's on and the members can hear you.

I recognize Mr. Ziegler to please begin his opening statement.


JOSEPH ZIEGLER:
Thank you, Chairman Comer, Chairman Smith, Chairman Jordan, Ranking Member Raskin, and members of the committee. Today, I sit here before you not as a hero or a victim, but as a whistleblower compelled to disclose the truth. That said, in coming forward, I believe I'm risking my career, my reputation and my casework outside of the investigation we are here to discuss.

I ultimately made the decision to come forward after what I believe were multiple attempts at blowing the whistle in the Internal Revenue Service -- at the Internal Revenue Service. No one should be above the law regardless of your political affiliation. I humbly view my role here today as providing the facts as I best understood them and to let Congress and the administration and the public consider those facts and determine the best path forward.

I recognize why I was present at the start of this investigation and was closely involved with the investigation for roughly five years. I'm just a part of the story, others including my colleague and supervisor, Gary Shapley, who is here with me today, have their own views and understandings of what took place during this investigation.

I've been an agent with the IRS since 2010. In 2007, I received my undergraduate degree from Ohio University, my MBA from John Carroll University. Prior to starting my career at the IRS, I worked at Ernst & Young -- Ernst & Young as an external auditor. Throughout my career with the IRS, I have worked a variety of successful criminal tax and money laundering investigations.

In 2018, I transitioned to being to being a part of the International Tax and Financial Crimes Group out of the Washington DC field office. I was the lead IRS case agent on the Hunter Biden investigation. I've recently discovered that people are saying that I must be more credible because I'm a Democrat, who happens to be married to a man.

I'm no more credible than this man sitting next to me due to my actions -- due to my sexual orientation or my political beliefs. The truth is my credibility comes today from my job experience with the IRS and my intimate knowledge of the agency's standard and procedures. I was raised and have always strived to do what is right.

Although I do have my supporters, others have said that I am a traitor to the Democratic Party and that I am causing more division in our society. I implore you to consider that if you were in my position with the facts as I have stated them, ask yourself if you would be doing the exact same thing. I hope that I am an example to other LGBTQ people out there who are questioning doing the right thing at the potential cost of themselves and others.

We should always do the right thing no matter how painful the process might be. I kind of equate this to the experience and feelings I encountered when coming out. It was honestly one of the hardest things I ever had to go through. I contemplated scenarios that would have been highly regrettable, but I did what is right and I'm standing -- or I'm sitting here in front of you today.

I would first like to take a minute to thank some people for their unfettered help and support. First off, God, for giving me the strength and courage to get through this process. My husband who has been my rock, has put up with me, my stress and has had to deal with -- with his personal information being out there.

My attorney, Dean Zerbe, who has agreed to represent me through this matter, pro bono and someone who has provided me so much help and guidance. My colleagues from the Hunter Biden investigation. The work that was done on this case was -- is tremendous, but seems to be overshadowed by what is happening here today.

And I just want to say to the investigative team that I am thankful for having worked with you. I also want to thank my family and friends back home in northeast Ohio and Georgia. I don't live in the DC area. I had to fly here and have had to pay out of pocket for all my travel related expenses and being a whistle blower.

On that note, I would like to make another statement that I have not accepted a single payment from anyone for being a whistle blower. First -- so, Mr. Chairman, I have my written statement as well as my testimony before the Ways and Means Committee, I would like to touch on briefly seven specific matters.

First, in a recent letter to Congress, Mr. Weiss stated that he had been granted ultimate authority over this matter, but then later stated in the same letter that his charging authority is geographically limited and that he would need a President Biden-appointed US attorney to partner with him in charge.

In the case, Mr. Weiss stated that he was making all decisions necessary to preserve the integrity of the prosecution consistent with federal law, the principles of federal prosecution and departmental regulations. In the internal -- in the Criminal Tax Manual Chapter 10 found on the DOJ website, Tax Division policy states that cases involving individuals who fail to file tax returns or pay a tax, but who also commit acts of evasion or obstruction should be charged as felonies to avoid inequitable treatment.

In early August of 2022, federal prosecutors from the Department of Justice Tax Division drafted a 99-page memorandum, in -- in so, they were recommending for approval felony and misdemeanor charges for the 2017, '18 and '19 tax years. That did not happen here and I am not sure why and as to the special -- and as the special agent on this case, I thought the felony charges were well supported.

When considering the elements of felony tax case under the Criminal Code, there are two key considerations, willfulness and tax due knowing. In the criminal context, willfulness is defined as voluntary intentional violation of a known legal duty. The tax loss is the monetary loss to the government. In 2020 -- early 2020, Hunter Biden on file -- or Hunter Biden's unfilled and delinquent tax returns were being prepared, which included his 2018 tax return.

During the 2020 time period, by Hunter Biden's own account, he was sober, newly married and writing his memoir. Hunter Biden's accountants requested that he sign a representation letter stating that all the deductions were for business purposes and were being reported appropriately. Statements Hunter Biden made in his book completely contradicted what he was deducting as business deductions on his 2018 return.

While writing his memoir Hunter stated, "I holed up inside the Chateau for the first six weeks and learned how to cook crack." Hunter Biden allegedly falsely claimed business deductions for -- for payments made to the Chateau Marmont, a hotel room for a supposed drug dealer, sex club memberships, falsely referenced on the wire as a golf membership, hotels he was blacklisted from, and a Columbia University tuition payment for his adult daughter.

All of these items were used to support willfulness -- the willfulness element for felony tax evasion. These false deductions claimed by Hunter Biden caused a false return to be prepared that underreported his total income by approximately $267,000 and a loss to the US Treasury of $106,000. Second, with respect to the 2014 tax year, Hunter Biden did not report any of the money he earned from Burisma for the 2014 tax year, which would have -- which would have been a tax loss to the government of $124,000. According to my previous testimony, Hunter Biden did not report this income to the IRS or pay tax on the source of income.

There is nothing that I see in the public documents as to the Department of Justice's action against Hunter Biden that indicate that Hunter Biden will be required to pay tax on this Burisma income from 2014 or amend his 2014 tax return. I would like to note that the plea agreement when released may provide a great a greater understanding.

Third, I would like to make clear that the charging document for the District of Delaware, Hunter Biden was charged with failure to timely pay his taxes for 2017 and '18 in excess of $100,000 for each tax year. On Hunter Biden's 2017 and 18 tax returns, Hunter reported

taxes owed of of approximately $581,000 and $620,000 Respectfully.

This tax amount in 2018 would not have included the alleged additional tax due and owing from the file false return of $106,000. Thus, as I read the public documents as the Department of Justice action against Hunter Biden, there is nothing that indicates Hunter Biden will be required to amend his false tax return for 2018. A false tax return that includes proper deductions -- improper deductions for prostitutes, sex clubs, and his and his adult children's tuition.

Again, perhaps when the plea agreement is released, it may provide us with a greater understanding. Fourth, the decision to bring felony counts against Hunter Biden was agreed to by both prosecutors and investigators. In the fall of 2021, I met with prosecutors assigned to the case and we all agreed and decided which charges we are going to recommend to -- in the prosecution report, which included felony counts related to 2014 and '18. In March of 2022, the prosecutors requested discovery from the investigative team and presented the case to the DC US Attorney's Office.

In later meetings in early August of 2022, the side prosecutors, all four attorneys, agreed to recommend felony and misdemeanor charges for the 2017, '18 and '19 tax years. Insofar as the Department of Justice Tax Division attorney sent an email about the process of bringing charges to include felony and misdemeanor tax charges in two separate districts, Delaware and Los Angeles.

Less than a month later, Gary Shapley and I met with Mr. Weiss. He stated that he agreed with us regarding the 2014 and 2015 tax year misdemeanor and felony charges, but that this could somehow affect the later year misdemeanor and felony charges that he conveyed were stronger. Despite these facts, the plea deal that is being -- that is being discussed occurred.

To this day, I do not have a reason why that occurred. From my perspective, this might not have been problematic had the investigation been handled in the ordinary course. Fifth, as I had previously testified and is contained in my written testimony, I have outlined for you some instances in which assigned prosecutors did not appear to follow the normal investigative process, slow walked the investigation and put -- put in place unnecessary approvals and roadblocks from effectively and efficiently investigating the case.

A number of times we were not able to follow the facts. I'm happy to respond to questions concerning these instance. Six. I will also note that while the impression has been conveyed by the US Attorney in Delaware that he has similar powers to that of a special counsel in this case, free rein to do as needed, that was not the case.

It appeared to me based on what I experienced that the US attorney in Delaware in our investigation was constantly hamstrung, limited and marginalized by DOJ officials as well as other US attorneys. I still think that a special counsel is necessary for this investigation. To further handle ancillary investigations that are spun off and relates to Hunter Biden but may not have venue in Delaware.

I lastly, I would like to conclude again by encouraging Congress and the administration to consider establishing an official channel for federal investigators to pull the emergency cord and raise the issue of the appointment -- or of the appointment of a special counsel for consideration by senior officials.

I do not want my colleagues at the IRS, FBI and other federal law enforcement agencies to go through my frustrating journey -- to go through my frustrating journey and that of our team.

I believe such a path will strengthen the public's confidence in their institutions and their fair and equal treatment of all Americans under the law.

Thank you and I look forward to the questions.


JAMES COMER:
Thank you very much. Chair now recognizes Mr. Shapley for his opening statement.


GARY SHAPLEY:
Thank you for inviting me to testify here today. I want to thank every member and staff around both sides of the aisle who work -- for the work you do to represent your constituents and hold government accountable. My name is Gary Shapley. I worked as a special agent for IRS criminal investigation for 14 years.

I have risen to become a senior leader in the organization and currently supervise 12 lead agents in the International Tax and Financial Crimes Group. I have worked directly with the United States attorneys in multiple districts and have supervisory investigated cases in more than a dozen United States Attorney's Office across the country.

I have led, planned or executed undercover operations or search warrants in more than a dozen countries. I've investigated and managed some of the largest cases in the history of the agency, recovering more than $3.5 billion for the United States taxpayer in this country. We believe in the rule of law and that applies to everyone.

There should not be a two track justice system depending on who you are and who you're connected to. Yet. In this case, there was based on my experience, I'm here to tell you that the Delaware, US Attorney's Office and Department of Justice handling the Hunter Biden tax investigation was very different from any other case in my 14 years at the IRS. At every stage decisions were made that benefited the subject of this investigation.

For example, prosecutors concealed the contents of Hunter Biden's laptop from investigators, DOJ slow-walked steps to include interviews, serving document requests and executing search warrants. Warrants that were ready as early as April of 2020, but were delayed until after the November -- November 2020 election and never pursued.

Investigators were not allowed to follow up on WhatsApp messages from Hunter Biden's, Apple iCloud backup where he suggested he was sitting next to his fatherAssistant United States attorney, Leslie Wolf. cited the optics of executing a search warrant at President Biden's residence as a deciding factor for not allowing it even though she agreed that probable cause existed.

Prosecutors instructed investigators not to ask about the big guy or dad when conducting interviews. The Biden transition team was tipped off about interviews the night before the investigation went over. A fact my FBI counterpart confirmed to this committee in recent testimony where the result was that only one witness spoke to investigators that day.

These are just some of the examples of how our investigation was stymied. I'm not here to support partisan agendas on either side. I'm here because our tax system relies on the American people having confidence it is administered fairly and equally for everyone regardless of your last name or political connections.

If the handling of this case was inappropriate, it doesn't matter whether it happened under a

Republican or Democrat administration, whether you agree with my concerns about the unethical slow walking and preferential treatment in this case, you can be sure that my testimony is true and correct to the best of my ability.

Unfortunately, the way this has already been handled by some members and the media has done immeasurable damage to future would be whistleblowers. I have been attacked as incompetent and falsely accused of being a liar, a leaker or both, all by people who know nothing about me or the facts of this case. Some question if I should even be called a whistleblower, suggesting that my disclosures are not legally protected merely because they don't like what I'm saying.

We've seen this shoe on the other foot before and some Republicans have made the same error. So there's plenty of blame for both sides. The cycle of villainizing or canonizing government employees who report what they believe is wrongdoing has to stop. When I first started noticing deviations from a normal investigative process around June 2020, I did not run to Congress to air grievances.

Instead, I documented my concerns and made internal protected disclosures to my chain of command. I tried to give the prosecutors the benefit of the doubt for a very long time. After our investigation had largely concluded by the end of 2021, the IRS recommended charging Hunter Biden with multiple felonies and several misdemeanors for the tax years of 2014 through 2019. The Delaware Assistant United States Attorneys and tax evasion trial attorneys supported charging the felonies and misdemeanors listed in Exhibit Two of my interview transcripts on page 44 and 45, which were officially referred to the Department of Justice Tax Division in February of 2022. This case was presented to the Washington DC US Attorney's Office in around March 2022. In April 2022 and a hearing Attorney General Garland was asked how the American people could be confident that the administration was conducting a serious investigation into the president's own son.

Attorney General Garland responded by saying because we put the investigation in the hands of a Trump appointee. He led Congress to believe the case was insulated from improper political influence because all decisions were being made exclusively by Delaware United States attorney, David Weiss, but that was not true.

The Justice Department allowed the president's political appointees to weigh in on whether to charge the president's son. After United States attorney for DC, Matthew Graves, appointed by President Biden, refused to bring charges in March 2022, I watched United States Attorney Weiss tell a roomful of senior FBI and IRS senior leaders on October 7th, 2022 that he was not the deciding person on whether charges were filed.

That was my red line. I had already seen a pattern of preferential treatment and obstruction. Now, United States Weiss was admitting that what the American people believed based on the attorney general's sworn statement was false. I can no longer stay silent. In November of 2022, the statute of limitations was set to expire for the 2014 and 2015 charges in DC, which included the 2014 felonies for the attempt to evade or defeat tax and fraud or false statements regarding Burisma income earned by Hunter Biden in those years.

The statute of limitations have been extended through a tolling agreement with Hunter Biden's defense counsel and they were willing to extend it past November 2022. Weiss allowed those to expire. Prosecutors presented the 2017, 2018 and 2019 criminal tax charges to the Central District of California around September of 2022 only after President Biden's nominee Martin Estrada was confirmed.

In January of this year, I learned Estrada had declined to bring the charges. For all intents and purposes, the case was dead with the exception of one gun charge that could be brought in Delaware. And yet, when Senator Chuck Grassley asked Attorney General Garland about the case in March 2023, Garland testified, "The United States attorney has been advised he has full authority to make those referrals you're talking about or to bring cases in other districts if he needs to do that.

He has been advised that he shouldn't -- should get anything he needs." After the October 7th red line meeting, there was no way to reconcile United States Attorney Weiss's statement, his officer's actions with -- and his office's actions with Attorney General Garland's public testimony. I am 100 percent certain of what Delaware US Attorney's office did and seeking approval from political appointees in DC and California.

The New York Times reported as independently confirmed the charges being presented and declined in California. Plenty of other witnesses are familiar with these facts. In addition to those who witnessed US Attorney Weiss's private admission. I encourage them step forward and tell the truth about what happened and what they heard.

Let me be clear, although these facts contradict Attorney General Garland's testimony and raised serious questions for you to investigate, I have never claimed to have evidence that Attorney General Garland knowingly lied to Congress. Whether Attorney General Garland knew his testimony was false as for you and the inspector general's to determine, not me. The same is true for the United States Attorney Weiss's three letters of Congress since June 2023 is for others to investigate and determine whether those letters contain knowingly false statements.

However, it's clear that United States Attorney Weiss's story for the -- to the American public has evolved. He's gone from unequivocally echoing Attorney General Garland to just one month later corroborating the disclosures we made about limits on his authority. Weiss first said he can charge anywhere and then admitted he's geographically limited.

To go beyond those limits, Weiss later admitted he had to partner a get special authority. Garland said Weiss has authority. United States,Attorney Weiss said he's been assured he would get authority. If he never requested or denied special authority from Attorney General Garland as he told us on October 7th, the American public deserves to hear why he allowed 2014 and 2015 DC charges to expire.

No number of carefully worded denials or evolving half truths can overshadow this stark fact. United States Attorney Weiss and Attorney General Garland will each be sitting before these committees one day. They will have to admit that despite all their obfuscation, the absolute fact is that this case was presented to two presidentially-appointed US attorneys in DC and California.

That no charges were brought and those districts tells you everything that you need to know. I don't claim to be privy to United States Attorney Weiss or Attorney General Garland's communications, but United States Attorney Weiss told us that he was not the deciding person, that he had requested and was denied special authority after DC declined charges.

And that if California declines, you will have to request special authorities. Again, I understood the gravity of those admissions, whether full responsibility lies with United States Attorney Weiss or Attorney General Garland is for Congress, the inspector generals and ultimately the public to decide. When I decided after October 7th to come forward and began researching whistleblower attorneys, I wanted to abide by the law in every way as I

navigated the complex taxpayer privacy and grand jury secrecy statutes.

I carefully followed the whistle blower process to the letter with the advice of counsel at every step. I am fortunate to be represented by Marc Lytle, a federal prosecutor for 25 years, including five years with the Department of Justice Tax Division. I'm also grateful for Empower Oversight, a nonprofit whistleblower group whose president, Trystan Levitt, was previously nominated by President Biden to the Merit Systems Protection Board and unanimously confirmed by the United States Senate.

While some have tried to paint me with a partisan brush, because this charitable organization employs some former staffers to GOP members on Capitol Hill, their expertise developed working for the patron saint of whistleblower Senator Chuck Grassley has been invaluable. Meanwhile, the Biden family attorneys appear to be representing Hunter Biden, President Biden and the Department of Justice and they are not working for free.

It has been reported in a public sources that there is a large fund paying for legal fees for Biden family attorneys. The source of those funds is unknown. They have virtually unlimited resources to pursue their agenda while my motives are questioned simply for finding competent representation from a small nonprofit that helps whistleblowers.

Groups such as Empower Oversight and Whistleblower Aid would only path to ensure whistleblowers like me are heard and receive competent advice. My intention was not to be your sole source of information and I implore you to take the necessary steps to obtain as much evidence as possible from as many sources as possible to be able to fully inform your conclusions.

I'm confident that after you have done that, both sides will find serious issues with the Hunter Biden investigation that closely aligned with my testimony. No matter your party, I am not your opposition. I am here with information for you to examine and investigate and determine whether more action is warranted on your part.

I am on your team whether we agree on every politically sensitive issue or not. There is no benefit for me blowing the whistle on this case. Absolutely, none. I have no book deal and the only money that goes into my bank account every two weeks is from my employment for the federal government. I am still a supervisor leading a group of 12 fantastic agents working complex international investigations.

Unfortunately, to this day, my immediate supervisors are retaliating against me for making protected disclosures. Even last fall, Biden family attorneys attacked investigators in the pages of The Washington Post and threatened to prosecutors with and threaten the prosecutors with career suicide if they brought charges against the president's son.

Then one of the Biden family attorneys sends to the press a ten-page error filled letter, it attacked me with innuendo false statements and baseless speculation that had leaked -- that I had leaked information to The Washington Post. These statements by Biden family attorneys are false. In conclusion, the American people for whom this body works, I implore you to look at the facts, not agenda-laced statements from either side of the aisle.

I am the average American citizen who worries about how I will send my kids to college and if I ever have enough money to retire, just like most people watching this today. I am the person -- the first person of my family to go to college. It was not an Ivy League school and I don't have a network of rich and powerful friends to help me weather the storms of retaliation and character assassination.

I am putting myself at risk for the American people who support me and for those who do not. At the end of the day, I'm just a small town kid from Norwich, New York who worked hard to get where I am and will never compromise my integrity. I will never forget who I am, where I come from or all the people in my life who have made me who I am today.

Thank you all for your time.

JAMES COMER:
Thank you both for those excellent opening statements. We'll now begin the questioning phase and I'll begin questioning. We'll start with Mr. Ziegler. Here on the committee we focused on following the evidence, specifically the money trail through bank records and suspicious activity reports and I want to discuss with you specific payments made to Hunter Biden and the Biden family.

Democrats and the left-wing media are also saying there's no evidence. Let's get into the evidence, Mr. Ziegler. I want to direct you to pages 99 and 100 of your transcript. How much money did Hunter Biden and his associates receive from the Romanian company you identified?

JOSEPH ZIEGLER:
So that amount would be from Romania, so the approximate total transfers from the Romania company would have been $3.1 million to everyone.

JAMES COMER:
$3.1 million. How much did Hunter Biden and his business associates receive from State Energy HK Limited through the Robinson Walker LLC?

JOSEPH ZIEGLER:
So total transfers from State Energy HK to Rob Walker was $3 million.

JAMES COMER:
$3 million. Was there a $100,000 payment from CDFC Infrastructure to a Owasco PC, Hunter Biden's professional corporation?

JOSEPH ZIEGLER:
Yes, Chairman.

JAMES COMER:
Approximately how much was transferred to Hunter Biden and his business associates through Hudson West III?

JOSEPH ZIEGLER:
So, the total transfers from Hudson West III to everyone was $3.7 million.

JAMES COMER:
$3.7 million. How much money did Hunter Biden and his business associates receive from

the Ukrainian company Burisma?

JOSEPH ZIEGLER:
Burisma paid to everyone involved $6.5 million.

JAMES COMER:
$6.5 million. Burisma also paid Blue Star Strategies and a law firm hundreds of thousands of dollars bringing the total Burisma payments to over $7 million. Is that correct?

JOSEPH ZIEGLER:
That is correct, $7.3 million.

JAMES COMER:
$7.3 million. Between 2014 and 2019, this brings the total amount of foreign income streams received to approximately $17 million, correct?

JOSEPH ZIEGLER:
That is correct.

JAMES COMER:
What was the purpose of analyzing money from foreign sources and do you have documents to support your findings?

JOSEPH ZIEGLER:
So, for the purpose of documenting the foreign sources is we -- as a part of a normal international tax investigation, we have to figure out where the money's come -- coming from. You have to follow the money trail and as a part of that process we have to follow different transactions, identify different foreign entities that might be paying a person and then we go and get those records.

JAMES COMER:
Right. And hopefully you can provide that to the -- to the committee?

JOSEPH ZIEGLER:
So, yeah -- yeah, any -- any records regarding those transactions we can --

JAMES COMER:
-- We love evidence on this side of the week in the aisle. On page 80 of your transcript, you identified other Biden family members who received relevant payments to your investigation such as the grandchildren. Can you explain why you wanted to interview them?

JOSEPH ZIEGLER:
So, as a part of the investigation, you want to interview people who might have received money, people who might have had deductions that were deducted on the tax return. So

there's -- there's a multitude of reasons why you would want to talk to family members.

JAMES COMER:
Is it common for grandchildren to receive money from foreign nationals and significant business wires?

JOSEPH ZIEGLER:
So, I don't know the reason or I don't know what's behind any of these payments that might have been made to specific family members, but I can just speak to what was paid -- what was in the -- what was in our transcript.

JAMES COMER:
Thank you. I would invite the media here today to review the committee's bank records memorandum, which closely matches the IRS figures. We will have a supplemental memorandum discussing payments from the Ukraine, Russia and other sources very soon based on bank records we've recently received, but haven't disclosed yet.

Sir, you've confirmed for me what I've been saying all along. The committee is accomplished in five months what it took the Department of Justice five years to figure out. Mr. Shapley, I want to turn to President Biden. You've stated to CBS Evening News that there were certain investigative steps you were not allowed to take that could have led to President Biden.

Can you tell us what investigative steps related to President Biden that you wanted to take, but you couldn't?

GARY SHAPLEY:
So, there are multiple instances in this investigation where there are references to -- to the father of the subject, President Biden. And in the course of any normal investigation when the subject's father is somehow related to the finances of the subject, in the normal course of any investigation, we would have to go and get that information to properly vet the financial flows of money in that investigation to determine what we end up charging.

JAMES COMER:
There was a tweet or a message in the laptop from Hunter Biden to Kevin Dunn who was with CDFC and it said, quote, "The Bidens are the best I know at doing exactly what the chairman wants from this partnership." Now, the chairman he's referring to is Chairman Ye of CDFC, Is that correct?

GARY SHAPLEY:
In that stream, I believe so, yes.

JAMES COMER:
So what -- can you tell me what the Bidens are best at? Do you understand what -- what he would have meant by that? I mean, the -- this is a Chinese company and I think the ranking member referred to it with Gal Luft. It's the same entity that paid Gal Luft the money that he got indicted for for being an unregistered foreign agent, I believe was was the charge.

But this -- this is another solicitation from Hunter Biden and he refers to the Bidens plural and they're best at doing what the chairman wants. I think that's very concerning to our committee because this is a Chinese Communist Party-owned entity. This is of concern to our national security and I didn't know in closing if you had any information with respect to that comment there.

GARY SHAPLEY:
With respect to the WhatsApp messages, it was something we clearly needed to follow up on and that was really one of the major deviations from in this case is that is that investigators asked and Special Agent Ziegler asked to follow to take some investigative steps to review that and it just simply wasn't supported by the prosecutor.

So for further delving into what that means, I just simply can't do.

JAMES COMER:
Well, I can promise you we're not going to stop on this committee until we understand what he fully meant by that message to a Chinese Communist Party official.

JOSEPH ZIEGLER:
Mr. Chairman, can I say something?

GARY SHAPLEY:
Yes, please.

JOSEPH ZIEGLER:
So, thank you for that question. What any -- that -- there was a long WhatsApp message contained in that that was only a portion of it. So, what we -- what we can do or what we can go back is we can turn that over to the House Ways and Means Committee, they can vote to release it and then that information can be available for you.

JAMES COMER:
Thank you. Thank you very much. I now yield to Ranking Member Raskin.

JAMIE RASKIN:
Thank you, Mr. Chairman. I want to thank both the witnesses for their testimony and for appearing with us today. It seems to me that a lot of your testimony has been about the problem of prosecutorial discretion and the traditional tug of war between investigators who characteristically want to charge as many offenses as they've come across and prosecutors who are more attuned to the rigors of the courtroom and the complexity of forensic evidence.

And I admit as a former state assistant attorney general, I see it more from the prosecutor's standpoint than the investigators' standpoint. But, Mr. Shapley, would you concede that there are lots of crimes that are identified by investigators that are not actually charged by prosecutors routinely? For -- I'll give you an example.

In the recent prosecution -- the recent indictment of Donald Trump for retaining government documents that he unlawfully took according to the indictment. He was charged only with

possessing those documents that were recovered after the August 2022 search warrant. But he had hundreds of documents that were recovered before that, 15 boxes that were recovered in January and then after the grand jury subpoena in June.

But the prosecutors decided not to charge any of those as offenses. They said they were going to take the most egregious offenses in charge of those. Is that unfamiliar to you that kind of decision by a prosecutor?

GARY SHAPLEY:
So, I can't speak to anything related to the Trump investigation, but, you know, the issue here with this case is that it wasn't just investigators that were agreed with these charges. In Exhibit Two in my testimony, it clearly shows a prosecution recommendation report where it says right in the document that the -- the assistant United States attorney's and Department of Justice Tax Division agreed with those recommended charges.

And -- and then again and as Special Agent Ziegler alluded to in late 2022 --

JAMIE RASKIN:
And they were recommended to whom?

GARY SHAPLEY:
To Department of Justice. So, the prosecution recommendation report is referred to the Department of Justice Tax Division for approval discretion or declination.

JAMIE RASKIN:
Right, but then it all went to the US attorney in Delaware, right?

GARY SHAPLEY:
So, that's not entirely accurate because Department of Justice tax division up through March 16th of 2023 had not yet approved, provided discretion or declined charges. So, US attorney Weiss had no authority to charge any of those charges without the Department of Justice Tax Division's approval beforehand.

JOSEPH ZIEGLER:
And I'd like to say something about this real quick --

JAMIE RASKIN:
-- Let me come back to you because I only have a limited amount of time and I've got questions for you. But we -- in fact, Mr. Ziegler, you say that Hunter Biden's unpaid taxes were around $2 million and he's now paid those back taxes, as I understand it. And he's been criminally charged for not paying taxes.

Will you just explain how people can be charged for not paying taxes even after they've made amends and gone forward to pay them?

JOSEPH ZIEGLER:
So, under the statute, the -- when someone fails to timely pay their taxes, usually due April

15th. Once that date occurs, they -- they have a known tax liability and they failed to pay it. The crime has already been committed. The fact that they paid the taxes after that's a mitigating factor that the judge can use their discretion at sentencing.

But I would like to make one reference that this does not include the -- the over $100,000 in additional tax due and owing that was not charged related.

**JAMIE RASKIN:**
No, you made yourself clear, you thought there were additional charges that were laid on the table and not pursued by US. Attorney Weiss, the Trump appointee. But, Mr. Shapley, you testified that the critical moment in your decision to blow the whistle in the Hunter Biden investigation was the October 7th meeting 2022 that you had with US Attorney David Weiss.

And up until that point, you say you were willing to chalk up the differences with prosecutors to the typical, quote, "investigator versus prosecutor type thing," which is what I think this is all about. But you say on page 28 of your transcript, "If I wasn't in the October 7th meeting, my red line might not have been crossed." And I think you reaffirmed that today.

Now, as I understand it, what crossed your red line is that in that meeting you understood Mr. Weiss to be saying that he did not have the authority to bring charges in DC or California without the approval of the US attorneys for those districts. Is that right?

**GARY SHAPLEY:**
That's correct.

**JAMIE RASKIN:**
OK, but in a letter that he sent to Chairman Jordan in June, US Attorney Weiss stated and I quote, "I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges." He went on to explain that in considering charges in districts outside Delaware, usual DOJ practice would be, quote, "to contact the US Attorney's office for the district in question and determine whether it wants to partner on the case." Now if that office declined, he would request and be granted authority to bring the charge himself under, quote, "special attorney status from the Attorney General pursuant to 28 USC Section 515." Now, to try to clear this up, Mr. Shapley, let's go back to March 2022 when as you explained on page 153 of the transcript, the US attorney for DC declined to partner with Mr. Weiss to bring the 2014 and 2015 charges in DC. After that decision by the US Attorney for DC, Mr. Weiss continued to discuss those charges with all of you.

In fact, Mr. Ziegler, on page 39 of your transcript, you described how in September 2022 you had a meeting in which US Attorney Weiss expressed some concerns about those charges, including that in 2015 Hunter Biden was in the throes of his drug addiction after the death of his brother and in that meeting Mr. Weiss tells you and I quote, "I'm still weighing it." Now, Mr. Ziegler In September 2022, Mr. Weiss was telling you that he was the one weighing whether to bring the 2014 and 2015 charges, isn't that -- isn't that correct?

**JOSEPH ZIEGLER:**
That is correct.

**JAMIE RASKIN:**

Now, coming back to the October 7th 2022 meeting, Mr. Shapley. According to you on page 155, Mr. Weiss said that, quote, "He decided not to charge 2014 and 2015." It seems to me this October 7th, 2022 meeting which you've described as a red line is just a misunderstanding. That after the US attorney in DC declined to partner on the '14 and '15 charges, Mr. Weiss took a good hard look at those charges himself and ultimately decided not to charge them and therefore not to seek the special attorney status.

He may have been right about that. He may have been wrong, as you guys make your case for, but it was his decision, isn't that right Mr. Shapley.?

GARY SHAPLEY:
No, that's not supported by the facts.

JAMIE RASKIN:
Really. Which facts is it not supported by?

GARY SHAPLEY:
His own admissions and the October 7th, 2022 meeting that I documented contemporaneously and the only piece --

JAMIE RASKIN:
But he contradicts what you're saying. Do you agree that? He doesn't agree with what you're saying about that meeting. Now, I wasn't at that October 7th, 2022 meeting, but what was said at the meeting over two and a half years ago may be a little ambiguous or unclear today. Mr. Weiss's letter to Chairman Jordan could not be more clear.

He had, quote, "ultimate authority over this matter including responsibility for deciding where, when and whether to file the charges." So, if there's any ambiguity, it's got to go to US Attorney Weiss, Donald Trump's handpicked, US, attorney for Delaware. I yield back Mr. Chairman.

JAMES COMER:
Gentleman, yields back and now recognize Chairman Smith.

JOSEPH ZIEGLER:
Chairman Smith, can I say something real quick on that? I have two things that I wanted to bring up. So, there are a lot of different tax cases out there that include misdemeanors and felonies. And there's a lot of reasons why we charge the felony. We might charge the misdemeanor. But I want to be clear on this that when you have a felony charge with the misdemeanor that you have to charge the felony.

And in this case, they did not charge that felony. And then there's one more points of this. We had a meeting with all four --

JAMIE RASKIN:
Excuse me -- when you say when you say you have to charge the felony, that is a Department of Justice rule, you're saying?

JOSEPH ZIEGLER:
That is in their manual that you have to charge the felony in order to avoid an equitable treatment of taxpayers.

JAMIE RASKIN:
No, but you're saying whether or not the evidence supports it?

JOSEPH ZIEGLER:
That is a part of that is in that analysis is whether the evidence, but that's -- that goes back to the point of that if the certain deductions that were taken -- the certain deductions that were taken on the tax return, that's for you guys to decide whether the felony was there or not. But the point is, is that we're bringing --

JAMIE RASKIN:
-- That's for the US attorney to decide and I'm afraid we're not going to be able to investigate every tax case in America.

JAMES COMER:
Gentleman's time has expired. Now chair now recognizes Mr. Smith from Missouri.

JASON SMITH:
Thank you, Mr. Chairman. Mr. Shapley, Mr Ziegler, I want to thank you both again for your testimony and your willingness to come forward and tell the truth for the American public. And I apologize of the behavior of some of our colleagues and how the press has treated you for doing what is right, so the American people can see it. Mr. Shapley, included in the documents you provided to the Ways and Means Committee is a document labeled Exhibit Two in the transcript of your testimony, which is a portion of a special agent report.

This document is located following page 41 of the transcript, this one. What is this document and what recommendations are made in this document?

GARY SHAPLEY:
Yes, so this is the prosecution recommendation report that IRS CIA agents produce at the end of an investigation when they're going to recommend prosecution to the Department of Justice. This was authored by Special Agent Ziegler and it's an incredibly robust document. There's -- there's several thousand pages because each of these -- the facts and the elements in this, in this particular report, the elements of each violation show which piece of evidence meets that element.

So, in this report, it recommended felony charges for 2014, 2018 and 2019 and misdemeanor charges for 2015, 2016, 2017, 2018 and 2019. And it further shows that Special Agent Ziegler spoke with prosecutors and worked hand in hand with prosecutors while this was being drafted and they clearly agreed that the elements of these violations were met and they supported this document.

And when it was sent to Department of Justice Tax Division for approval on February 25th, 2022.

JASON SMITH:
Mr. Shapley, what level of confidence does the IRS need to have to recommend charges like the felony counts listed in this document?

GARY SHAPLEY:
So, I mean, each each violation has each element listed in this report and the evidence is shown underneath each of it. This report goes through internal departments, IRS criminal investigation and in addition to the prosecutors agreeing that the evidence supported charging felony counts the senior leadership up to the director of field operations.

The IRS criminal investigation also personally reviewed this report and approved it to be sent to the Department of Justice Tax Division.

JASON SMITH:
So, were you surprised that on June 20th, 2023, prosecutors announced a plea agreement with Hunter Biden under which he would only plead guilty to violations of two misdemeanor charges?

GARY SHAPLEY:
So, the guilty plea is outside of my control, but what I can say is it's not what an investigator thought. It's not what specialty Ziegler. I thought that felony charges were proven in this case, the prosecutors again and again agreed with that assessment and attorney general assisting -- I'm sorry, United States Attorney Weiss also agreed with these because he went to the DC US attorney to ask him to partner.

You don't ask someone to partner with you if you don't yourself agree with those charges and when he got denied that he requested a special authority and was declined as he said in the October 7th, 2022 meeting.

JASON SMITH:
Yeah, in the -- in the -- the report that we just highlighted as Exhibit Two it states in there that even Leslie Wolf agreed with these charges moving forward, the assistant prosecutor. Mr. Ziegler, on page 32 of the transcript of your testimony, you discussed the need to interview Hunter Biden's adult children regarding certain deductions that you listed earlier of Hunter Biden included on his tax returns.

You also testified that Assistant United States Attorney, Leslie Wolf, told you that you would get into hot water if interviewed the president's grandchildren. In other cases that you've worked over your career, have you ever had a prosecutor tell you that you couldn't interview a relevant witness?

JOSEPH ZIEGLER:
So there are -- there are certain things that come in to whether we talk to a witness or not. So, if they're an attorney, if there is some special situation that might come up that might cause caution to interviewing that witness. But I've never been told that we couldn't approach someone to interview them as a part of an investigation.

Yeah, I mean, there's -- there are certain situations to where you have to do a further

analysis of the information that you might get if like I said, if they're an attorney. But yeah, so in this case we needed to -- to -- to talk to witnesses related to things that were deducted on the tax return and in this case it was the adult children that we needed to talk to.

JASON SMITH:
Thank you, Mr. Chairman. I see my time expired.

JAMES COMER:
Gentleman, yields back. Chair now recognized Mr. Krishnamoorthi from Illinois for five minutes.

RAJA KRISHNAMOORTHI:
Thank you, Mr. Chair. Thank you, Mr. Shapley. Thank you, Mr. Ziegler, for your service to this country. Really appreciate you coming here and appearing in this capacity. First of all, Mr. Ziegler, I see at page 12 of your transcript -- deposition transcript you start laying out a series of concerns that you had with regard to various people and different issues related to this investigation.

You say quote, "I started this investigation in November 2018 after reviewing bank deposits." Then you later say career IRS staff were not initially supportive of starting the investigation. Of course in November 2018, Joe Biden was not the President, correct?

JOSEPH ZIEGLER:
Joe Biden was not the president, correct.

RAJA KRISHNAMOORTHI:
And then at page 20, you lay out another concern. You had a concern about Bill Barr, Attorney General Bill Barr, consolidating the series of cases into the US attorney's office in Delaware. At that point you said quote, "What was the potential issue I saw with working the case in Delaware? We were working with a small US attorney's office who might not have ever worked a case of this caliber." Now of course, Bill Barr was appointed by Donald Trump, correct?

JOSEPH ZIEGLER:
Yes, that is correct.

RAJA KRISHNAMOORTHI:
Now, let me turn to another concern that you lay out in your testimony. You were concerned about the quality of the prosecutors. On page 14, you say quote, "The prosecutors were the JV squad and they weren't up to the task of handling such a big case." Now sir, US Attorney Weiss was also appointed by Donald Trump.

Right?

JOSEPH ZIEGLER:
So as far as the actual nomination and what went into why --

RAJA KRISHNAMOORTHI:
I'm not asking you why. I'm just saying US DA Weiss was an attorney appointed by Donald Trump, correct?

JOSEPH ZIEGLER:
That is correct.

RAJA KRISHNAMOORTHI:
OK. Now, another concern you lay out in your deposition at page 21. You talk about your concerns about this investigation having been made overt, being publicized for the world to know. You said quote, "One of the first disagreements I recall between the IRS investigators and prosecutors was the idea of going public." Now, sir, this was in March, April 2019. Joe Biden was not the president then was he?

JOSEPH ZIEGLER:
So, I don't recall the exact date of when he announced that he was going to run for presidency, but I know that --

RAJA KRISHNAMOORTHI:
That's not my question, sir. Joe Biden was not the president in March, April 2019, correct?

JOSEPH ZIEGLER:
That is correct.

RAJA KRISHNAMOORTHI:
Now, Mr. Shapley, let me turn to you for a second here. You also raise a series of concerns in your deposition transcript. One is this, you said you were concerned about the complexities of the election cycle and potential delays that arose in connection with the election cycle. You said at page 23, "And I remember there were always times where we were always on an impending election cycle.

It was always the elections being brought up in early 2020. It was the presidential primaries. Now, Sir Joe Biden was not the president at that time, either was he?

GARY SHAPLEY:
I mean, the answer to your question is no, he was not, but I don't see where you're referenced it in my, you know --

RAJA KRISHNAMOORTHI:
Page 23. You were talking about how the election cycle is delaying decisions by the prosecution and it turns out that the delay in the election cycle was happening at a time when Joe Biden was not the president.

GARY SHAPLEY:
I'm sorry, sir. That's in Special Agent Ziegler's transcript. That's why I couldn't find it.

RAJA KRISHNAMOORTHI:

So, Mr. Ziegler, and you shared concerns about delays related to the election cycle, but at that time, Joe Biden was not the president.

JOSEPH ZIEGLER:

I believe at that time he was the nominee for president.

RAJA KRISHNAMOORTHI:

Well, he was not the president, was he? It's just a simple question, sir.

JOSEPH ZIEGLER:

Can you rephrase -- what time period?

RAJA KRISHNAMOORTHI:

Joe Biden was not the president in the presidential primaries in 2020?

JOSEPH ZIEGLER:

Correct, That is correct.

RAJA KRISHNAMOORTHI:

Sir, finally, Mr. Shapley. You said that warrants were ready as soon as April 2020 to begin searching for records, but actions weren't taken with regard to those warrants. Again, Joe Biden was not the president in April 2020, was he?

GARY SHAPLEY:

So, I'm confused by a line of questioning. We're talking about an election to which now President Biden was a part of, so he didn't have to be the president to have election meddling.

RAJA KRISHNAMOORTHI:

No, but the question is this, was he the president at that time in April 2020?

GARY SHAPLEY:

The -- that's been asked and answered.

RAJA KRISHNAMOORTHI:

And what's the answer, sir?

GARY SHAPLEY:

The election -- the election --

RAJA KRISHNAMOORTHI:

The answer is yes or no.

GARY SHAPLEY:
The answer is no.

RAJA KRISHNAMOORTHI:
Thank you. Thank you. I will yield back.

GARY SHAPLEY:
Mr. Chairman, may I finish.

JAMES COMER:
Please. You may answer the question.

GARY SHAPLEY:
So, it's clear that he was not the president, but an election is for the purpose of electing a president. And Joe Biden at the time was a nominee for president of the United States. Therefore, the election clauses with DOJ policy took place and were in effect and it wasn't until September 4th of 2020 that the Department of Justice Public Integrity said that we can no longer take any actions on that case.

And in as early as April -- and as early as April or April to June of 2020, the Department of Justice, Delaware US Attorney's office was already invoking the election as a reason not to perform those search warrants and that --

RAJA KRISHNAMOORTHI:
-- Was Donald Trump --

JAMES COMER:
Gentleman's time has expired. We've got a lot of questions here. Chair now recognizes Mr. Jordan of Ohio.

JIM JORDAN:
Thank you, Mr. Chairman. Last month, David Weiss sent me two letters. In the first letter on June 7th. He said I have been granted ultimate authority over the matter including responsibility for deciding where, when and whether to file charges. The quote that the ranking member just put up. Later that same month, he sent me the second letter where he said no, I don't know.

I don't have that charging authority. So, June 7th, he says I'm the boss, I can do whatever I darn well want follow wherever I want. And then June 30th, he says no, I can't. What happened in between those two events? Your testimony went public. He goes, oh my goodness, I got to change my story because now the truth is coming out.

And it sounds like in this investigation to me, Mr. Shapley, that the prosecutors and the investigators were in agreement for most of the investigation and then we get to October of 2022. I see Mr. Ziegler nodding his head. And that meeting is where David Weiss told you something. Is that right, Mr. Shapley?

GARY SHAPLEY:
Yes.


JIM JORDAN:
What did he say? Can you put your mic on there? What did he say?


GARY SHAPLEY:
Yes, he told me he was not the deciding person on whether or not charges were filed. He told us that DC US attorney had declined to allow charges. He told us that he had requested special counsel authority from Maine DOJ and denied --


JIM JORDAN:
-- That were denied.


GARY SHAPLEY:
That's correct.


JIM JORDAN:
Were you the only guy in that meeting?


GARY SHAPLEY:
I was not.


JIM JORDAN:
How many other people were there?


GARY SHAPLEY:
There were seven total people including me.


JIM JORDAN:
You and Mr. Weiss and five others, right?


GARY SHAPLEY:
That's correct.


JIM JORDAN:
And did any of them -- have any of them come forward and say what you just said is not true?


GARY SHAPLEY:
They have not.

JIM JORDAN:
No one has, right?

GARY SHAPLEY:
That's correct.

JIM JORDAN:
No one is -- No one is disputed refuted, no one said what you said is not true. And did you memorialize what took place in that meeting? Did you memorialize that?

GARY SHAPLEY:
Yes, I did that day when I returned home from the Delaware US Attorney's office, I put it in an email to the two senior executives at my agency.

JIM JORDAN:
You put it in an email that day.

GARY SHAPLEY:
That's correct.

JIM JORDAN:
Contemporaneous from when it happened, I got the email here. It's Exhibit 10 in your testimony when you were interviewed by the Ways and Means Committee, October 7th, Friday after -- Friday evening 6:09 p.m. That email, right?

GARY SHAPLEY:
That's correct.

JIM JORDAN:
Sent to Mr. Walden [Ph] and Mr. Bagdorf [Ph]. Who are those individuals?

GARY SHAPLEY:
Mike Bagdorf is a director of field operations for Southern Division of IRS CI and Darryl Walden was the special agent in charge of the Washington DC field office.

JIM JORDAN:
These are your bosses, right?

GARY SHAPLEY:
That's correct.

JIM JORDAN:
Did Mr. Walden get back to you?

GARY SHAPLEY:
Yes, he did.

JIM JORDAN:
Remember what he said?

GARY SHAPLEY:
He said, "Thanks, Gary, you covered it all."

JIM JORDAN:
You covered it all he didn't say. Thanks, Gary, but you're wrong. That's not what happened. He affirmed what you said. You covered it all and you laid it out, you spelled out just what you told me a few minutes ago, right?

GARY SHAPLEY:
That's correct.

JIM JORDAN:
What Mr. Weiss told you in that meeting and when that goes public on June 22nd, last month, Mr. Weiss says, oh, I got to change my story. I better send a letter to the Judiciary Committee where he says I stand by what I wrote. But I wish to expand, I wish to fix it and then he had to further go go further in July when he talked to -- when he sent a letter to Senator Graham and said to clarify again.

They've changed their story, you guys haven't. What do you think happened? What do you think Mr. Weiss was consistent with the investigators up until this October 7th meeting and then he changed. What do you think happened, Mr. Shapley?

GARY SHAPLEY:
I mean, I don't know -- I don't know what happened internal at Department of Justice, but what I can say is that -- is that the story has been changing from Department of Justice and US Attorney Weiss. And I think the only person that's really had any documents that have been corroborated in my own.

JIM JORDAN:
Exactly. I think what happened, I think it's obvious anyone with common sense can see what happened because he said it in Mr. Graham's letter, he said I had discussions with Main Justice. I had discussions with the folks, the big -- the deputy attorney general, the attorney -- whoever was, I don't know, but he had discussions with the people at Main Justice and suddenly things change.

And that all became evident on October 7th and until October 7th, the investigators, to Mr. Ruskin's point, the investigators and the prosecutors they were in agreement. Here are the facts. Here's how we do it. Here's how we've always done it. We got the two best agents in the place on the case, let's go and then, shazam, something changes.

And I think it's what Mr. Weiss conveyed to Senator Graham when he said I had discussions with folks at Main Justice. We don't know what we're in those discussions, but it looks pretty obvious what happened, looks pretty obvious. Initially everyone was pounding their chest. David Weiss has complete authority.

Now suddenly he doesn't -- he doesn't because you guys came forward and told the truth. I yield back.


JAMES COMER:
Chair now recognizes Mr. Lynch from Massachusetts.


STEPHEN LYNCH:
Thank you, Mr. Chairman. First of all, I want to thank the witnesses for their willingness to work with the committee and help us with our work. I am surprised though this seems to be a new level of hypocrisy here. As a long standing member of this committee, I think most of the members who have served a long time here know full well, what -- what political interference and what sweetheart deals look like?

And I think context is very important. In 2017, we had a situation where a former national security adviser and Trump campaign surrogate Michael Flynn was indicted. Indicted by a federal jury -- federal grand jury. He pled guilty twice and he lied to FBI agents about his communications with the Russian government prior to the inauguration of President Trump.

He was only national security adviser for 22 days. But my colleagues on the other side of the aisle had no interest, zero -- zero interest in looking into that case. And in response, the president at the time, President Trump, repeatedly and publicly attacked the case and the agents who brought it, including by claiming that Mr. Flynn was the victim of a quote -- of quote, "dirty filthy cops at the top of the FBI," close quote.

He also described the prosecution as a disgrace and claimed that those who invested investigated Mr. Flynn were guilty of treason. Those are public statements made by a sitting president attacking the FBI. And despite the fact that Mr. Flynn pleaded guilty twice to lying to the FBI, President Trump's attorney general, William Barr, personally intervened in the case.

And that led the Department of Justice to abruptly reverse course and have the case dismissed on grounds that a federal judge found dubious to say the least. And that's a quote from the judge. In the case of longtime Trump associate and adviser, Roger Stone, a federal jury found him guilty in 2019 of obstructing a Congressional investigation into Russian interference in the 2016 Presidential election by lying to Congress and witness tampering> In response, a sitting president, President Trump, immediately took to Twitter attacking the Department of Justice and accusing them of employing a, quote, "double standard" and committing a quote, "miscarriage of justice." President Trump also publicly attacked the department's sentencing recommendation for Mr. Stone leading senior officials to overrule the federal prosecutors who had investigated and brought the case.

So, this blatant political intervention not complained of at all by my Republican colleagues at the time, caused those prosecutors some of them to resign or withdraw from the case. President Trump even congratulated former Attorney General Barr for interfering. That's what political intervention looks like and we know it on this committee.

And in the case of former Trump campaign chairman, Paul Manafort, who worked to elect a

pro-Kremlin president in Ukraine and was convicted in 2018 of bank and tax fraud, ultimately ultimately pleading guilty to conspiracy against the United States and conspiracy to obstruct justice. President Trump deemed it, quote, "a very sad day for our country." And in terms of sweetheart deals, in December of 2020 at the end of his term, President Trump granted full pardons to his close allies, his pals Flynn, Stone and Manafort allowing them to escape accountability.

For the numerous crimes, now that -- that -- that is a sweetheart deal. They got away with everything. Not like Hunter Biden who's pleading guilty to the reputational damage and embarrassment to his family. The widely publicized facts of his drug addiction and this was a Trump-appointed uUS attorney that prosecuted this for four years.

And President Biden did not seek to remove him, which normally happens when a new president comes into office. He has the full right to remove them, never did so. Mr. Chairman, I yield back.


JAMES COMER:
Gentleman yields back. Chair now recognized, Mr. Timmons, from South Carolina.


WILLIAM TIMMONS:
Thank you, Mr. Chairman. I'm going to try to help simplify this for the American people. We are here today because our institutions are broken. The DOJ, the FBI, the IRS have transformed from a balanced apparatus of justice into the political weapon of the left, a process that I believe began during the Obama administration.

They actively pursue individuals based on their ideological beliefs. Specifically, targeting Donald Trump who pose a significant threat to the political left. Upon his election, the bureaucratic resistance didn't stop. Their hatred for Trump permeated throughout their work attempting to cripple his administration almost every turn and for the last 30 months, the DOJ, the FBI and the IRS have worked to not only protect the criminal actions of the Biden family, but to continue persecuting President Trump.

Some describe this as a two-tier system of justice, but what it really is, it's a system deliberately and systematically prosecuting individuals within the Trump orbit due to their hatred for President Trump simultaneously crimes of the current president and members of his family, all while issuing selectively timed and perfectly planned indictments against President Trump.

Today, we are joined by two whistleblowers from the IRS. There are also whistleblowers from within the FBI and the DOJ. All these people are stepping forward now because after the 2022 election, the American people have entrusted the House majority to Republicans granting US subpoena power. With gavels in hand With gavels in hand, we now possess crucial evidence just months into our investigations.

The American people can see plain as day the corruption, bribery and criminal actions of the Biden family. We are here to do the jobs that the DOJ, the FBI and the IRS refuse to do. They have failed to fulfill their duties and properly investigate the Biden family and their international bribery schemes which resulted in million dollar payouts.

I want to again thank you both for coming forward. I cannot imagine how difficult this has been on you and your family. I think the best use of my time is to help simplify the complex

scheme for the American people, help do the job that DOJ IRS and FBI, they just refused to do. We talk about China, we talk about Romania, Ukraine.

It all seems complicated, but this scheme was born in 2014 in Ukraine and then replicated in other countries. Ukraine is the proof of concept, if you will. This is the scheme simple foreign client has a problem, pays a Biden -- Vice President Biden travels to the country, Vice President Biden leverages US influence to force a favorable outcome for the client.

The Biden family earns their fee. That's the scheme -- that's the scheme. So, let's just start with Ukraine, so I can just show you the proof of concept. I'm going to walk you through the timeline in 2014. Burisma has a problem. They want to get their stock listed on Wall Street, but the prosecutor general is investigating corruption and they can't get the outcome they want in New York.

So, what do they do? They hire Hunter Biden pay a millions of dollars. Mr. Ziegler, my only question for you is going to be, if I can direct you to page 99 of your transcript, is it accurate to say Hunter -- Hunter Biden received millions of dollars from Burisma?


JOSEPH ZIEGLER:
Yes, that would be accurate.


WILLIAM TIMMONS:
Thank you. To the American people, I want to point out briefly that Hunter Biden has absolutely zero qualifications in this industry or in business in general. But he does have the big guy. November 2nd, 2015 in an email to Hunter, Burisma executive says that he's demanding a high-level US official visit Ukraine to force out Shokin.

This is in an email obtained from Hunter Biden's laptop. November 14th, 2015, Hunter Biden confirms the big guy's on the way, Vice President Biden's coming have no fear. December 7th through 9th, Biden has an official visit, he's using US tax dollars, threatens President Poroshenko to withhold $=1 billion loan guarantee if Shokin isn't fired.

He lied about this during the campaign. He specifically said it wasn't true. Sure enough, Shokin's fired. If you have any questions about whether he fired him, January 23rd of 2018, he brags about it years later. Ladies and gentlemen, American people, that's the scheme. That is the proof of concept. They replicated it again and again because they never dreamt Biden would be president.

No one did, but he is our president and because of his actions because of him selling policy decisions to adversaries abroad for personal gain, he is vulnerable. He is vulnerable and our national security is vulnerable because of it. We are not here to prosecute Hunter Biden. We don't care about Hunter Biden.

We care about our country's national security decisions and whether our president is compromised. That's why we're here. That is why we're here. With that, Mr. Chairman, I yield back.

JAMES COMER:
Gentleman, yields back chair. Now recognize Mr. Connolly from Virginia.

GERRY CONNOLLY:

Thank you, Mr. Chairman, and thank you both for being here today. My friend from South Carolina said he was going to simplify it for the American people. I think he succeeded, so simple as to be unrecognizable. And if we're going to talk about Ukraine and Burisma, let's remember that the president of the United States, not Joe Biden, Donald J. Trump was impeached over a phone call to the president of Ukraine wanting to get dirt on this very subject, on this very individual with this very company and -- and withheld military equipment desperately needed, as we now know, including Javelin missiles which are very useful in anti-tank warfare to get it, for which he was impeached quite correctly.

But my friends in that side of the aisle all voted against that. They had no problem with that kind of interference that directly affected national security. Mr. Shapely and Mr. Ziegler, you both testified about the fact that you've been subject to criticism, ridicule, public disclosure, perhaps menacing comments because you've come forward.

Is that correct?

GARY SHAPLEY:

A medicine comments?

GERRY CONNOLLY:

No -- no -- no.

GARY SHAPLEY:

Oh, menacing comment.

GERRY CONNOLLY:

Menacing comments.

GARY SHAPLEY:

Yes, sir.

GERRY CONNOLLY:

And you, too, Mr. Ziegler?

JOSEPH ZIEGLER:

Yes, I have.

GERRY CONNOLLY:

Right, that must be a terrible feeling and whoever does that, I think you'd probably both agree, is doing a disservice to the country and to you individually. You're simply doing your duty as you see the -- the light. Fair enough?

GARY SHAPLEY:

Yes.

GERRY CONNOLLY:
Mr. Ziegler?

JOSEPH ZIEGLER:
I am doing my duty.

GERRY CONNOLLY:
Yes, so can you imagine how the district attorney in Fulton County, Georgia must feel? Or the district attorney in Manhattan must feel? Or the special counsel of the Department of Justice, Mr. Smith must feel when the very subject of an indictment or pending indictment takes to public rallies and ridicules them by name, disparages them by name, characterizes them by name, putting them and their families at the same risk you're experiencing?

If it's wrong for these anonymous people to criticize you, it must certainly be wrong that the former president of the United States would demonize people doing their jobs just like you try to do yours, as they see the light. You can disagree with their judgment, but it's not right to disparage their character.

And what's so ironic about this hearing, is again, not one mention on the other side of the aisle about that malign behavior by the very subject of the indictment. And speaking of interference, the American people know, President Trump pressured the Justice Department, which we're talking about here today, like, wouldn't that be wrong if someone did that, to go easy on his friend, Michael Flynn.

We know when President Trump's handpicked attorney general, William Barr took the reins, he pressured officials to reduce their sentencing for Roger Stone and glossed over Robert Mueller's 2016 presidential election report saying it exonerated the president. When, in fact, Robert Mueller explicitly said no, it did not and listed ten specific items of obstruction of justice he recommended be pursued and pointed out, lest we misunderstand the pursuit part, he couldn't indict a sitting president according to DOJ guidelines.

But he said in his report, an enterprising district attorney once that president left office might want to pursue it. According to recent reporting in The New York Times, former President Trump explicitly told US Chief of Staff, John Kelly, that they, quote, "ought to investigate and get the IRS on former civil servants that Mr. Trump considered his political enemies." Explicit testimony from his own chief of staff.

But again, absolute silence on the other side of the aisle, including from the Ways and Means Committee, which purports to be so concerned about any hint of interference by any political entity or individual over the pristine work of the Department of Justice and the IRS. An agent -- an agency, I might add another piece of irony of this hearing, that has been disparaged as the hobnob, you know, boot on the neck of the American taxpayer for so long by the majority and denied resources by the majority.

As we speak, they cut $24 billion in the debt ceiling compromise agreement out of the $80 billion we provided to, in fact, give you more resources to do your job. I yield back.

JAMES COMER:
Gentleman, yields back and we're going to have two more questions and at the request of

the witnesses at the -- at every 90 minute mark, we're going to take a ten minute bathroom recess. So, we'll recognize the next two questioners and then go to that recess. Right now, Chair recognizes the Representative Turner from Ohio for five minutes.

MICHAEL TURNER:
Gentlemen, thank you for being here. I appreciate your courage and I sure appreciate your dedication to the truth and your -- your sense of obligation. Surprisingly, my questions are actually going to be about your testimony in the subject matter as to why we're here. We're going to have a little shift to actually talk about what you're here for.

I'm going to cite specific spots of your transcript testimony for each of you, but I don't think you'll have to read the long. I'm going to do it for the purposes of the record. If I ask a question after having cited one and you want to refer to it and take a pause, please let me know, but I think pretty much we'll be able to follow along.

Mr. Ziegler, you stated on page 17 of your transcript that you started this investigation in November of 2018 after reviewing bank reports related to another case that you were working on on a social media company. Those bank reports identified Hunter Biden as paying prostitutes related to a potential prostitution ring.

Also included those bank reports was evidence that Hunter Biden was living lavishly through his corporate bank account. Mr. Ziegler, when you make this statement, did you actually review these bank statements? This is not knowledge, in other words, that you got from someone else that someone is relating to you what they said, you've actually looked at these documents?

JOSEPH ZIEGLER:
That is correct. I actually looked at them.

MICHAEL TURNER:
Mr. Shapley, you testified on page 57 concerning the 2014 tax report that Hunter Biden -- what Hunter Biden did is that he told Burisma to send that income to Rosemont, Seneca, Bohai and that when the money came back to him, he booked it as a loan. You then go on to testify that it should have been taxable as soon as it became income from Burisma to Hunter.

And whatever he did with it, after that was really just a scheme to evade taxes for that year. You had that Rosemont, Seneca, Bohai and did not book this as a loan itself. So, Biden is treating it differently than they did. Did you look actually at those records? Is this actually your -- your viewing of them to make this to create this testimony?

GARY SHAPLEY:
Yeah, I looked at the evidence, with Special Agent Ziegler would be the expert that saw every single piece, but yes, I saw that evidence.

MICHAEL TURNER:
So, Mr. Ziegler, you also looked at these -- these bank records respect to the 2014 tax payment from Burisma.

JOSEPH ZIEGLER:
Yes.


MICHAEL TURNER:
Mr. Shapley, you went on to say this is like textbook I learned at basic training nominee stuff and in all of these defenses it was alone got. You got to have a promissory note, you've got to have defined interest and you've got to have repayments, and none of them were included, So, Biden -- Hunter Biden claims this is a loan, but the company he got it from doesn't claim it as a loan.

There's no promissory note. There's no interest. There's no repayments, is that correct?


JOSEPH ZIEGLER:
That is correct. And they actually booked it -- Rosemont, Seneca, bohai booked it as a deduction.


MICHAEL TURNER:
As a deduction, meaning it would have been a payment to him and so it would have been deductible to them?


JOSEPH ZIEGLER:
Correct.


MICHAEL TURNER:
Income to him then payable with tax, excellent. So -- but it wasn't just the bank documents that that you looked at. You also had the opportunity to look at a memo from Eric Sherwin and Eric Sherwin was actually Hunter Biden's accountant. And, Mr. Shapley, on your testimony page 57, you included Exhibit 4, a memo from Hunter's accountant saying you're going to tax on this $400,000. So, you've got the accountant even agreeing with your position that this is income and that there should have been income tax paid on it.


GARY SHAPLEY:
A correction to that is that I did not provide this document. This was provided by the committee.


MICHAEL TURNER:
OK, excellent. Well, we have it then in the public testimony public record of his accountant agreeing. So, both of you I think indicate that the taxable amount of the $400,000 would have been about $125,000 that Hunter Biden would have had to pay on the $400,000 of income. Is that correct, Mr. Shapley?


GARY SHAPLEY:
Yes, that's correct.


MICHAEL TURNER:

Mr. Ziegler?

JOSEPH ZIEGLER:
Yes, that's correct.

MICHAEL TURNER:
And you've had no evidence in all the records that you've looked at that those taxes were ever paid?

GARY SHAPLEY:
No, they were not.

JOSEPH ZIEGLER:
Yeah, no, they were not paid by Hunter Biden.

MICHAEL TURNER:
And since it was -- since the -- the statute of limitations was allowed to run, Mr. Shapley, you go on to state that in order for him to pay this, he'd have to pay it voluntarily, that the government doesn't have a way to compel him to pay it because they've allowed the statute of limitations, not just what he got out of criminal, he got out of having to pay the tax, right.

GARY SHAPLEY:
That's correct. The criminal and statute of limitations have expired for that tax year.

MICHAEL TURNER:
So, he has in his pocket $125,000 of money that should have gone to the federal government as taxes. When in the state of Ohio, you've got average family earning about $62,000 a household. That's like two full households of tax income that that he got to keep in his pocket. I think -- I wonder is, is that he could pay that today, right?

Voluntarily?

JOSEPH ZIEGLER:
Yeah.

GARY SHAPLEY:
Oh yes. If he chose to voluntarily, yes, he could.

MICHAEL TURNER:
And perhaps, Mr. President, who's supposed to be in charge of taxes coming to our nation and who so frequently tells us that the American people aren't paying enough taxes might want to wander down the hall at the White House and turn to his son and say, "Hunter Biden, why don't you pay your taxes for 2014, because I got two men who just testified there's $125,000 owed and he ought to cut the check." Thank you, Mr. Chairman.

JAMES COMER:
Gentleman, yields back. Chair now recognizes Ms. Norton from Washington DC.

ELEANOR HOLMES NORTON:
Thank you, Mr. Chairman. Mr. -- Mr. Shapley and Mr. Ziegler, thank you for being here today. We're obviously going to talk a lot in this hearing about the investigation into Hunter Biden's taxes. So, I think it's important that we set the scene and make it clear what type of investigation we're talking about.

Mr. Ziegler, what year did you open the hot Hunter Biden investigation?

JOSEPH ZIEGLER:
That was 2018, November of 2018.

ELEANOR HOLMES NORTON:
2018, thank you. The Department of Justice announced a plea agreement with Hunter Biden last month, so I estimate that you spend four or five years on this investigation, Mr. Ziegler?

JOSEPH ZIEGLER:
That would be correct.

ELEANOR HOLMES NORTON:
Mr. Ziegler, in your testimony before the Ways and Means Committee, you said that when your time working on the investigation ended, it was both and here I'm quoting, "99.9 percent done," that's end quote and that you had, here I'm quoting again, "worked to complete 95 percent of the investigation," end quote.

Given this testimony, is it fair to say, Mr. Ziegler, that in the years that you spent on the investigation, you saw it nearly to completion?

JOSEPH ZIEGLER:
So, that reference was to the tax case. So, the tax investigation as far as all the work that we had done regarding that 99 percent of that had been done to that date.

ELEANOR HOLMES NORTON:
Exactly. Mr. -- Mr. Shapley, on page 12 of your transcript -- of the transcript from your interview with the Ways and Means Committee, you describe the IRS team that worked on this investigation as consisting of, here I'm quoting, "Twelve elite agents who were selected based on their experience and performance in the area of complex, high-dollar, international tax investigations," end quote.

Mr. Shapley, how serious are the investigations undertaken by these elite agents?

GARY SHAPLEY:
I'm not sure I understand how to answer your question. How serious?

ELEANOR HOLMES NORTON:
Yes. Do they have to be very serious to be undertaken by these -- by such elite agents?

JOSEPH ZIEGLER:
Well, I think I can answer this. So, we got to treat each taxpayer the same. That's the most important part. There's -- we're kind of the agents with the international tax group that come in there and that we have the expertise to work these complex financial investigations. So whether they're more serious or we have to treat each person, each taxpayer the same.

And and that's what I try to do in my job.

ELEANOR HOLMES NORTON:
Yeah, I was referring to these particularly complex, high-dollar tax concerns. I understand you have to give equal treatment. Mr Ziegler, you called Hunter Biden investigations a, quote, "complex, criminal tax investigation," end quote and I understand that it was an interagency effort involving the IRS, the FBI, the US Attorney's office in Delaware and DOJ's Tax Division in DC. Mr. Ziegler, is it fair to say that this sort of inter-agency team is only assembled for serious and complex investigations?

JOSEPH ZIEGLER:
So, I can only speak to what happened in this particular investigation. The reason why other agencies might join an investigation, that just depends on the crimes we're investigating. Us at the IRS, we are the only agency in the federal government that is allowed to investigate tax crimes. So, that's why you have to have -- if you have a tax crime case, you have the -- you have to have the IRS on that case.

ELEANOR HOLMES NORTON:
Yeah, and you had lots of other agencies as well. Look, it sounds like Hunter Biden's taxes were subject to a great deal of scrutiny and rigorous review by a large team of expert investigators who had experienced working complex cases. This investigation occurred over several years, span multiple agencies and divisions and had an expert team.

The time, personnel and other sources devoted to this investigation make it abundantly clear that this investigation was taken seriously by both the IRS and DOJ. While our witnesses here today may disagree with the US Attorney's division -- decisions, it is undeniable that Hunter Biden was subject to a thorough and rigorous investigation.

I thank you and I yield to the ranking member.

JAMES COMER:
Gentlelady yields back and as we promised the witnesses, we're going to take a ten minute recess at which point we will reconvene in approximately ten minutes. House is now in recess. [Recess] The committee will reconvene and is now back in order, Chair recognizes Mr. Palmer from Alabama for five minutes.

GARY PALMER:
I thank the Chairman. I want to welcome the whistleblowers and thank you for your courage

but more than that, for your fidelity to your duty to faithfully enforce the laws of the United States. Mr. Shapley, the statute of limitations has run out on a number of possible felony charges for tax years 2014 and 2015 is that correct?

GARY SHAPLEY:

That's correct.

GARY PALMER:

And there were huge tax liabilities for those tax years, correct?

GARY SHAPLEY:

There were tax liabilities, yes.

GARY PALMER:

But you didn't have access to all of the evidence related to those sources of income did you?

GARY SHAPLEY:

Based on the limitations placed on us by Delaware, US Attorney's office, that's -- that's very likely.

GARY PALMER:

OK, well, the oversight committee recently reviewed a non classified document from the FBI called an FD 1023 form which is a form used by the FBI to memorialize information related to it by confidential human sources. FD 1023 form was created in June of 2020. This is not a tip sheet, it's not a hotline.

It's not a suggestion box, it's a legitimate source used by the FBI and -- and it was used here. Mr. Shapley, did you ever review the June 2020, FD 1023 form with information about Hunter Biden and President Biden?

GARY SHAPLEY:

No, I did not.

GARY PALMER:

I reviewed the form and -- and their startling allegations in it. What would you have done if presented with this piece of evidence regarding this potential stream of income? Would that have constituted an additional area of investigation?

GARY SHAPLEY:

So, since I've never seen the document, I only know what's been reported.

GARY PALMER:

Right.

GARY SHAPLEY:

So I can say that there were investigative steps that -- that involved President Biden that were not allowed to be taken. And that information like this would have been really helpful to have from investigators, by investigators when -- when we received any pushback, when we -- when we were asked to, to take names on a document requests or search warrants, it would have -- it would have been nice to have Information that that that showed why that helped prove why those names needed to be in those requests.

GARY PALMER:

Well, I think it's material to your investigation because it was after all other information that led you, you know, related to Hunter Biden's lifestyle that led you to launch the investigation to begin with. Was there other evidence in this investigation that you were denied access to?

GARY SHAPLEY:

Yes, there was.

GARY PALMER:

Do you want to elaborate on that?

GARY SHAPLEY:

So one piece was -- was the Hunter Biden laptop. There's a memorandum that I documented contemporaneously in my House Ways and Means Committee testimony that -- that states what Assistant United States Attorney, Leslie Wolf told us on that day. I think it was September 3rd of 2020. And that's that they had information from the laptop that they were not providing to the investigators.

JOSEPH ZIEGLER:

Yeah, can I add something on that?

GARY PALMER:

Yes, sir, Mr. Ziegler.

JOSEPH ZIEGLER:

So when it came to questions, I -- as a part of the investigation, we interviewed a lot of people. And as a part of that investigation, you want to feel free to ask questions. It should be an open environment. I realize that there are some attorney-client privileged information involved in this, but there was -- there was an environment when we were interviewing people -- when we were interviewing witnesses were you were afraid to ask questions.

Questions that could lead to the Presidential campaign. And this is after the campaign is over. So questions like that was restricted and I was so things like that we were limited to, to talking about.

GARY PALMER:

Well, it appears to me that you learned about the FD 1023 form through public domain sources. And I just imagine, I can only imagine how you felt about having been denied

another piece of relevant information. And I think it's important that the committee understand that -- that you guys who were trying to do due diligence, who are faithfully executing, trying to faithfully execute the laws of the United States were denied evidence relevant -- relevant to your investigation.

I think the 1023 form is a very important piece, Mr. Chairman, that -- that. I want to ask Mr. Ziegler. At one point, you wanted to move the investigation to the District of Columbia. Is that correct?

JOSEPH ZIEGLER:
When the -- from the very onset of the investigation, yes.

GARY PALMER:
Why did you want to move it to DC?

JOSEPH ZIEGLER:
So are we refer it, there are two different scenarios on where DC is involved. So when we first initiated the investigation and then when we referred prosecution. So which -- which time period? So as far as venue for the tax case, so venue for this case, we saw that when we did our analysis, that venue was either in California or DC. Well, I guess at the time in the beginning, it was DC. So we -- that was where we wanted to start our investigation was in DC

GARY PALMER:
But you were told that attorney Weiss could bring charges anywhere. Was that your understanding?

JOSEPH ZIEGLER:
OK, so that fast forward to March of 2022, I had a phone call with the prosecutors assigned to the case. They said that our prosecution report went to low level people at the DC US Attorney's office. Those low level people reviewed. It said, hey, we're going to assist you with this. Here's what we're going to do to help you work the finish the case here in DC. A few days later, I get another phone call and it's from the -- it's from the same assigned -- same assigned attorney and they tell me that now that the US attorney has reviewed it that not only is it a no, but it's a -- no, you should not work this investigation in the District of Columbia.

GARY PALMER:
Well, Mr. Chairman, it appears to me that -- that Mr. Ziegler was -- was misled and -- and that his instincts were right that it should have been moved to the District of Columbia. And again, I want to thank you for your courage and your fidelity to the law. I yield back.

JAMES COMER:
Gentleman yields back. Chair recognizes Mr. Khanna from California for five minutes.

RO KHANNA:
Thank you, Mr. Chairman. Thank you, Mr. Shapley for being here. I understand you see it as

your duty to have the strict enforcement of tax laws. Is it true that you have often disagreed with charging decisions before?

GARY SHAPLEY:

I have agreed with charging decisions before.

RO KHANNA:

I'm saying is it true that you have often disagreed? Your recommendations have often been disregarded before when it comes to charging decisions. Is that true?

GARY SHAPLEY:

I don't think disregard is accurate representation.

RO KHANNA:

They have people in your own IRS have disagreed with your decisions often before. Is that accurate?

GARY SHAPLEY:

That's not accurate.

RO KHANNA:

Is it not true that the tax counsel in the criminal department has disagreed often with your decisions in the past?

GARY SHAPLEY:

Criminal tax attorneys? Yes, and as I stated.

RO KHANNA:

So how often have they disagreed in your opinion with your recommendation decisions?

GARY SHAPLEY:

A very often criminal tax attorneys, yes.

RO KHANNA:

Can you give us a percentage of how often you've said we ought to charge someone and they've said no, that may not be a good idea.

GARY SHAPLEY:

Yeah, I would say, I mean just ballpark a vast majority of what we do and that's why they're advisory and -- and.

RO KHANNA:

Do you have respect for them?

GARY SHAPLEY:
And their advisory.


RO KHANNA:
Do you have respect for them?


GARY SHAPLEY:
Most prosecutors


RO KHANNA:
It's a simple question, sir. Do you respect those colleagues or not?


GARY SHAPLEY:
Often, their opinion is not respected me and the prosecutors.


RO KHANNA:
So do you have more respect for them or Mr. Weiss?


GARY SHAPLEY:
I don't.


RO KHANNA:
I just think because you have a history of wanting to charge people and then people pushing back by your own testimony under oath, you said about 90 percent of the time people are pushing back on what you want to do. And I'm not questioning, I mean you want a stickler for the law, you know, it reminds me of Les Mis and the famous person wanted to get the -- the person who had a sandwich.

I mean, and then all those times, you've got people pushing back on you and you say, well, they're not very well respected. I mean, do you -- do you respect Mr. Weiss?


GARY SHAPLEY:
So the criminal tax attorneys, you know, I have never had a case that they -- that they declined, that they did not concur with, that we didn't ignore their requests and move forward with them.


RO KHANNA:
But at 90 percent, they have disagreed with you correct by your own testimony.


GARY SHAPLEY:
Yeah, yes, I established that.


RO KHANNA:

But -- and let me just ask you on the media, you've given testimony under oath that you have never spoken to The Washington Post any reported on this matter, correct?

GARY SHAPLEY:
That's correct.

RO KHANNA:
Do you know, have you spoken to any media outlet on this matter?

GARY SHAPLEY:
Uh, I have spoken after the House Ways and Means Committee.

RO KHANNA:
Before that. Have you spoken to any media journalist on this matter?

GARY SHAPLEY:
Absolutely not. Do you know of any colleague of yours at the IRS who has spoken to any journalists on this matter? Absolutely not.

RO KHANNA:
Do you know of any investigation into the leaks on this matter?

GARY SHAPLEY:
Uh, yeah, so the October 6th leak, I was the person who referred it to our inspector general.

RO KHANNA:
You know, any of your colleagues are under and.

GARY SHAPLEY:
December 9th of 2020, around the day of action.

RO KHANNA:
Do you know if any of your colleagues are under investigation? [Crosstalk] Sorry if I could just finish. Do you know if any of your colleagues are under investigation for that leak?

GARY SHAPLEY:
No, I know of no colleague under investigation for that leak.

RO KHANNA:
And just for the record then it is your testimony under oath that you have never spoken to any media person before the House testimony about this matter.

GARY SHAPLEY:

It's not only my testimony under oath today, I provide an affidavit of House Ways and Means Committee stating the same. I've said -- I've said it to our inspector general's office as well.

RO KHANNA:
I appreciate that. I just want to make a final point on this one. I think what.

GARY SHAPLEY:
Mr. Chairman, we mind if I?

JAMES COMER:
Can the gentleman answer the question you asked Mr. Khann?

RO KHANNA:
I just don't want my time to be affected if.

UNKNOWN:
Granting him the time. Mr. Chairman, but that's unusual.

RO KHANNA:
I want a minute to wrap up if you want to give him.

JAMES COMER:
OK -- OK you have you have a minute?

RO KHANNA:
OK, they -- here's the point. I think this whole thing, our ranking member Raskin summarized this. I don't disrespect you, sir. I think you have a tough view on what you think the law should be and this is why we have a prosecutorial system where you don't get to decide, I don't get to decide we have a whole system.

And it turns out that often your recommendations on who should be charged differ from some of the other folks. And that's what's happened in this case.

And as your testimony here, you yourself said you think Mr. Weiss should come and explain his decision. You don't -- you don't question him and I think on the optics issue that some of my colleagues have brought up, I mean obviously Attorney General Barr is going to be concerned of the optics. When you have a Donald Trump appointed US attorney, potentially bringing charges against his rival son, that's a real legitimate thing to do. So I guess my view here is we're spending hours on a disagreement about whether to charge someone.

We have a whole democratic process that does that. You don't get to. My final question, Mr. Shapley, do you think you should decide who gets charged or do you think that should be the charging officer?

GARY SHAPLEY:
So each time you say this is the disagreement, you can say it multiple times, it doesn't make

it true. We've -- we've testified under oath here about the prosecutors agreeing with charging felony charges on multiple occasions. And just to say this is a disagreement would be a misrepresentation.

RO KHANNA:
My last question though, who do you think gets to -- do you think you should have that final decision or a prosecutor should have the final decision?

GARY SHAPLEY:
No, I am a special agent for IRS criminal investigation. I do not make the final decision on whether to charge or not.

RO KHANNA:
I appreciate that.

GARY SHAPLEY:
Mr. Chairman, may I have a second? So yes, in terms of our criminal tax point of order.

UNKNOWN:
Mr. Chairman, just are we instituting a new rule in the committee? Because I've never seen this happen before.

JAMES COMER:
OK, I didn't know if it was to answer Mr. Are you finished?

UNKNOWN:
Someone else can follow up. I see someone could see.

JAMES COMER:
You're correct. Rules. Gentleman's time has expired. Chair now recognizes Ms. Green for -- for five minutes.

MARJORIE TAYLOR GREENE:
Thank you, Mr. Chairman. Before we begin, I would like to let the committee and everyone watching at home that parental discretion is advised. I would also like to remind everyone that on our oversight committee, we provide oversight into all parts of the federal government, including their Department of Justice and their -- their willingness to prosecute and their unwillingness to prosecute and whether it's politically motivated.

I would also like to say that when evidence and proof of a crime is presented, no prosecution should be denied, no matter who the person is. To the whistleblower's today, I thank both of you for your courage to come to the committee today and your commitment to -- to truth. I have great respect for it. So thank you.

I would like to talk with you both about Hunter Biden and his tax write-offs with his law firm Owasco. I would like to ask Mr. Ziegler, when did you start your investigation and your

testimony? It was November 2018, Is that correct? Yes or no?

JOSEPH ZIEGLER:
Yes, that's correct.

MARJORIE TAYLOR GREENE:
Thank you. During your testimony with the House -- with the House Ways and Means
Committee, you stated that through bank records you identified Hunter Biden was paying
prostitutes related to a potential prostitution ring. Is that correct? Yes or no?

JOSEPH ZIEGLER:
Yes, that's correct.

MARJORIE TAYLOR GREENE:
I've also reviewed those same bank reports commonly referred to as SARS, suspicious
activity reports. And I'm very troubled by them. We read thousands of them in the Treasury.
This particular excerpt from a SARS report talks about human trafficking and in regards to
Hunter Biden and Owasco and payments he was making.

What's even more troubling to me is that the Department of Justice has brought no charges
against Hunter Biden that will vindicate the rights of these women who are clearly victims
under the law. Um, I would like to talk about in your prior testimony, you stated that the
prosecutorial team was investigating violations of the Mann Act. Is that correct, Mr. Ziegler?

JOSEPH ZIEGLER:
That is correct.

MARJORIE TAYLOR GREENE:
Regarding the Mann Act, if a person is transported across state lines for sexual activity such
as prostitution, that could be a violation of a federal law, is that correct?

JOSEPH ZIEGLER:
I actually recently looked at the federal law regarding Mann Act and I believe that -- that is
correct, but I would refer you to the DOJ manual.

MARJORIE TAYLOR GREENE:
Thank you. I would like to present this to the committee. This is showing Hunter Biden paying
for a victims United flight from LA to Dulles. This was a -- I believe this is a violation of the
Mann Act. This is Hunter Biden's, this is his proof that he bought the ticket. He bought it for
this woman right here.

She -- he flew her from Los Angeles to Washington on June 14th, flew her back to Los
Angeles, California on June 15th of 2018. And I would like to point out that if he was
purchasing her a plane ticket for sex and traveling across state lines, do you believe that to
be a violation of the Mann Act? Mr. Ziegler?

JOSEPH ZIEGLER:
So I can talk to specifically what's in my transit or what's in my transcript regarding the Mann Act. So I know we were compiling the information together.

MARJORIE TAYLOR GREENE:
Yes, but Mr. Ziegler, as -- as the law states by the -- by the code of the law at states traveling, paying someone to go across state lines is -- is prostitution and it's a violation of the Mann Act. Let me just move on just one more, one more second here. So when or when Hunter Biden paid for this woman to do this with him to travel across state lines from California to Washington DC on June 15th, this is a violation of the Mann Act. This was prostitution.

Let me continue. Did Hunter Biden also use his company Owasco PC to pay prostitutes?

JOSEPH ZIEGLER:
Can you hold on one second?

MARJORIE TAYLOR GREENE:
Chairman?

JAMES COMER:
Yeah, we'll -- we'll give you this additional time back that was. [Off-Mic]

JOSEPH ZIEGLER:
So regarding Mann Act violations, what we can do is given by the statute we can turn those over to the House Ways and Means Committee and then we can -- they can decide to vote to turn them over to you. Regarding Mann Act.

MARJORIE TAYLOR GREENE:
Thank you, Mr. Ziegler. So talking about Hunter Biden using his company Owasco PC to pay prostitutes. This is also a suspicious activity report showing that victim one, the -- the woman that was paid for prostitution that traveled from California to Washington DC paid for by Hunter Biden. This is an excerpt from a SARS report that we've read in the Treasury.

And I think you all have looked at these too, showing that victim one was supposedly an employee of Owasco. But -- but I would like to point out, this is not really what most paralegals do for law firms. And it's very serious that Hunter Biden was paying this woman through his law firm and then writing it off as business tax exemptions.

Most people write off, you know, they're write off things for their taxes through their businesses like a meal or say office supplies. But can you confirm for me that Hunter Biden had written off payments to prostitutes through his law firm or Owasco?

JOSEPH ZIEGLER:
I appreciate the question given by the statute and limited in my testimony today and I respectfully would need to turn those records over to the House Ways and Means Committee.

MARJORIE TAYLOR GREENE:
OK, thank you, Mr. Ziegler. One last one, last question. You referred to one of the assistants as West Coast assistant. I believe this is the West Coast assistant. Could you agree with that?

JOSEPH ZIEGLER:
So I can tell you that there were deductions for what we believe to be escorts and then that $10,000 golf club membership, yes, that was not a golf club membership that was for a sex club payment.

MARJORIE TAYLOR GREENE:
That was for a sex club payment payments such as this through from -- from Hunter Biden to prostitutes. Also, Mr. Shapley.

UNKNOWN:
Come on Mr. Chairman, we're one minute and 53 seconds over. As long as Ms.Ocasio-Cortez can get equal time?

JAMES COMER:
I will let Ms. Green wrap up five seconds and then I'll give Mr. Mfume additional time.

MARJORIE TAYLOR GREENE:
Thank -- thank you, Mr. Chairman. Mr. Shapley you start an investigation into Hunter Biden, code named Sportsman which opened in November of 2018. It was an offshoot of an investigation the IRS was conducting into a foreign based amateur online pornography platform. This -- this is evidence [Crosstalk] of -- of Hunter Biden making sex tape -- excuse me, this is my time making pornography.

JAMIE RASKIN:
Should we be displaying this Mr. Chairman, in the committee?

JAMES COMER:
Gentlelady's time expired and went 2.5 minutes over. Mr. Mfume wants the 2.5 minutes. He can have it if he wants to yield some to Ms. Ocasio-Cortez. When she goes, she can have it. We'll make it right. 2.5 minutes. You all have an extra 2.5 minutes. Chair recognizes Mr. Mfume for --

JAMIE RASKIN:
Point of order -- point of order Mr. Chairman.

JAMES COMER:
State your point?

JAMIE RASKIN:
My understanding is that this committee was provided the suspicious activity reports on the

condition that it not publicized them for the reason that they are not actually even allegations much less evidence of anything and my colleague from Georgia has now just revealed it publicly.

**JAMES COMER:**
That -- that -- that is a good point. However, that suspicious activity report has been public for years. That suspicious activity report was on the Internet long before I became chairman of this committee. So that particular suspicious activity report has already been publicized.

**JAMIE RASKIN:**
Thank you for that clarification. She had said it was part of the thousands she reviewed, but I appreciate the clarification.

**MARJORIE TAYLOR GREENE:**
Public and able that we all reviewed in the Treasury.

**JAMES COMER:**
Reclaim time. Chair recognizes Mr. Mfume for five minutes and if you want more time, we'll -- we'll work with you.

**KWEISI MFUME:**
Well, thank you very much, Mr Chair. I am going to claim my five minutes and yield the two and a half additional minutes that you have given me to my colleague from New York, Ms. Ocasio-Cortez. I'm glad somebody brought up the word suspicious activity because that's just what's taking place in this room.

Make no mistake about it. And I want to congratulate my colleagues from across the aisle for gathering us here today. Almost distracting us from the biggest investigation that is going on right now in our country and in our nation's history involving the former President. Then the frontrunner for the Republican nomination who is currently facing a 37 count indictment this week and maybe two weeks from now, more it may be two weeks from then more.

But we're spending our time talking about Hunter Biden, someone who has already pleaded guilty to not filing his taxes, having a gun charge and now I hear also paying for prostitution. But let's just remember that there was a case in New York not too long ago where our former President also got into trouble regarding payments and regarding a stripper and was found guilty of a violation in civil court.

Now there seems to be a lot of hemming and hawing about special treatment and special treatments. When the President just a couple of days ago tried to delay his federal documents trial and requested the US district judge, Aileen Cannon, whom he appointed, to somehow or another consider the fact that he was a candidate and therefore maybe -- maybe -- maybe his trial should be put off until after the election.

That seems to me like special treatment if I've ever heard of it before. But I'm grateful that my colleagues on the other side of the aisle are taking at least tax evasion very seriously.

And I would welcome also, a hearing on the former President's history of tax evasion and how long it took to see his tax returns covering ten years and what was the outcome of that

decision? You know the Trump Organization was hit with $1.6 million in Manhattan state court being convicted of a tax scheme.

So let's -- let's be real when we talk about this. It's not just Hunter Biden, but as long as we're saying Hunter Biden, we forget everything else. And again, Hunter Biden did step forward and said I did not file taxes in two years. And yes, this gun charge, I will take responsibility for. Now I love the fact that we are so much in love with the IRS. In fact, Speaker McCarthy said when he was elected on the 15th vote that the first bill that he would repeal funding for was the bill that would provide for 87,000 additional IRS employees.

My don't -- we love the IRS. We're just going to cut their budget. In fact there is a member of this committee who on their own website said that they are proud to have voted to strip away the plan to empower the IRS with additional funding. So I'm going to get back to those two words again about keeping it real.

And I think we really have to do that. I just think Mr. Shapley, two quick things. Did Hunter Biden in any way, in your knowledge, not Hunter, but did any of his children receive money, yes or no?

GARY SHAPLEY:
I think Special Agent Ziegler would be better.

KWEISI MFUME:
Yes or no.

GARY SHAPLEY:
Special Agent Ziegler.

KWEISI MFUME:
Either one, yes or no.

JOSEPH ZIEGLER:
Congressman, thank you for your question given by the statute, I am limited in my testimony. I'm OK I can give here today, but I can -- we can turn over any of the records that relate to the adult children.

KWEISI MFUME:
Yes, we'd like to see the means Committee. We'd like to see those really, I would, since we are so concerned about tax evasion and we've got people at the highest levels of government doing it and we don't want to talk about that at all. Now here's what galls me. I don't like these attacks on the Department of Justice, the FBI, the IRS as if they are somehow anti US agencies.

Those agencies keep this democracy in check. It keeps them in float. They provide the checks and they provide the balances. And we could be, quite frankly, using our time to better talk about crime in America that's affecting everybody. Attacks on women's health, the economy, budgetary issues, public education, housing, the need for senior citizens to be able to pay for prescription drugs, child poverty and mental health to name a few.

And yet we are doing this all over again for the Hunter Biden Show to someone who has pleaded guilty and has taken responsibility for not filing taxes for two years. This is ludicrous. Beam me up Scotty. There is no intelligent life down here. None. I yield.

JAMES COMER:
Chairman time's expired. Chair -- chair now recognizes, Mr. Armstrong from North Dakota.

KELLY ARMSTRONG:
Well, if I could plead guilty to two years of tax evasion when I was accused of six, I might consider that to be a pretty good plea deal. And let's talk about what this is and what it's supposed to be. Mr. Shapley, I think you were going to testify that IRS criminal tax attorneys are advisory only and often DOJ prosecutors disagree with the IRS tax attorneys.

Is that probably an accurate statement?

GARY SHAPLEY:
Yes, it's an accurate statement.

KELLY ARMSTRONG:
And I think this is important because everybody continues to go after you two like you're the only two people who are involved in this. You were -- you went to work for the IRS in 2008?

GARY SHAPLEY:
2009, correct.

KELLY ARMSTRONG:
2009. Mr. Ziegler 2010?

JOSEPH ZIEGLER:
2010.

KELLY ARMSTRONG:
So you started under President Obama, continued your career under President Trump and are continuing your career under President Biden. Is that accurate?

GARY SHAPLEY:
Yes, that is correct.

KELLY ARMSTRONG:
And in your entire career excluding today, how many times have you talked about who appointed a US attorney?

GARY SHAPLEY:
No, I haven't.

KELLY ARMSTRONG:
In the course of any investigation have you talked about whether it was a Democratic appointee or a Republican appointee?

GARY SHAPLEY:
I have not. No.

KELLY ARMSTRONG:
Mr. Ziegler?

JOSEPH ZIEGLER:
I have not.

KELLY ARMSTRONG:
Because it's not supposed to matter, right? And that's why you have line US attorneys that also go across administrations and work through Republican administrations, Democratic administrations. And that's the part of your investigative team. Now that investigative team recommended that you charge Hunter Biden for every tax year from 2014 to 2019 and felonies for at least 2014 and 2018. And this included income from Burisma and a scheme to evade taxes through a partnership with a convicted felon.

Is that accurate?

GARY SHAPLEY:
Yes, that's accurate.

KELLY ARMSTRONG:
And the total amount of taxes not paid over that period or not paid timely, it was over $1.5 million. And that didn't include interest in penalties or other enhancements that are typically involved in this case, correct?

GARY SHAPLEY:
Yes, that's correct.

KELLY ARMSTRONG:
And Mr. Ziegler, you're testified identifies two separate criminal violations, which is an attempt to avoid taxes and filing false tax returns and they both carry a six year statute of limitations?

JOSEPH ZIEGLER:
That is correct.

KELLY ARMSTRONG:
And Mr. Shapley, you stated that the purposeful exclusion of the 2014 and 2015 tax years

sanitized the most substantial criminal conduct and concealed material facts. Can you expound on that a little bit?

GARY SHAPLEY:
So, so yeah, that statement and made to the House Ways and Means Committee was in reference to the -- the income from Burisma that was not reported and therefore if it wasn't reported, it wouldn't be on a statement of facts and it would be completely left off the Official record.

KELLY ARMSTRONG:
And as far as you're aware, that's not part of any plea deal, correct?

GARY SHAPLEY:
I can't speak to the plea deal, but I don't believe so.

KELLY ARMSTRONG:
I want to talk about something that is a little unique to this investigation. I want to take you back to December 7th and 8th of 2020, and you were planning your investigative team, right? This is the whole team East Coast all across the country. Numerous interviews being are going to be conducted and Hunter Biden was going to be the subject of one of those in LA, correct?

GARY SHAPLEY:
That's correct.

KELLY ARMSTRONG:
And this is unique because who Joe Biden has won the election. We're walking into this and there are some serious -- I mean, if there's Secret Service protectee as I'm assuming you have to contact the Secret Service, you're not walking up with armed FBI agents to a Secret Service protectee.

GARY SHAPLEY:
Yes, we had a plan on how to approach Hunter Biden that day.

KELLY ARMSTRONG:
Could you briefly explain that plan?

GARY SHAPLEY:
So the FBI, SSA and I were assigned with interviewing Hunter Biden that day. And the day previous we went to the LA, FBI field office and asked them to the special agent in charge of contact, the Secret Service special agent in charge from the LA Field office at 8 a.m. on the morning of December 8th and tell them that two agents were -- were going to approach Hunter Biden to and as part of an official investigation.

And the night before, all of that changed.

KELLY ARMSTRONG:

And all of that changed because FBI headquarters and Secret Service headquarters coordinated and that -- and that information had gotten out to everybody the night before and we can talk about whether it's a highly political investigation and all of those different things. But there's another group of people that was made aware of that the night before wasn't there.

GARY SHAPLEY:

Yeah, that's correct.

KELLY ARMSTRONG:

And that would be the transition team.

GARY SHAPLEY:

That's correct.

KELLY ARMSTRONG:

And the transition team is a political operation set up to help the President elect vet cabinet employees, work on inauguration, do all of those things. I mean is that your understanding?

GARY SHAPLEY:

Generally, yes.

KELLY ARMSTRONG:

They have any special investigative powers, I don't know about.

GARY SHAPLEY:

Not that I would know of.

KELLY ARMSTRONG:

Your entire history and working in history with the IRS, you ever worked with a transition team of a President to help set up an interview with a subject of a criminal investigation.

GARY SHAPLEY:

I have not.

KELLY ARMSTRONG:

Last question, did you ever get to interview Hunter Biden?

GARY SHAPLEY:

We did not interview him.

KELLY ARMSTRONG:

Thank you. I yield back.

JAMES COMER:
Gentleman, yields back chair now recognizes Ms. Ocasio-Cortez for five minutes plus the 2.5 minute that we went over.

ALEXANDRIA OCASIO-CORTEZ:
Thank you very much, Mr. Chairman. Good afternoon, Mr. Shapley and Mr. Ziegler. And I want to thank you both for appearing before us today. I understand that this is not easy and -- and it is very important that both of you are respected during the course of this hearing. Mr. Ziegler, in your deposition to the Ways and Means Committee, I believe that -- I believe you said that this -- that you began this investigation in 2018, correct?

JOSEPH ZIEGLER:
That -- that is correct.

ALEXANDRIA OCASIO-CORTEZ:
And so some of the events that you discussed in your deposition took place two, three, four years ago, correct? Over the last several years.

JOSEPH ZIEGLER:
Yeah, that would be correct.

ALEXANDRIA OCASIO-CORTEZ:
In your deposition in front of the Ways and Means Committee and in your testimony before us today, you have relayed your memory of events that occurred over the course of a nearly five year investigation. And Mr. Ziegler, when you testified before the Ways and Means Committee, you also testified that you were told that it was then Attorney General William Barr, who made the decision to merge the DC and Delaware Hunter Biden investigations, correct?

JOSEPH ZIEGLER:
I did testify to that, correct.

ALEXANDRIA OCASIO-CORTEZ:
And a few weeks after that testimony, your attorney wrote in a letter to Congress, I quote, "Mr. Ziegler is confident. He was told by his supervisor that the merging of the cases was at the direction of an official at the Department of Justice. However, on further reflection, Mr. Ziegler cannot definitively state that his then supervisor said that the Department of Justice official directing the merger of the cases was Attorney General Barr". Correct?

JOSEPH ZIEGLER:
That is correct and I can tell you that I actually refreshed my memory from looking at my emails and there was an email that I found from my supervisor at that time that stated what had happened. And I can turn that over to the House Ways and Means Committee at some

point.

ALEXANDRIA OCASIO-CORTEZ:
And -- and in that updated email, does it include Attorney General Barr or not?

JOSEPH ZIEGLER:
So I can't speak to the contents of that email, but.

ALEXANDRIA OCASIO-CORTEZ:
No problem. I think in light of the correction and truly in good faith, these things happen all the time, right? The recollection of these investigations require an extraordinary amount of detail and the charges of what is being brought forward today are extremely serious. Which require a high threshold of evidence including investigations and depositions.

But I hope you'd agree that even the best memory can be fallible at times and that is the widely understood reality in our justice system. Mr. Shapely, from your testimony today. I think you would agree that it is important that criminal investigations be conducted fairly and free from political influence.

That's why we're here today, correct?

GARY SHAPLEY:
Yes, that's correct.

ALEXANDRIA OCASIO-CORTEZ:
Now as you stated and as was kind of discussed with Mr. Comer and -- and with others, there are often disagreements. It seems as though within some of the transcribed interviews that we read, it says, yes about 90 percent of the time there is this IRS reviewing attorneys disagree with the charging decisions of the agents in the group, correct?

GARY SHAPLEY:
That was part of the testimony, not all of it.

ALEXANDRIA OCASIO-CORTEZ:
In some of your comments, you've also noted that there, you've made reference to a special counsel in this situation, but I believe what there might be a reference to here is the question of a special attorney, not a special counsel, correct?

GARY SHAPLEY:
So if you're speaking about the October 7th, 2022 email that I documented contemporaneously on that day. That's why I documented it on that day. So that nine months later, I'm not trying to recall a specific word and so it says special counsel authority, that's what he said that day, that's what a senior executive IRS corroborated when he responded to my emails.

ALEXANDRIA OCASIO-CORTEZ:

And I do think that that distinction is important because in this letter to -- to Chairman Jordan, the issue at hand seems to be a special attorney, not a special counsel which are two distinct different legal authorities. And there also may be some confusion I think with respect to that as well. And which brings me to the point of political influence.

Whether where there actually is a set of breadcrumbs however, is in a set of tweets and letters sent from former President Trump to several chairs to the chair of the House Judiciary Committee that we see here. In fact, according to New York Times article, which I'd like to present to the record, today, President Trump's attorney wrote to the Judiciary Committee chairman urging him to investigate what he called, quote, "a rogue local district attorney". And after -- after that, New York DA convened a grand jury that ultimately indicted Donald Trump.

Chairman Jordan complied with that letter shortly after President Trump's attorney sent that letter to the committee, which is highly unusual, a very highly unusual act. And in fact, after that on March 20th, Chairman Jordan, together with the Committee on House Administration Chairman, Brian Steele, as well as the chairman of this committee, wrote to District Attorney Bragg and then demanded a sweeping series of documents including communications between the DA's office and the Department of Justice, also highly unusual.

In fact, on his truth social account later on, Donald Trump claimed that the US attorney investigating Hunter Biden, a US attorney by the way that Donald Trump appointed, was quote, "a coward". And then in that he then urged that maybe the presiding judge will have the courage and intellect to break up this quote cesspool of crime.

Curiously just a few days after this tweet, the chairman of the Ways and Means Committee, Jason Smith sent a letter to US attorney David Weiss and Attorney General Merrick Garland who are implicated in this hearing. Ask -- explicitly asking them to place the whistleblower testimony from the committee's depositions into the court records which were addressed during the chairman's opening statements before Hunter Biden's plea hearing at the end of the month.

And as you can see right here, Chairman Smith explicitly said and I quote, "entering this information into the formal record". Additionally, those two chairmen waived onto this hearing today. Highly unusual.


JAMES COMER:
Will the gentleman gentlelady yield?


ALEXANDRIA OCASIO-CORTEZ:
And one moment and when we talk about political influence, we are not here today unfortunately because the facts have brought us here. We are here today because Donald Trump is exerting an influence campaign. In Congress when he is no longer President of the United States. In addition to that, if we want to talk about charges that have been dismissed and if we do want to follow the evidence, perhaps we should discuss Ivanka Trump's investigation, being charged, who was close to being charged with felony fraud after Donald Trump's personal attorney provided political contributions to the local DA. Those charges were dismissed and ultimately, we saw that that -- that that DA Vance, President Trump's attorney, provided over $50,000 in political contributions after the case was dismissed.

So when we talk about political contributions, I would hope if we are following the evidence

that -- that we are willing that this committee, if this committee is going to go there, that they be willing to open investigations into the dismissal of charges against Ivanka Trump. And by the way, if the chair, if the gentlelady from Georgia wanted to follow evidence, we should also take a look at hypothetically a case where sex trafficking charges against a 17 year old girl potentially.

JAMES COMER:
The gentleladie's time's expired.

ALEXANDRIA OCASIO-CORTEZ:
Thank you, I yield back.

JAMES COMER:
Chair now recognizes Mr. Gosar of Arizona for five minutes.

PAUL GOSAR:
Thank you, Mr. Chairman. Now Chairman Comer and his team have done an outstanding job of uncovering the millions of dollars sent to Hunter Biden from foreign sources located in places like China, Romania and Ukraine. It's pretty obvious that the Hunter Biden's only avenue for making money is the influence over his father.

Now the only thing missing is direct evidence that Joe Biden knew and participated in these bribery schemes. That is where you got brave men have come in. Their investigative efforts have the potential to uncover direct evidence in a pay to play and in some cases it did. Yet they're very hindered doing their jobs by the Department of Justice Deep State.

As Mr. Shapley said, put it, quote "At every stage, decisions were made to benefit the -- the subject of this investigation", end of quote. That's Hunter Biden and by extension Joe Biden. Now these men are not political people. They're hard working agents and the last thing they want to do is speculate. So I'm not going to stick to -- I'm going to stick to confirming the most egregious examples of the DOJ's prosecutorial misconduct abuse and favoritism detailed in their testimonies and leave it up to the American people to draw their own conclusion.

Mr. Shapley, under US tax law, taxes owed all are on all income received from legal and legal sources, right?

GARY SHAPLEY:
Yes, yeah.

PAUL GOSAR:
Hypothetically, if a person subject to US taxes receives $1 million for serving as a director for, let's say, an oil company, they would owe taxes on that $1 million perhaps as much as 38 percent, correct?

GARY SHAPLEY:
If they're a US taxpayer, yes.

PAUL GOSAR:

Failure to declare the receipt of such income violates the US tax code, correct?


GARY SHAPLEY:

Uh, yes, it would.


PAUL GOSAR:

Failing to timely pay the tax owed is what, in whatever amount, violates the tax code, correct?


GARY SHAPLEY:

Yes, it does.


PAUL GOSAR:

And the tax code has criminal and civil penalties for these violations, correct?


GARY SHAPLEY:

That is correct.


PAUL GOSAR:

So now hypothetically, if a person receives $1 million payment and then conveys 10 percent of that amount to another person, that person making that payment may have to pay a gift tax on that amount, correct?


GARY SHAPLEY:

Yeah, if they say it's a gift, yes.


PAUL GOSAR:

Or conversely the person receiving the money has to pay income tax on the money as well, correct?


GARY SHAPLEY:

If on the gift portion or on the income portion, No, on the gift, they would have to report the gift on their tax returns, but I don't believe it'd be taxable to them.


PAUL GOSAR:

And then the failure to do is subject to criminal or civil penalties, correct?


GARY SHAPLEY:

Yeah, filing a false tax return is incorrect is against the law, yes.


PAUL GOSAR:

Yeah, now is there -- is there indefinite confirmation that all evidence on the Hunter Biden laptop has been reviewed by federal agents and prosecutors.

GARY SHAPLEY:

The prosecutor stated that evidence was withheld from the investigators. We don't know how much.

PAUL GOSAR:

The DOJ prosecutors allow your team to access the laptop.

GARY SHAPLEY:

I'm sorry, could you repeat the question?

PAUL GOSAR:

Yeah. Did the DOJ prosecutors allow your team to access the laptop?

GARY SHAPLEY:

To the

PAUL GOSAR:

DOJ prosecutors.

GARY SHAPLEY:

So the -- when the laptop comes in their computer investigative specialists that review the laptop and they create reports and pull stuff from.

PAUL GOSAR:

And you were prohibited from looking at anything on the laptop, right?

GARY SHAPLEY:

We saw some but not all.

PAUL GOSAR:

OK, gotcha. Is it normal for the DOJ to deny this type of access to investigators?

GARY SHAPLEY:

No. That's the first time I've experienced being limited to investigate to evidence.

PAUL GOSAR:

Did Assistant Attorney Wolf collaborate with the data on the laptop?

GARY SHAPLEY:

Did she?

PAUL GOSAR:

Collaborate the data?

GARY SHAPLEY:
Corroborate -- corroborate, I wouldn't know.


PAUL GOSAR:
OK. Now I guess my question comes back and the reason I went down this rabbit hole is that, is it your conclusion that you were interfered with and that those that interfered with you are as guilty as those creating the problem? Are they accessories to a crime is what I'm getting to?


GARY SHAPLEY:
Well, I would agree that there were investigative steps that were definitely obstructed by DOJ that I'd never seen in my 14 years and just honestly just makes no sense. We wouldn't want to collect all of the evidence available. I can't -- I can't opine on your -- on the second part of your question.


PAUL GOSAR:
Gotcha, Mr. Ziegler, did the DOJ prosecutors deny your request to look into the famous quote, "I am sitting here with my father," text from Hunter Biden. Did they allow you to obtain location information to see where the text was sent from?


GARY SHAPLEY:
So I know it was an issue tha --t that came up whether we can get the location data and I know that that was a conversation that I would have had with the assigned prosecutors. I recall them saying to me that how do we know that he's there? How do we know that that's true? The statement that's being made there?

And then I said well, we would get the location data. So as a part of my normal investigation, that's what I would do. And what I can tell you is it, I know I didn't do it. I don't know if the FBI ever ended up doing it. It was kind of like it was kind of like a -- let's wait or I need to think about it, I guess is the proper response.


PAUL GOSAR:
Gotcha my time is up, I yield back.


JAMES COMER:
Gentleman's time has expired. Chair now recognizes Ms. Brown [Crosstalk] Ms. Brown for five minutes.


SHONTEL BROWN:
Thank you, Mr. Chairman. The American people have lost track of your supposed investigation of President Biden or is it an investigation of his son who does not and has never worked at the White House or another family member. We can't even follow which investigation we're discussing today. Is it the FBI, the IRS, ex execs or something new?

I know the American people are confused because we're all confused what we're doing here. Nothing this majority has claimed about the President or his family has merit. No wonder the folks back home are tuning out of this confused mess. My colleagues on the other side of the aisle have shredded all their credibility in this committee.

They simply grasping at straws that do not exist.

In this Congress so far, we've held more hearings on gas stoves than gun violence and culture wars than kitchen table issues. So let's talk about the real two tiered justice system. The one in which big corporations pollute the air we breathe and the big banks cause meltdowns with their negligence and not one person is held criminally liable.

They're certainly not called by the majority to sit before this committee. Or Mr. Chairman, what if we talked about the other unspoken two tiered justice system in this country. The one where people of color are subject to a deliberately harsher system at every turn from policing to prison to parole. In this country, a black person is five times more likely to be stopped without due cause than a white person and black defendants are 25 percent more likely to be held pretrial.

Meanwhile the twice indicted former President is out campaigning around the country and didn't even have to post bail. Yet hundreds of thousands of Americans sit behind bars waiting for their day in court. These are the types of lived experiences we should be addressing in this oversight committee. This is the real two tiered justice system and it's the justice system Democrats are trying to fix.

After four years of Donald Trump's misuse. Congressional Republicans however, are working to make these inequalities worse through their efforts to defund the IRS and other Democratic priorities included in the Inflation Reduction Act. So since my colleagues claim to want stricter IRS enforcement, you would think we would at least agree on giving the IRS its proper funding.

So let me conclude by asking a simple question. Mr. Shapley, yes or no. Do you know the rate at which black taxpayers are audited as compared to taxpayers who are not black? No, I don't know. Well, the answer is black taxpayers are audited at 2.9 to 4.7 times the rates of non black taxpayers. Another question for you, sir, yes or no. Will this hearing help alleviate the racial disparity in the rates of the IRS audits?


GARY SHAPLEY:
No, not the topic.


SHONTEL BROWN:
Thank you and with that [Crosstalk], I will yield the balance of my time to the ranking member.


JAMIE RASKIN:
Thank you kindly and for your excellent questioning and statement there. The chairman of the Judiciary Committee when he was here invited us to believe that the US Attorney for Delaware had changed his tune or changed his story. But when you look at the letters he actually sent, he didn't change his tune at all.

He said the exact same thing every time and even expanded the answer to be perfectly

clear. In his June 7th letter, he says, "I have been granted ultimate authority over this matter, including responsibility for deciding where, when and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution consistent with federal law, the principles of federal prosecution and departmental regulations". In other words, it's up to him, it's up to the US attorney.

Then in June 30th, the letter to the chairman, Jordan, he says, "Second, In my June 7th letter, I stated quote 'I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges ET cetera', unquote. I stand by what I wrote and wish to expand on what this means and this gets to the heart.

I think of what we're doing here today as the US attorney for the District of Delaware. My charging authority is geographically limited to my home district. If venue for a case lies elsewhere, common departmental practice is to contact the US Attorney's Office for the District and question and determine whether it wants to partner on the case.

If not, I may request special Attorney status from the Attorney General pursuant to 28 USC 515. Here I have been assured that if necessary I would be granted Section 515 authority in the District of Columbia, the Central District of California or any other district where charges could be brought in this matter".

OK, and it is the difference as Ms. Ocasio-Cortez was saying between special counsel and special attorney, which might explain the confusion or the disagreement here. In any event, the US attorney for Delaware had all of the authority he needed to bring whatever charges he wanted wherever he wanted and he is the witness for that.

Thank you, Mr. Chairman and I'll yield back to the gentleman.


UNKNOWN:
I would like to be clear that he was assured that authority, he was a --


JAMIE RASKIN:
Yes, he was. And he said he was assured the attorney.


UNKNOWN:
And he is jurist, he is limited within Delaware well.


JAMIE RASKIN:
But that's just the rules. You're just restating what the rules are. That's what he explained. That's -- you're not a lawyer, right? You don't work in the Department of Justice, correct. He's explaining what the rules are.


JAMES COMER:
Gentlemen -- gentleman's time has expired. Chair, recognizes Dr. Foxx from North Carolina for five minutes.


VIRGINIA FOXX:
Thank you, Mr. Chairman and Mr. Shapley, Mr. Ziegler. Thank you for being here today.

Blowing the whistle against a man as well connected as Hunter Biden is truly courageous, is a truly courageous act and I hope that all of my colleagues can appreciate that as well. Mr. Shapley, I'd like to start with a simple question.

When did you start your career as an investigator with the IRS?

GARY SHAPLEY:
In July of 2009.

VIRGINIA FOXX:
Thank you. In what year were you promoted to a supervisory role.

GARY SHAPLEY:
In 2018.

VIRGINIA FOXX:
So that's 14 years of service at the IRS with five of those years in a senior leadership position, correct?

GARY SHAPLEY:
Uh, that's correct.

VIRGINIA FOXX:
Did you ever in your 14 years of experience, see an investigation be handled in the same manner as the one we're here to discuss today, The one in Hunter Biden's taxes?

GARY SHAPLEY:
I have not, no.

VIRGINIA FOXX:
And when were you made Supervisor of the investigation in Mr. Biden's Operation Sportsman?

GARY SHAPLEY:
In January of 2020.

VIRGINIA FOXX:
By your estimate at that time, when did you initially believe that the evidence was sufficient to request physical search warrants in California, Arkansas, New York and Washington DC?

GARY SHAPLEY:
So Special Agent Ziegler drafted an affidavit in April or May, and that was when -- when for the search warrant.

VIRGINIA FOXX:
Of 2020?

GARY SHAPLEY:
2020, yes, I'm sorry.

VIRGINIA FOXX:
It was a short time after that you began to suspect that career officials at DOJ were quote "dragging their feet regarding the next steps in the investigation". Is that correct?

GARY SHAPLEY:
Yes, that's correct.

VIRGINIA FOXX:
And two months later in June of 2020, you came to the belief expressing as such in communications with IRS CL leadership that if normal procedures had been followed that these search warrants would have already been executed. Is that correct?

GARY SHAPLEY:
That's correct, yes.

VIRGINIA FOXX:
Was this within the typical timeframe for the self-imposed investigative pause that DOJ historically tends to implement in cases preceding elections?

GARY SHAPLEY:
It was not the official Department of Justice Public Integrity stand down came on September 4th of 2020.

VIRGINIA FOXX:
After the initial steps were in explicitly -- inexplicably denied prosecutors continued to decline to advance on promising leads. There were for example, many problematic text messages and emails on the infamous laptop in August 2020. When were you informed by Assistant US Attorney Wolf that the DOJ would not allow physical search warrant on Hunter Biden?

GARY SHAPLEY:
So I don't recall the exact date, do you?

JOSEPH ZIEGLER:
And I don't think that that's in the confines of our -- of our testimony, but we can provide that information to the House Ways and Means Committee a clarification to that and then that can clarify that -- that issue.

VIRGINIA FOXX:

My understanding is that it was October 2020, but we appreciate your clarification of that. Did Assistant US Secretary Wolf's decision not to execute a search warrant on Hunter Biden strike you as atypical? Mr. Shapley.

GARY SHAPLEY:
Uh, generally, any other investigation if we have probable cause and we believe there's evidence in that location that could prove -- help prove our violations, then we would execute that search warrant.

VIRGINIA FOXX:
So it was an unusual action.

GARY SHAPLEY:
Yes, yes, Congresswoman.

VIRGINIA FOXX:
Thank you. Is it fair to conclude that this pattern of odd atypical and sometimes bewildering actions taken by DOJ tax and the district attorney's office happened over the course of the entire investigation and not just one or two occurrences?

GARY SHAPLEY:
That's correct and it was the pattern that really drove me to one of the things that drove me to come forward of that deviation from a normal investigative processes.

VIRGINIA FOXX:
In your opinion, did these odd atypical and bewildering actions bolster or harm the investigation?

GARY SHAPLEY:
I believe they hurt the investigation.

VIRGINIA FOXX:
To our chairman. I would say that there's something rotten in the state of Delaware and that what has happened here with Hunter Biden would not have happened to other Americans. And this is totally unfair and I think it's very important that we get to the bottom of this investigation and find out who has been obstructing this sense of justice.

The American people demand justice and this committee demands justice along with the other committees involved. And I thank you for this hearing. Our witnesses.

JAMES COMER:
Gentleladies time's expired chair now recognizes Ms. Stansbury from New Mexico for five.

MELANIE STANSBURY:
Thank you. I'd like to get right into some basic vetting questions as unfortunately our

colleagues across the aisle failed to do so with some of the previous witnesses that they called. And so Mr. Ziegler and Mr. Shapley, I'm hoping that these are very simple, very straightforward questions. So I'd like to ask that you answer them with a yes or no answer.

Mr. Shapley, are you now or have you ever acted as an unregistered foreign agent for the Chinese government or for any other government?

GARY SHAPLEY:
No.

MELANIE STANSBURY:
And Mr. Ziegler, are you now or have you ever acted as an unregistered or registered foreign agent?

JOSEPH ZIEGLER:
No.

MELANIE STANSBURY:
And Mr. Shapley, have you ever participated in illegal arms trafficking?

GARY SHAPLEY:
No, I have not.

MELANIE STANSBURY:
And Mr. Ziegler, how about yourself?

JOSEPH ZIEGLER:
I have not.

MELANIE STANSBURY:
And finally Mr. Shapley, have you ever been indicted of a crime, lied to investigators while under oath or run from the law?

GARY SHAPLEY:
No, I have not.

MELANIE STANSBURY:
And Mr. Ziegler. Same question to you. Have you ever been indicted, lied to investigators or run from the law?

JOSEPH ZIEGLER:
I have not.

MELANIE STANSBURY:

Thank you for answering those questions. Obviously, it would seem strange to have to ask these clarifying questions, but given the majority's track record in calling witnesses on this matter, not to mention their own Presidential candidate, it seemed necessary to clarify for our American folks who are listening today.

So let's get into the kinds of crimes that the majority claims that they're interested in investigating here in the Oversight Committee, namely political influence, abuse of power and other alleged crimes by a President and their relations. And again, because our time is limited, I'd like to ask our witnesses to stick with very simple, straightforward yes and no answers.

Now Mr. Ziegler, you are aware that Mr. Jared Kushner received a $2 billion investment from the Saudi government after working for his father in law at the White House Correct?


JOSEPH ZIEGLER:
Congresswoman I thank you for the question. I'm here to talk about the Hunter Biden investigation.


MELANIE STANSBURY:
It is a widely known fact and I appreciate your response. Mr. Ziegler, you are aware that while serving as a senior advisor to her father, Ivanka Trump had a number of trademarks fast tracked by the Chinese government, correct?


JOSEPH ZIEGLER:
Again, I have to -- I have to stick to the confines of my transcript.


MELANIE STANSBURY:
I appreciate that. And finally, I want to remind everyone that the person who appointed US Attorney General, David Weiss to handle the matter that we're here to discuss today was Donald Trump. But this would be the same President Donald Trump, the man twice impeached for abuses of power and of course recently indicted for 37 counts of criminal activity.

Now one would think that here in the Oversight Committee, we would want to investigate such blatant acts of criminal activity and I truly could not agree more with our witness Mr. Shapley, that there should not be a two tiered system of justice for those who are powerful. And those who are wealthy and those who are not.

But that is not actually what this hearing is about here today because it's clear that this is yet another attempt by the majority to turn this committee into another in-kind donation to the Trump campaign. Now this follows on an earlier attempt this past month to undermine the FBI with a controversial markup which thankfully did not occur the very same day that Donald Trump was indicted under those 37 counts.

In fact, if you look across the aisle, we have 13 members who have already endorsed Donald Trump and now here we are trying to distract the American people once more, even though it was a political appointee appointed by Donald Trump who was at the helm of this effort when the issues we are discussing today occurred and yet we're using the committee's resources to advance this agenda.

But I think it's important that the American people actually understand that the real criminal and the actual threat to our democratic institutions is Donald Trump. The man found legally liable for sexual abuse. The man who refused to return classified documents to the government, the man who was inciting an insurrection that led to the deaths of five people and threatened the lives of people in this very room and who threaten the very foundation of our democracy.

So I find it hard to believe that members who witnessed the insurrection who have witnessed these criminal indictments continue to stand here today with Donald Trump and prop him up using committee resources. And I urge my colleagues to take a hard look in the mirror and to really reflect on what our oath of office means.

And with that I yield back.


JAMES COMER:
Gentlelady yields. Chair now recognizes Mr. Higgins from Louisiana for five minutes.


CLAY HIGGINS:
Thank you, Mr. Chairman, Mr. Shapley, Mr. Ziegler, we're going to be moving fast here. Let me make a statement to begin. Let's just clarify for America. Republicans are only interested in Hunter Biden's deceptions regarding his IRS confirmed receipt of $17.3 million from shady sources in Ukraine and Romania and China, while his father was Vice President, because Hunter Biden had nothing to sell, he had no product, no service, no skill.

All Hunter Biden had to sell was corrupted access to his father. The big guy, How dare Congressman Higgins call the President of the United States, May I say the inaugurated President of the United States, I would call him the big guy. Let's go December 30th, 2020, this investigator Shapley and Investigator Ziegler IRS criminal investigation team at a 12 hour long meeting with US attorney's office in Delaware, the prosecution team, Wolf and Weiss in attendance.

Shapley shares an IRS plan to interview Biden associate Rob Walker. Wolf objected to this plan to the dismay of those in the room. But she said we do not want to ask about the big guy and stated she did not want to ask about Dad. December 8th, 2020, Investigator Shapley and Investigator Ziegler, made in which Special Agent Joe Gordon received a call from Hunter Biden's attorneys stating that they would accept service for document requests but declined requests for the interview.

The IRS investigators were only able to conduct one meaningful interview that with Biden associate Rob Walker. That day. The investigations revealed to the Press December 9th, 2020. Wolf gets involved again to interrupt the investigation. December 14th, 2020 Assistant US Attorney Wolf tips off Biden counsel about an IRS plan that had reached a threshold of probable cause to execute a search warrant on a storage unit in Northern Virginia.

US Attorney Wolf calls on Biden's attorney and alerts him to the pending search warrant being executed. You stated investigator Shapley that at every stage during your investigation, decisions were made that benefited the subject of the investigation. Who was the subject of the investigation, good sir?


GARY SHAPLEY:

Hunter Biden.

CLAY HIGGINS:
Thank you very much and I think I clarified for America while we were interested in Hunter Biden? Because he sold access to his father, the big guy. And you Americans out there may have a compromised President in your White House. You should certainly be concerned. Mr. Ziegler, how did the IRS investigation regarding Hunter Biden begin?

Tell us briefly, sir.

JOSEPH ZIEGLER:
It was a review of bank records regarding another investigation I was working.

CLAY HIGGINS:
So was ancillary to another criminal investigation, is that correct sir?

JOSEPH ZIEGLER:
Correct.

CLAY HIGGINS:
And you are a criminal investigator, is that correct sir?

JOSEPH ZIEGLER:
That is correct.

CLAY HIGGINS:
Not civil.

JOSEPH ZIEGLER:
That is correct.

CLAY HIGGINS:
Thank you very much. Investigator Shapley, in the September 3rd, 2020 meeting with the prosecution team for the Hunter Biden case assistant US Attorney Leslie Wolf told your team there was more than enough probable cause for the physical search warrant of the guest house at then former Vice President's Delaware residence where Hunter Biden stayed for a time.

Did US Attorney Leslie Wolf confirm your investigative effort that you had sufficient probable cause for search?

GARY SHAPLEY:
Yes, she did.

CLAY HIGGINS:

Thank you very much, but you've told Congress that Assistant US Attorney Wolf also said that the question was whether the"juice was worth the squeeze", that's a quote and that optics were driving factor in the decision on whether to execute a search warrant. Optics. Have you ever run into that, Mr. Shapley?

GARY SHAPLEY:
I have not.

CLAY HIGGINS:
Have you Mr. Ziegler?

JOSEPH ZIEGLER:
I have not.

CLAY HIGGINS:
Now why do you think -- why do you think the Department of Justice might be concerned about optics in the search of the President's son's residence during the course of a criminal investigation? Mr. Shapley?

GARY SHAPLEY:
I mean just the sensitivities involved with that -- that search warrant and it would you know.

CLAY HIGGINS:
Pretty clear isn't it? There's another search warrant. I'm going to touch on a -- my remaining section. I'm going to have my time expired here. Let me just say, gentlemen, you're courageous for coming forward. And let me ask you, did your job begin with an oath?

GARY SHAPLEY:
It did.

CLAY HIGGINS:
Have you upheld that oath?

GARY SHAPLEY:
Yes, I have.

JOSEPH ZIEGLER:
Yes, I have.

CLAY HIGGINS:
And is it -- is it your core principles that have driven you to reveal the corruptions that you've witnessed in your criminal investigations coming before Congress today?

JOSEPH ZIEGLER:
Yes, it was.

GARY SHAPLEY:
Yes, it was. Thank you, Mr. Chairman, I yield.

JAMES COMER:
Very good. Chair now recognizes Mr. Gomez for five minutes -- Garcia for five minutes, sorry.

ROBERT GARCIA:
Thank you, Mr. Chairman. So let's first zero in on the bottom line. What we have is two IRS investigators who clearly worked very hard on the Hunter Biden investigation and thank you both for being here today. You both gave recommendations to prosecutors based on your work, which you've described today. And then Donald Trump's handpicked prosecutor then made recommendations to charge Hunter.

He acted independently and he himself has confirmed this. You did your job making recommendations and then the prosecutor did his job. You don't have to agree with his conclusions, but that's the bottom line of what we have today at this hearing. But today's hearing is like most of the majority's investigations and hearings.

A lot of allegations, zero proof, no receipts, but apparently some dick pics. Now at a certain point, the American people will need some actual evidence, actual evidence, but we've seen absolutely none. So let's go back and review what's gone over the course of the last seven months of this smear campaign against the White House.

First, the committee is clearly obsessed with Hunter Biden, massively obsessed with them. Now keep in mind there's been no evidence of any wrongdoing or transactions of the person that's actually in government, Joe Biden. A lot about Hunter, not a lot about Joe Biden. And Hunter Biden, I want to remind the majority, is actually not the President of the United States.

And I want to point out that no Biden, family members hold government positions of any kind. Now this is, of course, in stark contrast to the Trump crime family. The majority conveniently glazes over the Trump's family's foreign dealings. The Trump family who of course were actually appointed to White House senior jobs from Ivanka's Chinese trademarks to Jared's Qatari real estate bailout and $2 billion in Saudi private equity money.

So where's that investigation? They were actually in the White House. And I think Chris Christie, one of the Republicans running for President, said it best of course and the former governor. This is his quote, not mine. "The grift from the family is breathtaking. It's breathtaking. Jared, Kushner and Ivanka Kushner walk out of the White House and months later get $2 billion from the Saudis.

Continue you think it's because it's some kind of investigative genius or investing genius or is it because he was sitting next to the President of the United States for four years and doing favors for the Saudis. Now these are quotes from a man who's known Trump and the Kushner's for years. These people are in the White House every day formally making policy unlike Hunter Biden.

Now the Biden family attacks of course went nowhere, so they tried of course to create a new storm, a new conspiracy theory with the so-called FBI Ukraine document, another fake

scandal. This new fake scandal had a lot of hype, a lot of scary headlines from our chairman from a lot of members of this committee.

But a lot of us actually read the document and when you read the document it was pretty clear -- pretty clear this was all hype. Just a wild accusation being passed along to the FBI with zero proof. And where did this accusation actually come from Rudy Giuliani? Just another Rudy Giuliani, tinfoil hat conspiracy theory that went nowhere.

Giuliani recommended that it's Giuliani, by the way, whose law license is being recommended to actually be removed. Now Rudy Giuliani's longtime associate Lev Parnas just said that he's prepared to testify under oath that there is no evidence that the President or his son, Hunter, interfered with Ukrainian politics and there never has been.

The Republican US Attorney Scott Brady handpicked by Donald Trump determined to not have sufficient evidence to further investigate Rudy's claims. But members of this committee even today repeat this narrative over and over again. More accusations, no proof, no receipts. So what's next in this witch hunt?

This man, Gal Luft, The Republicans were so desperate just last week to find someone who could tell them what they wanted to hear that they promoted and collaborated with the Chinese spy trying to influence US policy while selling weapons to Iran and Libya. So why is this so-called whistleblower missing?

We don't know. Skipped his bail, being searched upon after being arrested. Now we're so desperate to cling to this narrative that they're defending this alleged crook. I want to know, we have questions, Was the chairman, was the committee staff in contact with Mr. Luft? He was a fugitive, do we know where he is? What vetting does the majority do to make sure that there aren't targets of foreign influence on this committee?

These are the real questions that we need to answer.


JAMES COMER:
If you're willing to yield, I'll answer that question.


ROBERT GARCIA:
Sure. I just want my time.


JAMES COMER:
I've never met Gal Luft in my life. All I know is he was getting money from the same company that the Bidens were getting money from CEFC. I yield back.


ROBERT GARCIA:
Thank you, Mr. Chairman. I'm looking forward to also if anyone from the committee or any committee members or committee staff in any contact with who is now obviously a Chinese spy which you and the committee have been hyping up for weeks.


JAMES COMER:
Well, is the President's son a Chinese spy? They took money from the -- the only difference is the President's money from hell of a lot more money than you. [Crosstalk]

ROBERT GARCIA:
Sir, sir, Mr. Chairman, you were the one hyping up a Chinese spy and arms dealer for weeks. This is just another example.

JAMES COMER:
Who cares if they had money from the same company?

ROBERT GARCIA:
So I'll, just to finish up -- just to finish up my time, let me just say that it's clear to me this majority will stop at nothing to try to impeach President Biden, the Attorney General, Secretary Mayorkas and the list goes on and on. This is just another witch hunt that the majority continues to do week after week.

The majority is trying to interfere in ongoing legal proceedings to cause chaos and to try to reelect Donald Trump. Who obviously is pulling this extremist agenda. I yield back.

JAMES COMER:
Chair recognizes Mr Sessions from Texas for five minutes.

PETE SESSIONS:
Mr. Chairman, thank you very much. Gentlemen, welcome and thank you very much for taking time. We've been sitting here listening, strongly, identify that both of you have chosen to do this as strong people who have an ethical and moral idea about your service to this country and we want to thank you. Today, we have examples of the Department of Justice and the IRS that have not just given special treatment to those who committed tax evasion and financial fraud with the President's family.

But I think there's another point that we would want to make today. And that is that I believe that a tax payer system or the agency is tasked with enforcing the laws fairly on regular citizens is also seeking the chance to shield those well connected to the President of the United States from consequences of illegal behavior in direct opposition to our nation's founding principles.

We've established that. I think that's pretty clear what you've said today. But I have a question for both of you because I believe today's hearing goes beyond that and that is that there are strong whistleblower protections under five USC Section 2302, the Whistleblower Protection Act that afford you and any other person who works in this government the protection from retaliation after making a legally protected disclosure.

In doing your job, you felt like there was something wrong, you said something about it and you filed for whistleblower status because you believe that something was being held against you. In fact, both of you had made several legally protected disclosures during this time for the record. Is that correct?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:
That is correct.

PETE SESSIONS:
So after making this disclosure to the committee, did the IRS comply with the statutorily required whistleblower protections? How were you treated in this endeavor?

GARY SHAPLEY:
So I'll start. So since I made these protected disclosures that are legally protected, the IRS has chosen to retaliate against me in multiple ways. Even now there's a major case initiatives that actually Special Agent Ziegler started as well that are now being -- being put on the back burner and just being slow walked.

Again, there's the immediate, my immediate supervisor and two levels above them, haven't spoken to me since June 1st of 2023, even though I'm sending them emails and trying to conduct my business on a daily basis, they literally have not spoken to me.

PETE SESSIONS:
Would that be normal?

GARY SHAPLEY:
No, absolutely not. I mean we're running undercover operations, we're doing interviews across the world -- across the world and you know really becomes when -- when senior leadership really cuts off communication like that increases the chance of some officer safety type issue. When we can't communicate that those type of issues with senior leadership and we have no support from them.

PETE SESSIONS:
Absolutely, Mr. Ziegler. To be completely honest with you. This is going to make me a little bit emotional, but -- and I'm sorry, because I know this personally, you spoke about that in your opening statement.

JOSEPH ZIEGLER:
Never have -- I thought that it's essentially like being left out on an island and I don't know if that's done purposefully, but I -- I essentially made disclosures up to the commissioner of the IRS. I said what happened and the response I got a few days later was I may have broken the law and don't ever do this again.

Your -- your emails need to go through your leadership. So to have that come to me was chilling, it was -- I can't even put words to it. But what I can say is there are some people within my agency, some people in leadership that have been a person that I can go to for support, but the vast majority of it has just -- it's the impact on the person.

It's awful.

PETE SESSIONS:
Well, retaliation is many times seen by people who know it when they see it. And that is why

the law exists. And I want both of you to know, as chairman of Government Operations Subcommittee for this committee, Government Reform and Oversight, Government Accountability. I will be coming to the IRS and I will be going to other agencies specifically about their retaliation under the law within their agencies that we should take as a committee, a whole committee and a subcommittee very seriously.

Because this could be a number of matters that are taking place where people have chilling impact against the laws of the United States of America. Gentlemen, I've been taking notes. I want to thank you for being here today. Mr. Chairman, thank you. I yield back my time.

JAMES COMER:
Gentleman yields back. Chair now recognizes Mr. Frost from Florida.

MAXWELL FROST:
Thank you, Mr. Chairman. First off, thank you two so much for your service, working at the IRS, very important work. Let's get right into it, Mr. Shapley, you're blowing the whistle today because you feel like the Department of Justice provided preferential treatment to Hunter Biden. Is that correct? Yes or no.

GARY SHAPLEY:
That's correct.

MAXWELL FROST:
And you believe that Hunter Biden received that preferential treatment because his father is the Democratic President Joe Biden. Is that correct?

GARY SHAPLEY:
I can't conclude why heI was receiving the preferential treatment, but that is one conclusion you can come to.

MAXWELL FROST:
Yeah, I mean it's evident in your deposition that you believe that. Mr. Ziegler, did any of your supervisors explicitly tell you you're not allowed to investigate Hunter Biden because he's the President's son. Yes or no?

JOSEPH ZIEGLER:
I was never told that.

MAXWELL FROST:
You were never told that. Thank you. I mean and nowhere in your deposition, did you suggest that there are some larger conspiracy at play here, which is what my colleagues on the other side of the aisle would have us believe that there's a two tiered justice system that privileges Democrats over Republicans.

And that's what my colleagues are doing. They're using you and using your story and using your work to make this argument for themselves. And since January 6th, these Republicans

and Trump have complained about a two tiered justice system. Co-opting the language of the decades long civil rights movement for black lives and black freedom of movement that they actually are actively looking to eliminate.

There is a two tiered justice system, but it's not about Democrats versus Republican. This language, two tiered justice system has a real history. It has a real history of Emmett Till. It has a real history with Breonna Taylor. It has a real history with George Floyd, the Central Park Five. Derek Diaz, a young man who was just an unarmed young man who was just killed in central Florida, about a week ago.

And it has a real history with the Groveland four. Four black boys from central Florida who were falsely accused of kidnapping and sexually assaulting a white woman when they pulled over to help the help her when the car was broken. The fourth boy who was in pictured here Ernest Thomas wasn't apprehended initially.

He was actually shot to death in his sleep. A 100 person mob wanted to get their hands on the remaining three black boys and couldn't and so they took it out on the predominantly black town shooting residents, looting, setting fire to their homes. Charles Greenlee was sentenced to prison for life. He was 16 years old.

Now just a quick trigger warning here for black death and trauma, but it's important story to tell when we talk about the two tiered justice system. Because on the way back from the courthouse, the sheriff took it upon himself to shoot the two remaining individuals, Walter Irvin and Samuel Shepard. Walter Irvin actually ended up living because when he was shot, he played dead, but the other one was shot killed, Samuel Shepard.

They were both handcuffed as you can see in the photo and were shot to death. They all died in either prison or on parole as convicted criminals. And in 2021, 72 years later, a judge exonerated them and the trial was considered a fraud. In closing, there is a two tiered justice system. It does exist, but it's not what my Republican colleagues want to say.

It is using your story for that. It's not Republican versus Democrat, it's black, brown and poor people versus everyone else. And I won't accept when Republican politicians look to appropriate the language of the movement for black lives and civil rights to fit a political agenda to defend Donald Trump. This is the two tiered justice system.

This is the two tiered justice system. And so we have to continue to fight for a world where this doesn't happen. This case about Hunter Biden is a case closed. And I'll close with a question with the Chairman considering the quote, "falsehoods, abuses and misrepresentations of sensitive information" that you presented here when we're done with this made up investigation, are you expecting to be censured by the House?

The reason I ask is because it's in line with the logic and actions of the Republican Party here in the 118th Congress. Thank you and I yield with the gentleman, I yield to the ranking member.


JAMIE RASKIN:
Thank you very kindly. Mr. Ziegler, you referred to an FBI supervisory special agent who went with you to try to interview Hunter Biden. Is that someone that you respect?


JOSEPH ZIEGLER:
That wasn't me. That would have been my supervisor. OK. Sorry, Mr. Shapley, you went with

this SSA, Was that someone that you respect?

GARY SHAPLEY:
Yes, I respect the FBI SSA.

JAMIE RASKIN:
Because he came and did an interview with us and he said he testified that over his decade of experience with the Delaware US Attorney's office, the FBI agent never knew the assistant US attorneys in office or US Attorney Weiss to allow any political considerations to influence their prosecutorial decisions in any case.

Do you accept his judgment or you disagree with his judgment about that?

GARY SHAPLEY:
So, yeah, the FBI, SSA, I respect and it's a matter of timing, he -- he retired in June of 2022. And at that time, I haven't even overcome the burden that it took me to -- to -- to say that this has been political and been politicized. It wasn't until October 7th, 2022. So the FBI SSA made -- he came to his conclusions and he wasn't there for the October 7th.

JAMIE RASKIN:
Can I mention something? Let me just say I respect very much your service and I respect very much your testimony today, but I think it's completely within the realm of prosecutorial discretion and just subjective differences of opinion that people have. And those of us who've been in prosecution, understand that happens all the time with prosecutors and investigators.

JAMES COMER:
Chair recognizes the gentleman from Arizona, Mr. Biggs for five minutes.

ANDY BIGGS:
Thank you. It's good to have you here. Appreciate it. Appreciate your courage and your willingness to testify. I'm Mr. Shapley, I'm going to go to pages 18 to 20 of your testimony and Mr. Ziegler, I'm going to go about page 104 to 105 of yours to start with. And but while you're going there, I'm going to ask this question.

You know, we've heard a lot about this well, you know, this is 2014, 2015, 2016 tax things. You know, Trump -- Trump, you know, we've heard lot about Trump there, but in 2014, '15 and '16 those tax years, Donald Trump wasn't elected, but who was the Vice President of the United States If you know?

GARY SHAPLEY:
A Joe Biden was a Vice President of United States.

ANDY BIGGS:
I think that's right. And when the statute of limitation ran on those '14 and '15 years who was the President of the United States when the statute expired.

GARY SHAPLEY:
So that was President Biden.


ANDY BIGGS:
Under President Biden. Well, there's some indicia in their statements and testimony that you made that I want to go over. Mr. Shapley, why did you want to interview Rob Walker?


GARY SHAPLEY:
So I think Special Agent Ziegler would be better to answer that question. [Off-Mic]


ANDY BIGGS:
So I'm looking on page 18 of your -- of your -- of your testimony, Mr. Shapley.


GARY SHAPLEY:
Yeah, can you repeat the question.


ANDY BIGGS:
Yeah, I'll tell you what, I'll rephrase the question. The -- on the -- the day of action you guys were intending to interview 12 people, one of whom was Rob Walker, a business associate of Hunter Biden. And in particular you wanted to talk about, I think the quote is "ten held by H for the big guy", right.

So what, who was the big -- who did you infer that the big guy may be?


JOSEPH ZIEGLER:
So all I can do is speak to the evidence there. What I can say is I think I know what you're referring to is when we're preparing for that, we're preparing for that interview and we're referencing that email ten held by H for the big guy. And from what I understand, to be President, his dad, President Biden.


ANDY BIGGS:
OK. So I'm sorry, I just want to ask Mr. Shapley similar question because the AUSA Wolf interjected and I'm reading from your transcript now and said she did not want to ask about the big guy and stated she did not want to ask questions about 'dad' in quotes, Who did you -- who did you take dad to be when she refers to dead?


GARY SHAPLEY:
The father of the subject is President Biden.


ANDY BIGGS:
President Biden. And so even by her response, she's inferring that Joe Biden may be involved in Hunter Biden's transactions. And then you get to the FBI agent and you give some detail about his -- his, Mr. Shapley, you give some detail about what he is saying and the transcript if you will of his interview.

And in particular the FBI agent asks Mr. Walker. "So you definitely got the feeling that that

was orchestrated by Hunter Biden to have like an appearance by his dad at that meeting just to kind of bolster your chances of making the deal work out". Walker answered, "sure." The FBI agent continued "Any times when any time he was in the office or did you hear Hunter Biden say that he was setting up a meeting with his dad with them while Dad was still in office". Walker answered "Yes". That's the quote that you gave to in your transcript.

And so I guess the question there is what did you infer that the -- and then you said the FBI agent inexplicably does ceases that line the questioning. I want to know what you thought the FBI agent was inferring. What did you think? What do you think when you read that when you heard that of the relationship between Joe Biden and Hunter Biden and his business transactions when he is still in office?


GARY SHAPLEY:
Yeah, so I can't go beyond what you -- what you've quoted me as saying in my testimony, so I'll just leave it there.


ANDY BIGGS:
OK. Thank you, Mr. Ziegler. On page one -- page 104 of yours, you mentioned that -- that -- that Mr. -- Mr. Biden, Hunter Biden attempted to obtain a business tax deduction on his return for hotel rooms that were used by his father, Joe Biden. Tell us about that please.


JOSEPH ZIEGLER:
So, yeah, on his tax return, he deducted a hotel room for his dad. So Joe Biden. And we actually got the invoice from the hotel that showed the dad's name on it.


ANDY BIGGS:
So -- so for that to be a valid business deduction you would -- he would have to be doing business with Hunter Biden, is that not true?


JOSEPH ZIEGLER:
So we would typically a typical part of the process would be to interview that person to find out what you had or what might have happened. Why did you -- why did you go to that hotel room. And based on statements he made in his book, I mean you can correlate to what was kind of going on around that time?


ANDY BIGGS:
But how does it become a valid business deduction if -- if Joe Biden's just there on vacation?


JOSEPH ZIEGLER:
You know, generally speaking that to be a valid business deduction, it would have to be some type of business activity being conducted at that time.


ANDY BIGGS:
And the last one is the WhatsApp and I won't get into it because we're just about out of time. But I would just say the WhatsApp where he says he's sitting. my dad sitting next to me and you remember that. And then that's on, I want to say what page 105. That's where you talk

about it, Mr. Ziegler. And what page 105 of your transcript.

I guess the question there is, how would you be able to determine whether those rooms, whether he was actually next to -- to Hunter Biden? How would you be able to determine that?

JAMES COMER:
And the gentleman's time has expired, but you can please answer the question.

JOSEPH ZIEGLER:
So typically in that situation, you'd want to get location data. Contemporaneous data that would show where that person is at. So that's what we would typically look to yeah.

ANDY BIGGS:
Thank you so much.

JAMES COMER:
Very good chair now recognizes Ms. Lee from Pennsylvania.

SUMMER LEE:
Thank you, Mr. Chairman. Republicans have been invoking this term two tier system of justice a lot recently. So I want to talk about what the real two tiered justice system is where black and brown people are over criminalized and over incarcerated. On June 20th, Chairman Comer claimed in a committee press release quote "The Department of Justice's charges against President Biden's son Hunter reveal a two tier system of justice". From this, as you see or have seen from the knock off social media site, former President Trump has also used this phrase in connection with the Hunter Biden investigation.

I'd like to address the way my Republican colleagues are attempting to co-opt the phrase two tiered justice system to make it sound like Trump and his cronies are somehow the victims here when the reality is that the term two tiered system of justice is meant to refer to the very real system that exists in the United States and which affects black and brown folks.

Not powerful former Presidents and their political allies. The real two tiered system of justice is one in which in 2021, according to the DOJ's Bureau of Justice Statistics, the imprisonment rate for black men aged 18 and 19 was 11.6 times the rate for white males. The real two tiered justice system is one in which in 2021 according to those same statistics, the imprisonment rate for Native American males aged 18 and 19 was 5.1 times the rate for white males.

The two tier justice system is one in which according to a May 2018 Vera evidence brief and I quote 'black men comprise about 13 percent of the male population, but about 35 percent of those incarcerated". One in three black men born today can expect to be incarcerated in his lifetime. Compared to one in six Latino men and one and 17 white men.

The two tiered justice system is one in which an analysis of nearly 100 million traffic stops across this country found that black drivers were about 20 percent more likely to be stopped than white drivers. My Republican colleagues seem to think that using criminal law as a weapon or a political tool is objectionable only when directed against someone who should

be out of reach of the criminal system.

Someone too rich, too powerful or too white to be charged. But let's face it, that same system has been used as a weapon and a political tool against black people since the Emancipation Proclamation. These racial disparities are rooted in a two tiered view on race. The belief that black people were inferior that was created to justify the -- the enslavement of black people, which has now evolved into -- to include the belief that black people are more prone to criminality.

During the decades of lynchings that followed enslavement, white people defended the torture and murder of black people as necessary to protect property, families and a way of life from black criminals. In 1980s, Nixon's war on crime evolved into Reagan's war on drugs and we saw harsher and more frequent punishments in the start of mass incarceration.

In both cases, it was black people who were targeted and suffered under those policies. There's a reason that crack cocaine, which carries a stereotype of being used by black people, was at one point punished far more harshly than powder cocaine. Prior to 2010, that ratio was 100 to one. Meaning someone convicted in a federal court of possessing crack cocaine will receive the same sentence as someone who possesses 100 times more powder cocaine.

And I want to say that PA's extreme sentencing practices have overwhelmingly impacted people of color, but most specifically, black people who make up less than 11 percent of the population in Pennsylvania, but more than 65 percent of those serving life without parole sentences. And 58 percent of those serving non life sentences of 20 years or longer.

How many times have our elected officials and judges ran on a promise of a tough on crime approach. Even now, Republicans still tell that they are the party of law and order while in the same breath claiming that Donald Trump should not be prosecuted. Don't get it twisted. Republican efforts -- efforts to use the term two tier justice is to distract from those who are truly the victims of a disparate treatment in our criminal justice system.

And whether we say it out loud or not, we all know who those people are. I yield the remainder of my time to the ranking member.


JAMIE RASKIN:
Thank you, Ms.. Lee, for that very eloquent statement. I just -- I wonder if you remember you might be too young for this. But when there was this horrific assault, a gang rape in Central Park donald Trump ran ads in The New York Times saying that the Central Park suspects should be given the death penalty and of course they turned out to be completely innocent of the offense.

So I think that's just to reinforce your point. There's a history of profound racism in the criminal justice system and in the rhetoric around it. And there's something very disappointing about our colleagues co-opting as you say in prostituting the critique of the system as two tiered in on behalf of Donald Trump.

I yield back to you.


JAMES COMER:
Chair recognizes Mr. Grothman from Wisconsin for five minutes.

GLENN GROTHMAN:

Thank you, Mr. Chairman, for holding this important hearing. I found it interesting that the 12 witnesses, the FBI and the IRS wanted to interview on December 8th, 2020, including Hunter Biden. They only got one interview. That was Rob Walker, a friend of the Biden family and whose company, Robinson Walker LLC sent millions of dollars to the Bidens that originated in Romania and China.

President Biden said his family didn't receive money from China, but that wasn't true. Mr. Shapley, according to your testimony before Ways and Means on page 18 on December 3rd, 2020, did you have a long meeting with the prosecution team at the US Attorney's Office in Delaware?

GARY SHAPLEY:

That's correct on December 3rd, 2020.

GLENN GROTHMAN:

Is it true that US Attorney Weiss was in and out of that meeting?

GARY SHAPLEY:

Yes, that's true.

GLENN GROTHMAN:

And during the meeting, did you share your plan to interview Hunter Biden -- did you share your plan to interview Hunter Biden's associate Rob Walker?

GARY SHAPLEY:

All the interview outlines for the witnesses were discussed that day, yes.

GLENN GROTHMAN:

OK, and you wanted to question Walker about the email that said ten held by H for the big guy, is that correct?

GARY SHAPLEY:

That was included in the interview outline, yes.

GLENN GROTHMAN:

OK, but US Attorney Lesley Wolf told you she did not want you to ask questions about dad meaning Joe Biden, is that correct?

GARY SHAPLEY:

That's correct.

GLENN GROTHMAN:

OK. So assistant US Attorney General Wolf , was you felt conceding that the big guy was

Joe Biden.

GARY SHAPLEY:
I think that's accurate. I mean, I don't -- I don't -- I don't want to conclude what she was thinking.

GLENN GROTHMAN:
OK, you did have an interview with Rob Walker in Arkansas, correct?

GARY SHAPLEY:
I did not, but agents did, yes.

GLENN GROTHMAN:
OK. And did Rob Walker tell you that President Biden had ever showed up to a meeting with his son's business associates?

GARY SHAPLEY:
He told us that he had shown up at the meetings, yes.

GLENN GROTHMAN:
OK. Can you elaborate on that at all?

GARY SHAPLEY:
I can only stick to what's in the transcript and the witness described an instance where CFC executives were or people involved in CFC were meeting at the Four Seasons and that the subject's father President Biden showed up at that meeting.

GLENN GROTHMAN:
So President Biden was there physically.

GARY SHAPLEY:
That's what the witness said, Yes.

GLENN GROTHMAN:
OK, Mr. Ziegler, maybe I'm going back here a little bit further, but earlier today you wanted to elaborate on one of your questions and you were cut off by one of the Democratic Congressman. Is there anything that you want to say that you can remember that you weren't able to say?

JOSEPH ZIEGLER:
I appreciate that. So I wanted to say that one thing that was mentioned regarding the -- the -- the retired FBI supervisory special agent, I've actually recently reached out to some of my former colleagues that I worked this investigation with at the FBI, and I've asked them, was there anything I misstated In my transcript?

They said no from their best understanding of reading it. So I want to be clear on that, that they've read my transcript or they've referenced that they did and that they've said that there's -- that they didn't see any issues with what I said in my transcript.

GLENN GROTHMAN:
OK, thank you. Mr. Shapley, anything else from you?

GARY SHAPLEY:
Yeah, I want to speak briefly about our criminal tax attorneys IRS criminal investigation. So first, they're only advisory and I can't recall an instance where they not concurred with any of my actions and within the group and that we didn't send it forward anyway through our -- with our senior leadership approval.

The issue here was the manner in which it became a non concur. The line Cty attorney who took more than 50 days to review all the evidence she concurred with all of the charges in that prosecution report in this exhibit two. When she sent it forward a panel of five of lawyers at the National Office of Criminal Tax Attorneys, they concurred with the line attorney's assessment that it was concur on all of the charges that were recommended.

It then went to the senior leadership at CT Counsel and in the top said that you need to change this to a non concur. So that -- that even something like that could happen in practice. The issue here was that -- that we -- I contacted the line attorneys manager, the area counsel and I said that this was going to be -- we didn't know this is going to be a non concur.

She's been saying it's going to be a concur and she told us that it always been a non concur. Basically obfuscating the entire events that occurred at the senior levels with the panel agreeing with the law and that and recommending concurring those charges. So I don't know why CT counsel would -- would lie to us or provide false information about it being a non concur the whole time and Special Agent Ziegler had some communication with that line attorney and said, do you know that that they are saying that it's always been a non concur and she confirmed.

She -- she said what? No, I sent a yellow light, which is a concur. And so that was the issue with CT counsel that really perplexed me and that's something that I wanted to add to the Congressman back there. So thank you for the extra time.

GLENN GROTHMAN:
Thank you and just one other thing, I think with regard what happened in Central Park years ago, the mischaracterization of -- of what happened there is, I'm sure, very hurtful and harmful to the Central Park -- Park jogger. I wish you wouldn't have -- there's more of that story you know very well.

JAMES COMER:
Thank you very good, but at the request of the witnesses, we're going to take two more questioners and then we'll have another ten minute recess. So I'll just recognize Mr. Gosar and then Mr. Donalds. Right now Chair recognizes Casar from Texas for five minutes.

GREG CASAR:

It's clear from this hearing that Democrats are pro accountability, equal treatment under the law and for paying your taxes. In the Hunter Biden case, we've heard that the Trump-appointed US attorney took the extensive work of the IRS investigation and got the most severe penalty that he thought was possible and he was held accountable.

But there are so many millionaires and billionaires and big corporations that are never held accountable for tax evasion. And in fact, they are shielded by this GOP majority. Republicans are not interested in that kind of accountability. Instead, they're interested in trying their hardest to embarrass the President and prevent our government from operating as it should.

If Republicans were truly interested in holding the powerful accountable, we would be holding hearings on making sure the IRS has the resources to investigate every billionaire and every big corporation who cheats on their taxes. But instead, the first bill that I voted on, the first bill brought forward by this Republican majority was to slash funding dedicated to the IRS in order to chase down billionaire tax cheats.

That would have brought us more revenue for us. If we spend some money on the IRS to chase down tax cheats that would have brought ultimately more revenue to the United States and reduced our deficits and improved programs for the American people. A 2021 Treasury Department paper found that the wealthiest 1 percent may owe more than $160 Billion in uncollected taxes.

According to The New York Times quote, "tax compliance rates for high and low -- or sorry, or high tax compliance rates are high for low and middle income workers who have their taxes deducted automatically from their paychecks. The rich however are able to use accounting loopholes to shield their tax liabilities". So I'd like to reiterate, low and middle income Americans have high tax compliance rates.

They pay their taxes, it is the very wealthiest and the biggest corporations who refuse to pay their fair share and rig the system here in DC in their favor. So Mr. Chairman, I'm interested in whether you could commit in short order to holding a hearing about holding billionaires and big corporations accountable for evading their taxes.

I think this could be a bipartisan hearing. It could result in reductions to the deficit and if we have interest in holding folks accountable on tax evasion, I think we should be looking at the biggest fish we can across the board.


JAMES COMER:
We're starting here today.


GREG CASAR:
No, but I'm -- yeah and we -- and we can have and we -- and we're having a hearing about -- about accountability, but what I want to know is why it is we folks have voted for cutting billions of dollars in order to let folks off the hook. So I'd be interested in if we could have a hearing on the fact that the IRS has lost to attrition, thousands of employees, including those with sophisticated skills.

It used to be that 41,000 audits happened a year for millionaires. That was ten years ago. But in fiscal year 2020, the IRS only audited 11,000 millionaire returns. Only about 7100 of those returns were audited by revenue agents who are the most highly qualified auditors. So I want to know Mr. Chairman, can we have a hearing?

I think this is something we could all get behind, have a hearing about billionaires and big corporations at large scale potentially getting away with from the latest reports. We're talking about $160 Billion in uncollected taxes. I would like to see whether there might be interest from anybody on the other side of the aisle on us having that kind of a hearing.

Any interest really I have -- I have over a minute of time. Mr. Sessions, that'd be great. I think that that would be a good hearing for us to have. Yeah, we want everybody to follow the law, I agree. And with that, I yield back my time to the ranking member.

DAN GOLDMAN:
Will you yield? Yes, I mean. We'll yield to the gentleman from New York. Thank you. I appreciate the gentleman from Texas yielding. I want to bring up that October 7th meeting real quick in just a minute we have. You're familiar with an October 6th Washington Post story entitled Federal Agency Chargeable Tax Gun Purchase Case against Hunter Biden.

Is that right?

GARY SHAPLEY:
Yes, I'm familiar, yes.

DAN GOLDMAN:
And then this was -- this meeting occurred October 7th, the day after this, right/

GARY SHAPLEY:
That's correct.

DAN GOLDMAN:
Was this article discussed at that meeting?

GARY SHAPLEY:
It was.

DAN GOLDMAN:
And what was the nature of the discussion?

GARY SHAPLEY:
It's in that document that -- that email that basically says that we got to keep the sphere small.

DAN GOLDMAN:
And so it was pretty clear though, you would agree, it was pretty clear that this was a leak to The Washington Post by law enforcement agents since it describes what federal agents believe, right?

GARY SHAPLEY:

So it wasn't actually clear to me that it was because usually they'll say that it's a law enforcement source that provided it. And if you see in the bottom, it says that they corroborate it independently and they did not mention law enforcement.

DAN GOLDMAN:
And there was. You don't think it's a federal agent -- the agents who leaked this, when the headline says federal agents see chargeable tax gun purchase case against Hunter Biden.

JAMES COMER:
Gentleman's time has expired, but feel free to answer the question.

JOSEPH ZIEGLER:
So prior to that, if you go back to December of 2020, there was another leak to The Washington Post that got -- I mean, we had to get Department of Justice OIG involved TIGTA involved. So there was other leaks that happened prior to this to The Washington Post that I think are important for -- for us to understand as well in that situation.

GARY SHAPLEY:
It had similar information as the October 6th leak.

JAMES COMER:
Chair -- chair now recognizes Mr. Donalds from Florida.

BYRON DONALDS:
Thank you, Mr. Chairman. To the witnesses, thank you for being here today. I want to get right to it because we have a lot to cover. Mr. Ziegler, you're the -- you are the agent that opened up this investigation. From your transcript, page 17, what -- what it says is -- is that you were investigating a social media company and through the process of that investigation, you found out that Hunter Biden was paying prostitutes was paying potentially for prostitutes in a potential prostitution ring.

Is that correct?

JOSEPH ZIEGLER:
That is correct.

BYRON DONALDS:
OK. You also say that in -- in the beginning phases of that investigation, reviewing bank reports that there was evidence that he was living lavishly through his corporate bank account. Is that correct? And when I say him, I mean Hunter Biden, is that correct?

JOSEPH ZIEGLER:
That is correct.

BYRON DONALDS:

OK. Question for you and also for Mr. Shapely. Is it -- is it -- is it a clear line of potential investigation if somebody is charging up massive living expenses through a corporate account and not doing that through their own personal accounts and not accounting for that properly on their income tax returns?

Is that the basis of a criminal investigation?

GARY SHAPLEY:
You know, generally speaking that would definitely be factors that would spur a criminal investigation, yes.

BYRON DONALDS:
OK, let me -- let me ask this question. Let me answer this question real quick. So there was reference to the WhatsApp -- the WhatsApp text message referring to and everybody knows it now, hey, I'm sitting here on my dad tell the chairman to give me my money because I'm -- we remember and we're not going to forget because we're the Bidens and we have all these connections, yada, yada, yada?

We all -- we all know that text message now. Mr. Ziegler, on page 105 of your testimony, page 105, Gentlemen. You state, I know we wanted to get location data because I went to the prosecutors with this and they again came back at me with "well how -- how do we know that he could just be lying and claiming that dad Joe Biden, now that dad was there and dad was not there, were you allowed to get location data dealing with the WhatsApp text message?

JOSEPH ZIEGLER:
So from -- from my memory of it and from the notes that were taken, I never obtained location data regarding that message.

BYRON DONALDS:
Did -- did -- did Ms. Wolf the AUSA in Delaware, did she say, oh, wow, look at this text message, let's figure out if let's figure out the location data and see where Hunter Biden was when he sent said message. Was she like excited about this as a prosecutor?

JOSEPH ZIEGLER:
So I mean when I asked her about the location data in her response right here, it was her responding with well, how do we know that? It wasn't a -- yeah, let's try and figure that out. It was like, well, how do we know that?

BYRON DONALDS:
Well, did she read the text message? Because if I read that text message as a prosecutor, I'm saying wait a minute, Dad is sitting next to him and Dad happens to be the now President, then Vice President of the United States. Shouldn't we find out where Hunter was when he sent said text message? I mean that's -- I'm not a prosecutor, I'm a finance guy, but that just seems like common sense to me. Yeah.

JOSEPH ZIEGLER:

And I think with the previous email that was referenced, ten held by H for the big guy. Now that you have those two things kind of correlating with each other as a normal process or procedure that we would go through, you would want to figure out is that information truthful in that WhatsApp message?

BYRON DONALDS:

I totally agree with you, Mr. Ziegler, which is why I think it is the view of members on this committee. And frankly, a lot of Americans at this point that there are elements at the Department of Justice who did not want this information out, who did not want to go down the line of process of actually going through the evidence gathering process to see the depths to which this international pay for play scheme was that was actually happening around Joe Biden going through Hunter Biden and all the money that the Biden family was occurring.

That's not a question for you. That's just a statement from me. Last question. Through your investigation, how much money did you uncover was coming from Ukraine, Romania and China?

JOSEPH ZIEGLER:

If you hold on one second, let me reference the. $17.3 million approximately.

BYRON DONALDS:

OK. So $17.3 million through your investigation and you are -- you and Mr. Shapley, you are the guys that investigate criminal tax evasion on an international scale, is that correct?

JOSEPH ZIEGLER:

That is correct.

BYRON DONALDS:

OK. A question for the chairman. Mr. Chairman, through the investigation of the Oversight committee, about how much money have we seen come from Ukraine to Ukraine, Romania and China?

JAMES COMER:

Over $10 million.

BYRON DONALDS:

OK, so we have two separate investigations, one done by the investigative branch of the IRS that is charged with doing these types of investigations. These are the people you want doing them and an independent investigation by the oversight committee. And we're coming up with the same amount of money, give or take a couple million going through the same person in Hunter Biden and his investigation is slow walked.

And we're supposed to sit here and think that Joe Biden knows nothing. I think for the record, Mr. Chairman that the relevant committee needs to have questions for Lesley Wolf, the AUSA of Delaware for David Weiss, the attorney general of Delaware for Lisa Monaco, who is the deputy attorney general; and for Merrick Garland himself, the attorney general of the United States.

Because if this action is allowed to occur and investigations are slow walk with this level of detail, this ain't Donald Trump y'all. These are facts I yield back.

JAMES COMER:
Thank you. Great job and I will add, we just got bank records for Ukraine. So we'll be going through tha. At the request of the witnesses we're going to recess for ten minutes and then we'll promptly reconvene. Committee in recess. [Recess]

The oversight committee will reconvene. We're now back in order. The chair recognizes Ms. Crockett for five minutes.

JASMINE CROCKETT:
Thank you so much, Mr. Chairman. The problem with going this late in the game is there's so much that's been put out there, you're just kind of all over the place, so just rock with me for a little bit. First of all, I want to get the elephant out of the room. Just to be clear, both of you provided deposition testimony, and in your depositions, neither one of you ever stated that President Joe Biden interfered with your investigations, correct?

GARY SHAPLEY:
The transcript doesn't include that, no.

JOSEPH ZIEGLER:
Yeah, the transcript does not include that.

JASMINE CROCKETT:
Nor does it include that Merrick Garland interfered with your investigations, correct?

GARY SHAPLEY:
The transcript does not say that, no.

JASMINE CROCKETT:
Thank you. The reason that I say that is because it's the insinuation that this committee is trying to make, or at least one side of this committee is trying to make, is that for some reason there was interference, and my colleagues continue to make sure that they outline the fact that this investigation actually started under the Trump administration.

So that's the reason about who appointed who comes up. But at the end of the day, we have no evidence whatsoever that the president nor the attorney general of the United States interfered. But I also want to make sure that we outline some legal principles since we've got so many newfound prosecutors today on this committee.

Number one, just to be clear, just because you investigate something, it doesn't necessarily mean that there will be a conviction, correct?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:
That is correct.

JASMINE CROCKETT:
OK. In fact, in our criminal justice system, you are cloaked in a presumption of innocence. That is what happens under the Constitution. OK? So we all have a role to play. Your role is investigative, correct?

JOSEPH ZIEGLER:
Correct.

JASMINE CROCKETT:
All right. So then you have an AUSA who usually is the one that is responsible for taking the evidence. Actually, they probably have an investigator in their office. There's usually an investigator that is directly within their office that will review any documentation that you provide, and then they will sit down and talk to the AUSA's office about recommendations, like what the charges will look like and things like that.

Is that not correct?

GARY SHAPLEY:
If that's correct, I've never seen that.

JASMINE CROCKETT:
OK. Well, let me be clear. There is a level after you get done with your investigation in which the US attorney's office then we'll look at the evidence that you've provided and they will make decisions, correct?

JOSEPH ZIEGLER:
Yes, and all four assigned attorneys agreed with recommending felony and misdemeanor tax charges.

JASMINE CROCKETT:
I heard your testimony before. I'm not going to dispute that. The difference is, I've done the defense side of this before. So as far as I'm concerned, it sounds like a sweetheart deal, because I've never played anyone to every single count of a federal indictment in the first place, unless they only had one count.

I have always negotiated and unlike on the state level, I typically do my negotiations a lot of times before there's even an indictment because a lot of times, my clients are actually turning evidence over in all kinds of things. But the thing is, those conversations have never taken place with an investigator.

They always take place with the US attorney. So the point is, you don't have the ultimate charging authority. The people that did, they decided to do what they decided to do for whatever reasons, correct?

GARY SHAPLEY:
So in my experience, I've always been a part of that, at that table, talking to the AUSA and talking about the charging decisions. So that's not accurate to say that an investigator is not involved in that process.


JASMINE CROCKETT:
So this time it was a little different for you and that's why you felt as if something was wrong. But I want to get to something else really quickly. I want to talk about what we should be prosecuting. We should be looking at the fact that in 2017, Trump's first year in office, he also made $6.5 million from China, his tax returns show.

The source of the China payments is not clear from the returns. The payments were a surprise since Trump is an outspoken critic of the $5.8 million that Hunter Biden made. The difference is Trump was our president when he made this money from China, whereas I'm sure you would agree with me, Hunter Biden has always been a private citizen.

We've got a lot of other stuff. In fact, it's clear that Trump never paid more than $750 in taxes for, I want to say, a total of two years of his taxes, which is absolutely insane. But we also know that it showed that Trump claimed large cash donations to charities, but the report said the IRS did not verify them.

The report also said that while Trump's tax filings were large and complicated, the IRS does not appear to have assigned experts to work on them. That is shameful. In addition to that, we heard testimony earlier that talked about whether or not you executed a search warrant under Section 9-13.420 of the DOJ's Justice Manual, it specifically states that when searching the premises of an attorney that is the subject of an investigation, prosecutors are expected to take the least intrusive approach consistent with vigorous and effective law enforcement.

It's kind of what they did for Trump when they gave him a number of opportunities to turn over the documents or national secrets that he kept in the toilet, but he chose not to and that's why he is facing federal charges down in Florida. And finally, I just want to make sure that we clear up something about the Central Park five, because I don't think my colleague from the other side of the aisle understands that not only were they found to be not guilty, they were paid $41 million in a 2014 settlement because their civil rights in that lawsuit were violated.

In addition to that, we do know that one of the Central Park five now serves on City council, Yusef Salam. So I asked unanimous consent that I allow this New York Times article be admitted.


JAMES COMER:
Without objection, so ordered. And the lady's time has expired, but would the lady yield to a quick question?


JASMINE CROCKETT:
To who?


JAMES COMER:

Would you yield a question?


JASMINE CROCKETT:
Yes.


JAMES COMER:
You made the argument that Trump received $6 million from China or something and Hunter Biden received the money from China. Do you know exactly what Hunter Biden did to receive the money from China because that's something we've had a hard time trying to figure out. I think I know what Trump's businesses were.

I'm not saying it's right or wrong. I just know what his businesses are. I don't know what the Biden's businesses are.


UNKNOWN:
And you don't know what it's not.


JAMES COMER:
I'm sorry?


UNKNOWN:
And you don't know what it's not either.


JASMINE CROCKETT:
But what I'll say--


UNKNOWN:
So you have no idea why or why not he received that money.


JASMINE CROCKETT:
What I will say--


UNKNOWN:
You have no evidence about it.


JASMINE CROCKETT:
Can I submit this MSNBC, or this NBC article for the record as well?


JAMES COMER:
Without objection, so ordered.


JASMINE CROCKETT:
And I will say that in this article, it specifically says that the source of a number of Trump's monies, it was unclear.

JAMES COMER:
OK.


JASMINE CROCKETT:
It just said that he did have businesses there. He did say that he had opened some bank accounts in China, but they could not find the source of the monies that were paid to him from China.


JAMES COMER:
Chair recognizes Mr. LaTurner from Kansas for five minutes.


JACOB LATURNER:
Thank you, Mr. Chairman. Thank you both for being here today. There's a lot of information. Let's try to quickly lay this out for the American people, OK? So quick answers. How long have each of you worked for the IRS. Mr. Shapley, you first.


GARY SHAPLEY:
14 years.


JOSEPH ZIEGLER:
13 years.


JACOB LATURNER:
Is it fair to say that you both have had successful careers at the IRS? You've both been recognized for your achievement there?


GARY SHAPLEY:
I believe so, yes.


JOSEPH ZIEGLER:
Yeah, absolutely.


JACOB LATURNER:
Are either of you overly partisan people?


GARY SHAPLEY:
I am not, no.


JOSEPH ZIEGLER:
Yeah, I've made an effort to not be overly--I made an effort to be partisan. I apologize.


JACOB LATURNER:
Do either of you have a burning desire or have you ever to be a spectacle at a Congressional

hearing? Are you wanting to be on TV? Are you looking for your 15 minutes of fame here?


GARY SHAPLEY:
I would prefer not to be here.


JOSEPH ZIEGLER:
Yeah, I never imagined that this would happen, but here I am.


JACOB LATURNER:
Then quickly, for the American people, why did you step forward?


GARY SHAPLEY:
Because we need the equal application of justice, and we hear all these stories about these crimes that are committed that are horrible, but without the equal application of justice, I don't understand how we move forward. And I don't understand how I meet my oath of office if I don't do what I can to ensure that occurs.

There are 300 million taxpayers out there that they think that this hearing is a big deal because they're paying their taxes and they see someone who isn't.


JACOB LATURNER:
And Mr. Ziegler.


JOSEPH ZIEGLER:
So it's a matter of accountability. So it's twofold. The matter of accountability, we need to hold those accountable who basically, for the last five years, hasn't been following proper procedure. And the second part of this is that I think we need to have some reform or something that's built in there that this doesn't happen to people again, investigators.


JACOB LATURNER:
Let's get the facts out. The Biden family and their associates received millions in global payments from companies linked to Ukraine, Romania and China funneled through various shell companies. Mr. Ziegler, is that correct?


JOSEPH ZIEGLER:
That is correct. It's $17.3 million.


JACOB LATURNER:
Quickly, Mr. Shapley, what is a special agent report?


GARY SHAPLEY:
It's the report that recommends prosecution for various charges, each of which have been proven each element.

JACOB LATURNER:
Approximately how many of these over your career have you been a part of or have you prepared? Guess.

GARY SHAPLEY:
Hundreds.

JACOB LATURNER:
Hundreds. Did you complete a special agent report for the Hunter Biden case?

GARY SHAPLEY:
Special Agent Ziegler authored that report.

JOSEPH ZIEGLER:
I completed that report.

JACOB LATURNER:
And when the special report was sent up the chain of command, just like you all have been involved with, in your case, Mr. Shapley, hundreds of times, did you notice anything outside of the normal process that you have grown used to over the years?

GARY SHAPLEY:
So the changing criminal tax attorneys was definitely inappropriate and out of the norm, but no. After that, the senior leadership quickly trumped CT counsel and they concurred with the charges, so we sent it forward to the Department of Justice Tax Division for further approval.

JACOB LATURNER:
And Mr. Ziegler?

JOSEPH ZIEGLER:
Everything that he just said was correct.

JACOB LATURNER:
Now, Mr. Shapley, you recommended felony charges in the special agent report, and we all know the answer, but was Hunter Biden ultimately charged with those felonies?

GARY SHAPLEY:
No, he was not.

JACOB LATURNER:
Mr. Ziegler, what role did Lesley Wolf play in the investigation?

JOSEPH ZIEGLER:
So she was an assistant United States attorney out of the District of Delaware assigned to

the investigation.

JACOB LATURNER:
You met with her and her team during the Hunter Biden case, correct?

JOSEPH ZIEGLER:
That is correct.

JACOB LATURNER:
In your testimony to Ways and Means you describe Assistant US Attorney, Lesley Wolf, who was once again overseeing the case out of Delaware as saying during a meeting that she did not want to ask about the big guy and stated she didn't want to ask questions about dad. Is that statement accurate? And I want to remind you that you're under oath.

Is that accurate, your testimony to Ways and Means?

JOSEPH ZIEGLER:
Can you ask that question one more time so I can--

JACOB LATURNER:
She said, Lesley Wolf said during a meeting that she did not want to ask about the big guy and stated she didn't want to ask questions about dad.

JOSEPH ZIEGLER:
So there's two fold to that. There's that line in the email that said, 10 held by H for the big guy. That was something that came up as a part of us reviewing what we were going to say during that day, and she immediately says, no, we're not going to ask that and then we essentially had to argue our stance on why we should ask it. And then it was ultimately that we didn't know.

It was unknown.

JACOB LATURNER:
I appreciate that. Mr. Shepley, you stated in public interviews that you and your team were stopped from taking certain investigative steps that you believe could have potentially connected this Hunter Biden case to President Biden. Is that correct?

GARY SHAPLEY:
That's correct.

JACOB LATURNER:
Now, I just want to summarize as quickly as I can here. We have two credible nonpartisan IRS investigators confirming that there are millions of dollars in foreign payments to shell companies to the Biden administration. We have Hunter Biden who most of us wouldn't hire to dog sit receiving these millions of dollars for services that they cannot come forward and tell us about and that potentially this is linked to President Biden, but we don't know that for a

fact because you were shut down.

You were not allowed to pursue the investigative angle that you wanted to. This is something that we have to get to the bottom of. It's shameful what's happening, and I want folks to mark my words that we will not be stifled. This committee will not be stifled by the Department of Justice or anyone in the Biden administration.

We are going to pursue this and get to the bottom of this no matter what. Thank you, Mr. Chairman, I yield back.


JAMES COMER:
Chair recognizes Mr. Gomez for five minutes.


JIMMY GOMEZ:
Thank you so much, Mr. Chairman. I just want to be clear. Whistleblower allegations should be taken seriously, period. I had a whistleblower approach my office during my first term, but one of the things I learned from that is that there's a clear, fact-based process that needs to be followed to ensure a whistleblower investigation is executed properly without political interference.

This is not what is happening here today. Where this originated, in Ways and Means, Republicans threw that process into the gutter. Here's how. One, there were more than 50 people identified in the Ways and Means committees depositions on this same topic that were not spoken to and not interviewed before the Republican majority released these allegations to the public.

They didn't take the time to check their fact and the Republicans even admitted during questioning that they never interviewed or asked questions or sought to ask questions of these individuals. Instead, Republicans cherry-picked 13 people who they knew agreed to corroborate their claims. Why wouldn't they conduct a thorough investigation and interview all people identified who might have information in this case?

There are more than 50 people who weren't given the opportunity to defend their names, respond to allegations or give this inquiry important context and facts. Two, the Whistle-Blower transcript contains unauthenticated, unverified documents from unknown searches on the internet. The exhibit used by the gentleman from Ohio in the early part of this hearing is one of those unverified documents pulled from the internet, yet they treat it as a smoking gun.

You can literally find anything on the internet. That doesn't make it true, and Republicans refuse to verify their sources. They are trying to give the appearance that these documents are from IRS files provided by the whistleblower or from some trusted source, but in fact, they are not. These documents are unauthenticated, and we don't even know their real source.

What kind of basis is this for a serious investigation? Three, the majority released this transcript with all these errors I cited to the public before verifying any of these allegations. They put the cart far before the horse, declining to speak to over dozens of valuable witnesses, refusing to verify the information they pushed to the public, throwing this whole process and its credibility out the window.

Additionally, this process has been tainted by the fact that one of these whistleblowers

attorneys has made substantial contributions to the Republican chairman of Ways and Means, as recently as February of this year and one of these whistleblowers didn't even come voluntarily. He was asked to testify by his supervisor.

None of this inspires confidence in these efforts of my colleagues across the aisle or in the process that has been taken. If my colleagues were serious about these allegations, they would have gone through the proper steps to ensure this investigation was done correctly, but they didn't. They'd rather drag this investigation and this committee into the gutter, and that was proved by the gentlewoman from Georgia.

If the gutter is where they choose to live and the only purpose of this hearing is to drag us all down there with them, I don't want any part of it. I ask for unanimous consent to submit for the record a letter from Ways and Means ranking Member Richard Neal, outlined the improper steps taken by the majority in this investigation.


JAMES COMER:
Without objection, so ordered.


JIMMY GOMEZ:
Thank you. With that, I'd like to yield my remaining time to Mr. Goldman of New York.


DAN GOLDMAN:
Thank you, Mr. Gomez. Gentlemen, I want to return to The Washington Post October 6th article, and I'd ask unanimous consent to enter it in the record. In your testimony, Mr. Sharply, before the Ways and Means Committee, you stated, quote, there was a leak. It appeared to come from the agent's level who was critical of the prosecutors for not charging the case.

What you testified earlier was a little different. Which one do you stand by today?


GARY SHAPLEY:
I'm sorry, could you repeat that?


DAN GOLDMAN:
There was a leak. It appeared to come from the agent's level who was critical of the prosecutors for not charging the case.


GARY SHAPELY:
Yeah. So yeah, it appeared because it said it came from the agent level, but the source was a source familiar with the topic, and it didn't say it was a law enforcement source.


DAN GOLDMAN:
OK. It seems to be a distinction, I think, without a difference. And then you understand that obviously leaks of grand jury information is a felony, right?


GARY SHAPLEY:
Leaking investigative information includes 6103 would be a felony, yes.

DAN GOLDMAN:

Well, that's true as well. So would you agree that there would be some skepticism from any prosecutors about which of the agents may be the source of a leak?

JAMES COMER:

And gentleman's time is expired, but feel free to answer the question.

GARY SHAPELY:

Oh, since there have been multiple leaks on this investigation and one on December 8th or December 9th, 2020, that appeared to have come from someone as Lesley Wolf stated--

DAN GOLDMAN:

I was just asking about October 6th, 2022.

GARY SHAPLEY:

So I would--

DAN GOLDMAN:

It would cause anyone suspicion, right?

GARY SHAPLEY:

If it says it comes from an agent level?

DAN GOLDMAN:

Yeah, that's what you said.

JAMES COMER:

Gentleman's time is expired. You're the next questioner after Mr. Fallon from Texas for five minutes.

PATRICK FALLON:

Thank you, Mr. Chairman. We were just talking about obfuscating and diverting and distracting and spin and a whole lot of word vomit from the other side of the aisle that makes no sense as to what we're here for today. And you hear a lot of Trump, Trump, Trump, Rudy Giuliani, Giuliani Giuliani. We're not talking about either of those gentlemen today.

I want to thank both of the witnesses for being here. I think it's been established that you're very credible, you're very experienced your subject matter experts at what you do. Mr. Shapley, you led a team of 12 elite agents in this investigation. How long were you investigating the sportsman, the Hunter Biden investigation?

How long did you lead it for?

GARY SHAPLEY:

I started in January of 2020.

PATRICK FALLON:
OK. So two to three years investigating?

GARY SHAPLEY:
That's correct.

PATRICK FALLON:
OK. You both, I'm sure, are aware that one of Hunter Biden's lawyers has accused you of having access to grind and that you're disgruntled agents. Mr. Shapley, are you a political activist?

GARY SHAPLEY:
I am not, no.

PATRICK FALLON:
You are not. Mr. Ziegler, are you a part of the MAGA movement?

JOSEPH ZIEGLER:
I am not.

PATRICK FALLON:
You are not. OK. Thank you. So I have to ask you a direct question and it's an important one. Are you two out to get Hunter Biden or are you out to get justice?

GARY SHAPLEY:
It's all about justice here and that's why a plea agreement, when people ask me to comment about the plea agreement, it is outside of my control.

PATRICK FALLON:
Justice or you want to get Hunter?

JOSEPH ZIEGLER:
It's justice.

PATRICK FALLON:
Thank you. OK. So the ranking member who was a rather skilled order, rather bombastically claimed when he was speaking earlier that this is all, and I quote, normal stuff and there's no evidence that Hunter Biden received preferential treatment. So Mr. Ziegler, do you agree with those statements? That this investigation was normal stuff, nothing out of the ordinary and that Hunter Biden didn't receive any preferential treatment.

JOSEPH ZIEGLER:

Based on my transcript, I would believe that that answer or that question would be incorrect.

PATRICK FALLON:

Would you fair to say that you vehemently disagree with those statements?

JOSEPH ZIEGLER:

I don't think it changes my perspective of it. All I can say is that we came forward with the information of slow walking, not following the investigative steps.

PATRICK FALLON:

So it was out of the ordinary?

JOSEPH ZIEGLER:

Yeah.

PATRICK FALLON:

OK. Mr. Shapley, do you agree with those statements or disagree with them?

GARY SHAPLEY:

Yes, this is out of the ordinary.

PATRICK FALLON:

OK. So when you read your transcribed interviews, which are pretty massive in and of themselves, it's clear that the levels of interference and roadblocks that the DOJ and other federal government personnel put in front of you, was astounding, if not unprecedented. In these pages, I was really shocked to see how an assistant US attorney stonewalled and scuttled your investigation.

So let's go back. It's December of 2020, the prosecutorial team is meeting to discuss next steps. Hunter Biden has received millions of dollars in foreign payments. One of his shell companies, Wasco, to this day no one can tell what the hell it ever did other than accept money. So nobody knows what services the company has ever provided.

And it's December of 2020. Hunter is vacating Wasco's DC offices and he's moving those documents to a storage unit in Northern Virginia. Mr. Shapley, were you pretty interested in what some of those documents might reveal?

GARY SHAPLEY:

Yes, we were.

PATRICK FALLON:

OK. And maybe possibly could have shedded light on criminal activity, felony criminal activity?

GARY SHAPLEY:
Unfettered access to the documents there before defense counsel can filter them and would have been very advantageous--

PATRICK FALLON:
It could have been a treasure trove. We don't know, OK, because of what happened later. So I'm going to get that in a second. So did you prepare an affidavit to search that storage unit?

JOSEPH ZIEGLER:
Yeah, I was the one that prepared that.

PATRICK FALLON:
OK. Mr. Ziegler did that. Did US Attorney Weiss agree that if the unit wasn't accessed for 30 days, then you could execute the warrant?

GARY SHAPLEY:
That's correct.

PATRICK FALLON:
OK. So now that in and of itself seems kind of weird, though, doesn't it, to wait 30 days? How are you going to know if somebody accesses it? Is it going to be under 24 hour surveillance? Is it going to be a stakeout? Are we going to have to call Emile Estevez and and Richard Dreyfuss and have them there with the binoculars checking things out?

GARY SHAPLEY:
So it wasn't in the transcript, but this was a little bit unique location where it would have been easier than what you just described, to see if it was accessed.

PATRICK FALLON:
OK. But you didn't have to wait the 30 days did you, because did assistant US Attorney Lesley Wolf, what did she do when she learned that you wanted to execute the search warrant on this storage unit?

JOSEPH ZIEGLER:
So she actually first approved and was saying that it's going to take approvals for us to get this done, but then came back a few days later and said, no, we're not going to move forward with this. And I was the one who proposed, well, let's just wait 30 days, we'll get the approvals, we will make sure that the storage unit is not accessed and then we can move forward with the warrant.

Her response was, I'm going to think about it. And then we come to find out a few days later that they had let defense counsel know that we know about the storage unit.

PATRICK FALLON:
OK. So that's key. So a US attorney tipped off the lawyers of a person who was a subject of a

years' long criminal felony investigation? Is that what you're saying? Did Lesley Wolf tip off Hunter Biden's lawyers?

JOSEPH ZIEGLER:
Regarding?

PATRICK FALLON:
The storage unit. That you guys had interest in the storage unit. Because once you know that, if you're the subject of a criminal investigation, any of those documents that could incriminate you are probably going to meet a match and some gasoline. So that's astounding to me that that is direct evidence clearly of preferential treatment and that is not normal stuff.

Is that normal?

JOSEPH ZIEGLER:
So I can tell you that that was actually my kind of red line situation, a little bit different than how Shapley refers to it, but I didn't think we had a seat at the table. It disappointed me so so badly, but I knew this was something that we were up against and that it was, like, OK, that's what they decided to do.

PATRICK FALLON:
Have either of you ever seen anything like that before in your decades of experience?

JAMES COMER:
And gentlemen's time is expired but please, feel free to answer the question.

GARY SHAPLEY:
No, I have not.

JOSEPH ZIEGLER:
I have not either.

PATRICK FALLON:
Well, I want to thank you. I think you're both excellent public servants and you're courageous and justice is the only thing I want to be blind, not our Democratic colleagues, not the legacy media and certainly not top administration officials. Mr. Chairman, I yield back.

JAMES COMER:
Chair recognizes Mr. Goldman from New York.

DAN GOLDMAN:
Thank you, Mr. Chairman. I'd love to get the extra minute that Mr. Fallon got as well. Thank you, guys, for being here today. We don't have a lot of time here. I have a lot of questions. If I cut you off, I'm not trying to be rude. I'm just trying to get through them, and I want to talk a little bit about the evidence you did have.

Mr. Ziegler, you were the case agent, so how many documents would you say you gathered during the five year investigation?

JOSEPH ZIEGLER:
So however, I do believe I may have documents, I am limited by the statute, but I would be more than welcome to turn those documents over to the--

DAN GOLDMAN:
No, no, I don't need them. How many, just the number?

JOSEPH ZIEGLER:
It was a significant amount of documents. I apologize.

DAN GOLDMAN:
Hundreds of thousands, millions?

JOSEPH ZIEGLER:
I don't want to put a number to it, but there was a lot.

DAN GOLDMAN:
Right. Bank records, right? You had a lot of bank records?

JOSEPH ZIEGLER:
Yes.

DAN GOLDMAN:
Both domestic and foreign?

JOSEPH ZIEGLER:
That is correct.

DAN GOLDMAN:
And you conducted search warrants?

JOSEPH ZIEGLER:
Yes. There was reference in our transcripts to conducting electronic search warrants.

DAN GOLDMAN:
And did you do other search warrants as well?

JOSEPH ZIEGLER:
When you say other search warrants, what do you?

DAN GOLDMAN:

Any other search warrants, electric, otherwise, physical?

JOSEPH ZIEGLER:

So I'm going to stick to what I stated in my transcript. There were multiple electronic search warrants that we executed.

DAN GOLDMAN:

And you said that you conducted more than 60 interviews as part of this investigation, is that right, in your transcript?

JOSEPH ZIEGLER:

That is correct.

DAN GOLDMAN:

That's a lot for any investigation, right, for a tax investigation?

JOSEPH ZIEGLER:

I wouldn't say that. I would say that--

DAN GOLDMAN:

All right. In my 10 years, I don't know how many investigations I did was 60 interviews. So I want to focus though for a second on the WhatsApp that we went through. And Mr. Shapley, in your testimony your opening statement, you said that the text message, the WhatsApp message that we've been talking about shows Hunter Biden discussing business with his father.

Could you show me where in the text message it says anything about discussing business with Joe Biden?

GARY SHAPLEY:

So if you'd like me to go through it, I mean, I can take time to review it, if you'd like me to.

DAN GOLDMAN:

Well, I don't have the time unfortunately, as you point out. I will tell you the only thing it says about it is that Hunter Biden was sitting with his father. It does not say anything about discussing any business. And Mr. Shapley, you also said in your testimony, and we've talked about this a bunch, that the agents were prohibited from pursuing leads related to Joe Biden and the big guy, but the agents did that anyway, right, interviewing Rob Walker?

GARY SHAPLEY:

The agents interviewed Rob Walker, did not use--

DAN GOLDMAN:

And they asked him about that, right?

GARY SHAPLEY:
--the word big--

DAN GOLDMAN:
Right. They didn't use the word big guy, but they asked about it in reference to that text. And do you recall that Rob Walker actually said in response to that, that he was not aware that Joe Biden was ever a part of anything that he and Hunter were doing?

GARY SHAPLEY:
That's what the witness said, yes.

DAN GOLDMAN:
Yes, and then you describe a lunch, what we talked about earlier, where Joe Biden came to say hello at the Four Seasons Hotel, to lunch that he was having with CFC executives, right?

GARY SHAPLEY:
That's correct.

DAN GOLDMAN:
But what you didn't talk about is what Rob Walker said the origination of that lunch was, and you testified that he said, that Hunter told his dad, according to Rob Walker, quote, I may be trying to start a company or try to do something with these guys. Now, let me ask you something. That doesn't sound much like Joe Biden was involved in whatever Hunter Biden was doing with the CEFC, if Hunter Biden is telling him that he's trying to do business with them, does it?

GARY SHAPLEY:
No, but it does show that he told his father he was trying to do business and he was talking to his father about the business.

DAN GOLDMAN:
Well, that is true. Hunter Biden does try to do business. That's correct. So you not only have no direct evidence connecting Joe Biden to any of Hunter Biden's business deal, you actually had proof that he wasn't involved. That is the proof that you had. And in the end of the day, that this was a five year criminal investigation with tens of thousands of documents, maybe hundreds of thousands-- [Audio Gap] --warrants, aggressive techniques.

You wrote a report recommending felony charges. It went to DOJ tax. They wrote a 99 page memo, approval memo, right? And neither of you saw that, did you?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:
That is correct.

DAN GOLDMAN:
And what was their recommendation?

JOSEPH ZIEGLER:
So all I know is--

DAN GOLDMAN:
Approval, discretion or declination?

JOSEPH ZIEGLER:
So I have to stick to the confines of--

DAN GOLDMAN:
OK. You testified that it was discretion, which means that it wasn't an approval. It was to the discretion of the US Attorney's office which had that DOJ tax memo, which had information from the defense lawyers that they spoke with, and they are the ones who have to prove this case in court. And I will tell you, as a federal prosecutor for 10 years and I worked with many of your colleagues who do great work and I'm sure you do great work as well, but I never met an agent who didn't want to charge every possible case.

But what I noticed in five hours of testimony today is that neither one of you has ever mentioned a portion of the case that may not be so strong or may be suspect or may have a defense, and that's because that's what the prosecutor has to think about before charging a case and that is not what the special agent report does.

So in the end--

JAMES COMER:
Gentleman's time has expired. You went a minute over. Chair now recognizes Mr. Perry from Pennsylvania.

SCOTT PERRY:
I thank the chairman. Mr. Shapley, if you can turn to page 30 of your transcript and I want to say to Mr. Shapley and Mr. Ziegler, we sure appreciate you coming forward. I think, look, we've heard of alleged so-called whistleblowers in the past. They couldn't reveal themselves, and it led to an improper impeachment of a president that was unjustified and unsubstantiated.

So I really do credit you. I think this has probably been very difficult and a hard choice for you to make, but I think it was the right one and I commend you for it. Mr. Shapley, page 30 of your transcript, let me see, middle of the page, last sentence, second paragraph, starting with every single day. Every single day was a battle to do our jobs, and I understand that in Congress, but you're following the letter of the law.

You're taking in information. You're doing--prescribed, you do this, you do this, and you get

that. Why is your day--that's a chilling line. What did you mean when you said that?

GARY SHAPLEY:
So yeah. Every time we try to communicate investigative steps and get support for investigative steps, it was always slow walked. It was always pushed off that we needed a DOJ public integrity approval or DOJ OEO's approval, and it was just used as a crutch. The process was really used to stall the investigation.

And ultimately, which some people seem to be overlooking, is that these prosecutors agreed with these charges.

SCOTT PERRY:
And you finally reached your redline. You said previous in answering Mr. Fallon's question, you were seeking justice. I believe you were. I don't think you were picking winners and losers. You were just seeking to see following the rules. You finally reached your redline October 7th of 2022 at the meeting with US, Attorney Weiss.

Is that a reasonable characterization?

GARY SHAPLEY:
Yeah, that's correct.

SCOTT PERRY:
And what did you mean when you say you reached your red line?

GARY SHAPLEY:
So throughout the investigation, starting in the summer of 2020, my case agents were coming to me with certain concerns and because we were worried about the discovery process with the agents turning over documents at the end of the investigation. We wanted to protect that investigation, so I documented that amount of recurring basis issues that we were having.

And it was after discussions with my agents, I also saw these things firsthand. So we got to the point, it's a heavy burden. I have a very deep respect for the Department of Justice and AUSAs and US attorneys I've worked with in the past. And I just couldn't--to ultimately conclude that they were doing the wrong thing was just such a high burden.

SCOTT PERRY:
Yeah. You concluded that. And Mr. Ziegler your redline, I think you said, I don't want to mischaracterize, is a little later December 14th, 2020, when AUSA Wolf tips off the Biden counsel about your plan to search the storage unit. Is that right?

JOSEPH ZIEGLER:
Absolutely, because that storage unit, the method that we were planning to do was the least intrusive. It was a storage unit. We needed to get those records.

SCOTT PERRY:

And again, you were just seeking justice, right, seeking the truth/

JOSEPH ZIEGLER:
Absolutely.

SCOTT PERRY:
Truth is going to take wherever it takes you to make decisions based on what you learned. Turning back to you, Mr. Shapley. What was your agency's leadership's response when you tried to alert officials outside your chain of command?

GARY SHAPLEY:
So most recently when Special Agent Ziegler emailed the commissioner, they basically threatened and intimidated Special Agent Ziegler that he had violated some type of law.

SCOTT PERRY:
Threatened and intimidated.

GARY SHAPLEY:
And forced him, this chain of command requirement that does not meet the legal requirement.

SCOTT PERRY:
So you're trying to seek justice, you're trying to seek the truth and they're throwing an obstruction in front of you. They're obstructing you from doing it, aren't they?

GARY SHAPLEY:
So my complaints for IRS criminal investigation and senior leadership is not necessarily for blocking this investigation. I do believe that we raise things on a continual basis, and they just stuck their head in the sand and took no action. But in terms of the retaliation, that's when they first reared their head.

And there's no doubt about it, that after protected disclosures were made, that they took primitive personnel practices against me.

SCOTT PERRY:
Mr. Shapely, Mr. Ziegler, have you ever been threatened before in an investigation?

JOSEPH ZIEGLER:
I have not and I've come to learn that that this 6E grand jury threat may have happened before to other people inside the IRS.

SCOTT PERRY:
Mr. Shapely?

GARY SHAPLEY:
No, not from my own agency, not from [Inaudible].


SCOTT PERRY:
So when my friends on the other side of the aisle say that Treasury hasn't retaliated against you, it's simply not true. There's a law 5USC 2303 B13, and they placed unlawfully, you and your fellow supervisors under a gag order. Mr. Shapely and Mr. Ziegler, my time is expired, but what we're talking about here is obstruction of justice.

You were seeking justice and you were obstructed. It's against the law. Mr. Chairman, I yield the balance.


JAMES COMER:
Gentleman yields back. Chair recognizes Mr. Moskowitz from Florida.


JARED MOSKOWITZ:
Thank you, Mr. Chairman. And gentlemen, thank you for appearing today. Thank you for being a public servant and there should be no retaliation against you as whistleblowers. Unlike my colleagues that said nothing and supported President Trump when he retaliated and fired Vindman and escorted him from the building for appearing in an investigation, that shouldn't happen to you.

But of course, they said nothing when it happened to other people. We heard a lot about the Bidens, the Bidens, the Biden family, Biden associates, right, Biden's plural, the s, what does the apostrophe mean, but not Joe Biden. Didn't hear a lot about Joe Biden. Why? Because he didn't do anything. This has nothing to do with him.

You know, my colleagues talked about foreign countries, foreign entities trying to make it all scary for the American people. Of course, President Trump got $5.4 million from the Chinese while he was president because they were leasing space in Trump Tower. He goes out in air kisses. President Xi, totally perfect.

Jared Kushner gets $2 billion from the Saudis, even though he oversaw Mideast peace, totally kosher. Ivanka Trump, she's doing business with the Chinese while she's working in the White House, totally beautiful, right? Why do I bring that up? They want to say you have credibility. The problem is they have none.

They have no credibility and because you're here at their behest, their lack of their credibility questions your credibility, not because of you personally, but because of what they've done over the last several years. So the chairman says you're credible. You want to know actually what they feel about you, people like you who work in government?

I got pages of it. It goes on for years, but you know what, I'll just read a couple of adjectives. Trump has called people like you, so-called whistleblowers, fake whistleblowers, partisan people, political hack jobs, scams, frauds, traitors, cowards, spies, losers, clowns, thugs, puppets, unelected bureaucrats, the swamp and my favorite, the deep state.

By the way, are you members of the deep state? You members of the deep state. Did you stop paying--it's a rhetorical question. Did you stop paying your deep state dues? Did you do not attend the latest deep state meeting? Is that why you're not in the deep state? I can't tell when they want people like yourself to be in the deep state, not in the deep state, depending

upon what the deep state is saying.

Again, it undermines their credibility. It undermines government. It undermines the Americans trust in government. It undermines our institutions. And throughout all of this, four years, four years of it, they said nothing. And now, in an effort to own Hunter Biden, OK, they're assembling nude photos of him, right, having some intern have to sit in a room and blow up these photos and put it on poster board and figure out oh, which ones are beyond the pale?

Mr. Shapley, you said that the DOJ was slowing down the investigation, but some of that happened when President Trump was president. And I found it strange that when my colleague tried to ask both of you these questions about when your perceived slowness of this happened, you all struggled for a period of time to admit that it started under President Trump.

Was President Trump directing that DOJ to slow down the investigation? He wasn't, just like President Biden isn't now. So if there's any perceived issues with DOJ, it's with DOJ. It's not with the president. Mr. Ziegler, you said no one is above the law regardless of political affiliation. Do you think the president's son-in-law, and not as an IRS agent, as a person, do you think the president's son-in-law, Jared Kushner who worked in the White House couldn't get security clearance until the president made it happen, was put in charge of Mideast peace, and with no investment experience, got $2 billion from the Saudis?

You guys made a lot of noise today about $17 million, but what about $2 billion? Do you think as a person that should be looked at? Sounds a little strange.

JOSEPH ZIEGLER:
Congressman, thank you for that question. Given the statute, I am limited to my testimony.

JARED MOSKOWITZ:
I understand. I got it, but think about it, $2 billion from a foreign country that he was put in charge of their policy while he worked in the White House. They got no questions about that. That's totally great. Totally wonderful. Right? Joe Biden has been in Washington for almost 50 years. We didn't hear about Hunter until a couple of years ago.

Why? Because it's a pay no attention to the man behind the curtain, like the Wizard of Oz, right? Donald Trump is in so much trouble and they can't save him. But what they can do, is they can spend taxpayer money and all the time while they control these hearings to convince the American people that somehow Joe Biden has done something wrong.

But there's no evidence, none, zero zilch, nada, zippo and you know how I know that? Because they couldn't even bring up their own impeachment. They had to bury it in committee, on immigration, not on this topic, right? There are members of this committee that filed articles of impeachment, didn't bring it up for a vote.

Buried it in committee. Again, not on this topic because there's no evidence on Joe Biden. Thank you, Mr. Chairman. I yield back.

JAMES COMER:
Chair recognizes Ms. Boebert from Colorado.

LAUREN BOEBERT:
Thank you, Mr. Chairman, and thank you gentlemen for being here today. I appreciate you. Now, Mr. Shapley, Mr. Zeigler, if you could each just quickly maybe 20 seconds or less summarize, what did each of you find when you criminally investigated Hunter and Joe Biden, particularly as it relates to China?

GARY SHAPLEY:
You can start.

JOSEPH ZIEGLER:
So specifically related to China, there's CEFC, Hudson West Three, State Energy HK, yeah, those are, I believe, the three entities in my transcript.

LAUREN BOEBERT:
Mr. Shapley?

GARY SHAPLEY:
So yeah. I mean, I would just echo the same thing that's in my transcript.

LAUREN BOEBERT:
And so there's a--[Inaudible] he's a Chinese billionaire and he's tied to a CCP intelligence gathering agency and his company is CEFC, excuse me. What is the connection between Hunter Biden and CEFC?

JOSEPH ZIEGLER:
So I'm going to have to stick to the confines of my testimony, but what I can tell you is that there may be some documents that are responsive to that, and then I can turn those over to the House Ways and Means Committee and get those over.

LAUREN BOEBERT:
I welcome those. Yes.

JOSEPH ZIEGLER:
Or if they would vote to get those released.

LAUREN BOEBERT:
Yes, we would love to get those in. And I see that Hunter Biden received more than $8 million in foreign payments including $100,000 made from CEFC directly, $664,000 from State Energy HK, as you mentioned, another Chinese company and a $325,000 capital contribution made into Bohai harvest on Hunter's behalf, a Chinese equity investment fund.

Were you shocked to find that the then vice president's son received all of these payments, particularly the ones from Chinese entities?

JOSEPH ZIEGLER:

Well, as I try to state earlier, in this position, you have to be nonpartisan. It isn't a matter of shock, it's just, you follow the evidence.

LAUREN BOEBERT:
Well, it's not the political position, not the party, but just the vice president's son. So I'm not accusing you of a political bias here.

JOSEPH ZIEGLER:
So it's just, follow the evidence, see where the transactions are coming from, interview witnesses and try to figure out what the purpose of those transfers of money were for.

LAUREN BOEBERT:
And Mr. Shapley, in March of 2017, Robinson Walker LLC received a $3 million wire from a Chinese company, State Energy HK Limited, which took place just two months after Joe Biden left office as vice president. And I believe it was in your testimony that you said that it seemed that this would be getting into place or was in a testimony that was said today, that this would be being assembled before he left office, and then just shortly after, it came to fruition.

So can you quickly discuss the Robinson Walker connection to the Biden family?

GARY SHAPLEY:
So, yeah, I mean, I have to refer to Special Agent Ziegler. I don't think I spoke about the $3.

JOSEPH ZIEGLER:
Yeah, so any of that information related to the $3 million, we can turn over to the House Ways and Means Committee and they can vote to release that to you.

LAUREN BOEBERT:
Thank you. And I see that Hunter Biden and [Inaudible] a CEFC associate established Hudson West Three LLC and each owned 50 percent of the company. Between August 2017 and October 2018, Hudson West Three sent over $4 million to Hunter Biden and over $75,000 to James Biden, Hunter Biden's uncle. Now, can you discuss these payments?

Because my colleagues on the other side of the aisle are wondering what the apostrophe is when we're talking about the Biden's, and it seems there are more Biden's right here who are receiving money.

JOSEPH ZIEGLER:
So in an answer to his question regarding President Biden and in an answer to this question, any documents that we believe that we may have in our possession, we can turn over to the House Ways and Means Committee. They can vote to release it to you guys.

LAUREN BOEBERT:
OK. I request that you release those to them. And then also, we have this situation with Gal Luft, that he was doing business with CEFC, and I guess that makes you a Chinese spy. So I

guess Hunter Biden is a Chinese spy according to their allegations, but do you have any information regarding Gal Luft that you could also turn over to the Ways and Means Committee?

JOSEPH ZIEGLER:
So any information that I have in my case file at the direction of my attorney, we can turn over to the House Ways and Means Committee.

LAUREN BOEBERT:
Thank you so much. I appreciate you gentlemen for being here, your bravery, your courage for standing up. You know, we saw a lot of evidence today about millions of dollars being shuffled through these shell companies. We've seen delayed warrants to impact a 2020 election, prosecutors instructed not to involve the big guy because optics.

Well, the optics are very, very clear. Hunter Biden sold access to his father with an influence peddling scheme, which in my opinion, compromises the current president of the United States. The Biden family has never sold anything in their life, but their influence in Washington DC. Every business they have is monetizing their grift of the American people.

Thank you for making that very clear today, gentlemen. I yield.

JAMES COMER:
Gentlelady yields back. Chair now recognizes Ms. McLain from Michigan.

LISA MCCLAIN:
Thank you, guys, for being here. I know it's been a long day, but we appreciate you. The American people appreciate you, to get some truth and and honesty back in the American justice system, I think is great. So thank you again. We've heard a lot of rhetoric today and I just want to talk about as much as we can, just the facts, just stick to the facts.

So Mr. Shapley, in August of 2020, your team obtained a July 2017 WhatsApp message from Hunter Biden to [Inaudible], a Chinese businessman. And I want to read a few lines from that message. I'm sure you remember it, but I'll just refresh your memory, and I quote, Z, please have the director call me, not James or Tony or Jim. Have him call me tonight.

I'm sitting here with my father, and we would like to understand why the commitment made has not been fulfilled. And Z, if I get a call or text from anyone involved in this other than you, Zang or the chairman, I will make certain that between the man sitting next to me and every person he knows and my ability, to forever hold a grudge that you will regret not following my direction.

And I am sitting here waiting for the call with my father, end quote. That's a fact. I didn't make that up. That's not my opinion. That's not rhetoric. This is a message from Hunter Biden's WhatsApp app, correct?

GARY SHAPLEY:
It's from a search warrant from an Apple iCloud backup, yes.

**LISA MCCLAIN:**
From where? From whose phone, my phone, your phone?

**GARY SHAPLEY:**
It was from Hunter Biden. Wasn't from his phone, but it from a Hunter Biden device.

**LISA MCCLAIN:**
Thank you, sir. I didn't mean to be disrespectful. Yes, OK. Thank you. But it was linked to Hunter Biden, correct?

**GARY SHAPLEY:**
Yes.

**LISA MCCLAIN:**
OK. Thank you. Now, Mr. Shapley, were the Bidens contemplating a deal with CEFC in July 2017 time frame?

**GARY SHAPLEY:**
So I would just have to stick to what was in my transcript. I don't know if I really describe that. Have you?

**JOSEPH ZIEGLER:**
I think that's a portion of the WhatsApp message. However, I do believe there's a full chain that if it's relevant, we can turn that over to the House Ways and Means Committee and they can decide to vote to release that to you.

**LISA MCCLAIN:**
That would be appreciated. I just wanted to give, in my limited time, just to set the stage. One person has come forward, Tony Bobulinski, I believe, has alleged that the Bidens were contemplating a deal with CEFC even earlier than 2017 and he's come forward and said that. Is Tony Bobulinski the Tony referenced in the WhatsApp? I'm trying to connect the dots.

**JOSEPH ZIEGLER:**
I think we need to stick to the transcript, and I think in my testimony, I referenced Sino Hawk, the Sino Hawk deal and we know that that deal never went through and that relates to CEFC in China.

**LISA MCCLAIN:**
OK. So the Tony that he's referencing, do you believe that to be Tony Bobulinski?

**JOSEPH ZIEGLER:**
In my transcript, I did not mention anything regarding Tony Bobulinski, but what I can do, again, is provide any information that I have related to him over to the House Ways and Means Committee.

LISA MCCLAIN:
Please. Thank you so much. And then the reference to James, is there a reference to James in there? Is that James Gilliard, another Biden associate?

JOSEPH ZIEGLER:
Again--

LISA MCCLAIN:
We might have to get that one too. That's OK. And again, I think it's just critical that we stick to the facts and not my opinion, so I appreciate the fact that you're only speaking with fact, not on a partisan basis.

JOSEPH ZIEGLER:
Absolutely.

LISA MCCLAIN:
But if you could get those, that would would help because in another message, [Inaudible] responds to the earlier message, copy, I will call you on WhatsApp. And Hunter writes back, oh my friend, OK, my friend, I am sitting here waiting for the call with my father. Again, my concern is the ability to tell the truth, right?

The cover up is always worse than the crime. How many times did we hear Joe Biden say, not involved, not involved, not involved. I have no idea, yet, his son says he's sitting right there while he's making these alleged peddle influence peddling? So Mr. Shapley, what do you these messages indicate to you?

Can you comment on that?

GARY SHAPLEY:
Yeah, I mean, they indicate that we needed to take additional investigative steps to find out what the facts and circumstances were of this WhatsApp message and we just, simply, it was not supported.

LISA MCCLAIN:
Can you explain to us what do you mean it wasn't supported?

GARY SHAPLEY:
So Special Agent Ziegler, I mean--

JOSEPH ZIEGLER:
Yeah, as a normal part of a tax investigation, you want to understand why individuals are earning money. If someone's paid a significant amount of money, in order for that to be income, not a gift, not a loan, you need to understand the substance to why that person is paying them and that's why you need to understand the four corners of that transaction.

**LISA MCCLAIN:**
Sure, and that's standard operating procedure that is usually held for normal members of society. I mean, that's standard operating procedure, but what you're telling me is you weren't able to pursue that. Correct?

**JOSEPH ZIEGLER:**
That's correct.

**LISA MCCLAIN:**
I am out of time. Thank you so much, Mr. Chairman, and thank you again.

**JAMES COMER:**
Chair recognizes Mr. Burchett from Tennessee.

**TIM BURCHETT:**
Thank you, Mr. Chairman. Members, thank you all for being here. When I was younger, man, the country wasn't going too well and one night it really culminated in something. And I remember my daddy praying, said Lord--at the blessing. He just said, Lord, please don't let us lose our country. That's the prayer I'll be making tonight after hearing this testimony because this just really, it sickens me and Mr. Ziegler, I know you're a man of faith.

Mr. Shapley, I guess after tonight maybe you are, or you aren't, I'm not sure where it will drive you, but I will be remembering y'all in my prayers. And I appreciate you all's incredible courage. It takes a lot of guts to get up here and put your families and your spouses through all this garbage and it's not right.

And thank you all, sincerely.

**JOSEPH ZIEGLER:**
I appreciate that.

**TIM BURCHETT:**
Yes, sir. Mr. Ziegler. It's also come to my attention that today, after this hearing was already underway, apparently Oppo Research is circulating from, quote, Hunter Biden's legal team, unquote, suggestions that you had leaked SARS and other investigative information to someone who had released that information online.

Is there a statement that you'd like to make about whether you have leaked any investigative information to someone to reveal on the internet? And I'm sure Hunter Biden's legal team who is obviously watching right now and these dirtbags are trying to smear you through the press, and it's disgusting and I'd appreciate hearing a direct answer from you, brother.

**JOSEPH ZIEGLER:**
So there's two parts to this. There was that release of that bank report. My name was listed in there, so my name was out in the public as one of the IRS agents working this case and that was maybe two or three years ago, so that came out. And then on top of that, me and my husband were in a report that's out on social media on Twitter by a person with the same

last name that I have, who I've never met, I've never turned over information to, we just happen to have the same last name.

OK?

TIM BURCHETT:
Right.

JOSEPH ZIEGLER:
I was, for my sexuality, my sexual orientation, my husband was put out there, like, information related to me. So it was in an effort to discredit me that I'm this person working for the liberal side, and I must be a plant. And it was awful the things that they were saying about me, but I can tell you that I've never turned over any information regarding this case to anyone related to that Marco Polo report or someone with the same last name that I have.

TIM BURCHETT:
Thank you and I appreciate that and I'm sorry you--

JOSEPH ZIEGLER:
Thank you so much, sir.

TIM BURCHETT:
--you and your husband had to go through all that misery. Mr. Ziegler, also, how much do you think Hunter Biden's Business Associates receive from the Burisma Board?

JOSEPH ZIEGLER:
I'm going to need to refer to my transcript, so if you give me two--

TIM BURCHETT:
How about this? How about if I just help you out, $666,667. Does that sound about right?

JOSEPH ZIEGLER:
So is that a monthly transfer?

TIM BURCHETT:
I'm not sure. Well, if it's a monthly transfer, I'm in the wrong line of work.

JOSEPH ZIEGLER:
So Burisma paid everyone involved $6.5 million.

TIM BURCHETT:
OK. OK. And when did Hunter leave the Burisma Board?

JOSEPH ZIEGLER:

Can you hold on one second?


TIM BURCHETT:
Sure.


JOSEPH ZIEGLER:
It's not in the confines of my transcript, so that would be something I'd have to turn over to the House Ways and Means.


TIM BURCHETT:
OK. I'd like to get that. Was the money you think received from Burisma sent directly to Hunter Biden in 2014 and '15?


JOSEPH ZIEGLER:
It was not. It was sent to an entity called Rosemont Seneca Bohai.


TIM BURCHETT:
OK. Why would they do that? Why would they send it to his business partner, Devon Archer, and all that?


JOSEPH ZIEGLER:
So I can talk about my normal experience, what I--hold on one second.


TIM BURCHETT:
Can you give me a couple of seconds?


JOSEPH ZIEGLER:
So I can provide this in an additional testimony to the House Ways and Means Committee to explain that.


TIM BURCHETT:
OK. I'd like to get that. Mr. Ziegler, also, Rosemont Seneca Bohai, they didn't do anything. They didn't produce anything. Skinny Atlas, they didn't obviously do anything. Owasco did not do anything. Hudson West Three didn't do anything, but are all these Hunter Biden affiliated companies, to your recollection?


JOSEPH ZIEGLER:
I believe I referenced in my testimony that I knew of those, but I didn't reference how I knew of them.


TIM BURCHETT:
OK. Well, I guess, and I should have directed that at Mr. Shapley, I believe, but my point is you're familiar with these companies, but have you been able to identify what the Bidens did here in the business of selling or what they did with these companies? Either one of y'all, Mr.

Shapley?

JOSEPH ZIEGLER:
Again, I'm going to have to--the response to that, the reason why some of these payments were received, we can turn over as a part of an additional testimony to the House Ways and Means.

TIM BURCHETT:
Well, I guess my point is they didn't sell tough steaks or crappy ties. They sold influence, in my opinion. And I'm out of time. Mr. Chairman, I apologize. I would like to close and say a buddy of mine, Rob Delozier, texted me during all this and said, I hope you all get to the bottom of this, and I hope you all do something about it. So that would be my wish for this committee.

Thank you, guys, so much. God bless you.

JAMES COMER:
That's the goal. Thank you. Chair now recognizes Mr. Fry for five minutes.

RUSSELL FRY:
Thank you, Mr. Chairman. Mr. Ziegler and Mr. Shapley, were you able to pursue this investigation in areas that may implicate the president's involvement in his family's businesses?

GARY SHAPLEY:
We were hindered from following that line of investigative steps.

RUSSELL FRY:
Would you echo that, Mr. Ziegler.

JOSEPH ZIEGLER:
Yeah, specifically in my testimony, I referenced the campaign.

RUSSELL FRY:
In 2020, President Biden, Candidate Biden at the time said during a debate, and I'm going to quote, my son has not made any money in terms of this thing about, what are you talking about, China? I have not had--the only guy who made money from China is this guy, Donald Trump. He's the only one. Nobody else has made any money from China.

Mr. Ziegler was the president telling the truth when he said that his son, Hunter Biden, had not made any money from China?

JOSEPH ZIEGLER:
So I don't know what the president at the time was thinking, but what I can tell you based on what I testified in my transcript, that he did earn money from China.

RUSSELL FRY:
Right. And in March of 2023, just a couple of months ago, the committee showed through bank records that Hunter Biden, the president's son, James Biden, Hally Biden, all received money originating from China funneled through Robinson Walker LLC, a company owned by Rob Walker, who's a well-known Biden associate.

When presented with this evidence by a reporter, the president said, that's not true. Mr. Ziegler, is it true that the President's family received money originating from China, which was funneled through the Robinson Walker account?


JOSEPH ZIEGLER:
That is correct.


RUSSELL FRY:
As it pertains to the Hunter Biden investigation, Mr. Shapley, you sat on a meeting on October 7th, 2022, with Mr. Weiss. You've testified to that. Is that correct?


GARY SHAPLEY:
Yes, that's correct.


RUSSELL FRY:
And later this year on June 7th, Mr. Wiess publicly stated in a letter to the Judiciary Committee, the following, quote, as the Attorney general has stated, I have been granted ultimate authority over this matter including responsibility for deciding where, when and whether to file charges, end quote. That statement is dramatically inconsistent with your recollection of a meeting that happened in October of 2022. Is that correct?


GARY SHAPLEY:
Yes, corroborated documentation of that meeting clearly shows that that's not accurate.


RUSSELL FRY:
How was that not accurate, from your recollection of that meeting?


GARY SHAPLEY:
Because during that meeting, United States Attorney Weiss said that he wasn't deciding person, said it right out, and he further went in, the Department of Justice Tax Division had to approve any charges first to which as of March 16th, 2023, we know that they had not approved anything yet. He further goes and says that the DC US attorney had declined to allow charges would be brought there and that he requested a special counsel authority around that time and was denied and was told to follow the process.

That process would lead him to another President Biden appointed US attorney in the Central District of California and he told us at that meeting on October 7th, 2022, that if California declined it, that he would have to request a special authority again.

RUSSELL FRY:
Right. So during that meeting and subsequent letters that Mr. Weiss produced to both Senator Graham and to the Judiciary Committee, he seems to corroborate that meeting of some of the facts from that meeting that maybe he didn't have that authority, right?

GARY SHAPLEY:
So yes. The second letter on June 30th clearly shows that he's saying that he has full authority, has ultimate authority. He immediately goes in and says, but my authority is geographically limited. I don't understand how you can conclude any way from that statement in the June 30th letter that he has full authority.

It's just simply not accurate.

RUSSELL FRY:
Correct and that was something that you saw early on, or you all saw as a potential problem. Mr. Ziegler, if the US US Attorney Weiss could not gain special counsel authority, what options remained in bringing charges against Hunter Biden in California or in the District of Columbia?

JOSEPH ZIEGLER:
So I guess it would have been the special attorney authority that I've seen recently referenced, but I mean, essentially when DC said no and we know that DC said no, we were having conversations with our FBI counterparts of, how do we bring in a special counsel into this situation? I think that once we knew that there was going to be potential problems with going to President Biden appointees with moving this case forward, we were actively trying to figure out, how as agents do we get that to happen?

And still to this day, there is not a special counsel assigned to this investigation.

RUSSELL FRY:
Right. So the approach was, and I got to go quickly here, but the approach was to go to DC with Matthew Graves, where he was not able to bring charges under a Biden appointee. He went to the Central District of California, and Mr. Estrada was not able to bring charges. So to both of you in conclusion, in relation to the US attorney's inability to obtain that special counsel authority and bring these cases in either California or DC, do you agree with Attorney General Garland's testimony that, quote, the United States Attorney Weiss has been advised that he has full authority to bring cases in other districts if he needs to do that?

GARY SHAPLEY:
I don't believe that's accurate.

JOSEPH ZIEGLER:
And I think the key word there is he has, and I don't think that that's accurate, and I think that that's refuted in the later letter by US attorney David Weiss.

RUSSELL FRY:
Thank you both. In conclusion, thank you both for being here for your bravery and testifying

today. I know it's not been easy on you or your family, but the American people and this committee appreciate the work that you do, that you continue to do, and the truth that you're shedding light on. With that, Mr. Chairman, I yield back.

JAMES COMER:
Yield back. Chair recognizes Mr. Edwards from North Carolina for five minutes.

CHUCK EDWARDS:
Thank you, Mr. Chair. Mr. Ziegler, did you ever ask for access to Hunter Biden's laptop in your investigation?

JOSEPH ZIEGLER:
I do recall asking for access, yes.

CHUCK EDWARDS:
And were you granted that access?

JOSEPH ZIEGLER:
I don't believe that that's in the confines of my transcript. So I do know--so when we're talking about--

CHUCK EDWARDS:
Did you look at the laptop?

GARY SHAPLEY:
So I can jump in there because I documented a meeting where we had this discussion, and it was included in my House Ways and Means Committee Transcript and Special Agent Ziegler asked multiple times, that he had certain pieces of certain downloads from the devices, but he did not have access to all of them.

And that's when Lesley Wolf said that, well, that's because prosecutors decided not to give it to you all.

CHUCK EDWARDS:
So you effectively were denied access. Mr. Shapley, in your interview with the Ways and Means Committee, you stated the following regarding efforts to obtain a search warrant for, at the time, former Vice President Biden's guest house. We talked about the storage unit earlier. Let's talk about the guest house now, where Hunter Biden had been staying.

And Assistant US Attorney Lesley Wolf's assessment of the situation regarding the likelihood of such a warrant being approved. There was more than enough probable cause for the physical search warrant there, but the question was whether the juice was worth the squeeze, and I find this in quotes. She continued that optics were a driving factor in the decision on whether to execute a search warrant.

She said a lot of evidence in our investigation would be found in the guest house of former Vice President Biden, but said that there's no way that we'll get it approved. I open this

question to both of you. In the course of your distinguished careers at the IRS, has a DOJ official ever attempted to argue against the execution of a search warrant while acknowledging that such a warrant being carried out would likely yield positive evidentiary results for the investigation?

Mr. Shapley?

GARY SHAPLEY:
So my response would be that argument wouldn't be required. It would be a discussion with the investigators working with the prosecutors. And if you weren't on the same page, then you just simply would move on. And with the circumstances of probable cause being achieved and knowing evidence was there, I don't know how she could have not allowed us to execute that search warrant.

JOSEPH ZIEGLER:
And I mean, it goes further and even to the storage unit, when you talk about access to something and you're relying now on them to turn the records over to you, versus you having access to those records, they're not being potentially destroyed. I mean, there's a multitude of reasons why you'd want to execute a search warrant.

CHUCK EDWARDS:
Mr. Chair, I'd just like to share some some thoughts. This hearing is much like arguing with my wife. We start out on a topic and then we go in all kinds of different directions, and it seems like that is what I'm hearing, at least from the other side, today. And I've heard over and over that President Biden has not been implicated or proven for any wrongdoing here.

And I acknowledge that for now, but I know that it is the intent of this oversight committee to continue to look at the evidence that we have here. The issue at hand, however, is that it is Joe Biden's son that is the target of this and seems to have had preferential treatment on a number of levels. The investigators were denied access to the laptop.

The Biden family was tipped off with the warrant on the storage unit and the investigators were denied access to the guest house, even knowing that or suspecting that there was evidence in that, and that is what concerns the American people. That's the real two-tiered justice system that we see here. It's not that Joe Biden has been proven to do anything wrong yet.

It's that Joe Biden's son has received preferential treatment through the Department of Justice. I think that's a shame and I appreciate these gentlemen being here to share their brave story with the American people. I yield back.

JAMES COMER:
Gentleman yields back. Chair recognizes Mr. Langworthy from North Carolina or from New York, Buffalo, New York. I've been to his place, Buffalo, New York.

NICK LANGWORTHY:
New York. Thank you, Mr. Chairman, and thank you to these two very brave whistleblowers for what's been a very grueling hearing today. And I just am very grateful for openly testifying in front of everyone. And this must be challenging despite your providing accurate and

credible testimony, but that goes directly to my point.

I think it's important to sum up a few things, so I just want to ask you a series of questions to you, Mr. Shapley and Mr. Ziegler. It is true that you provided testimony to the House Ways and Means Committee, correct?

GARY SHAPELY:
Yes.

JOSEPH ZIEGLER:
Yes, correct.

NICK LANGWORTHY:
And how long did each of your interviews last?

GARY SHAPLEY:
Say, around seven hours.

JOSEPH ZIEGLER:
Yeah, a little bit more than six, seven hours.

GARY SHAPLEY:
Six or seven hours.

NICK LANGWORTHY:
OK. And when did those interviews occur?

GARY SHAPLEY:
Mine was a late May of 2023.

JOSEPH ZIEGLER:
June 1st.

NICK LANGWORTHY:
Of this year?

JOSEPH ZIEGLER:
Yeah.

NICK LANGWORTHY:
Were Democratic staff present during your interviews, and did they question you?

GARY SHAPLEY:

Yes, they did.

JOSEPH ZIEGLER:
Democratic staff was present and actually, the Chairman Smith was present at my testimony.

NICK LANGWORTHY:
OK. Did you give your testimony knowing that you could be criminally prosecuted if you lied to Congress?

GARY SHAPLEY:
Yes, I did.

JOSEPH ZIEGLER:
Yes, I did.

NICK LANGWORTHY:
Now, how long has your testimony been public for the American people to read?

JOSEPH ZIEGLER:
For the last three plus weeks probably.

GARY SHAPLEY:
Yeah. Yeah, around, yeah, three weeks, four weeks.

NICK LANGWORTHY:
OK. And you've been questioned by both Republican and Democratic members today, correct?

GARY SHAPLEY:
That's correct.

JOSEPH ZIEGLER:
That is correct.

NICK LANGWORTHY:
OK. Now, given all that you have just told us, you gave over 15 combined hours of testimony to the Ways and Means, hours of public testimony today, and these facts have been public now for weeks and yet, not one single person has been able to contradict a single fact about your testimony. That's incredible because it's that impressive and it speaks to your credibility, your attention to detail as investigators and now as whistleblowers.

The attacks you hear today aren't actually because of your testimony, they're Democratic talking points meant to protect the Bidens, just like the DOJ and the IRS. Your testimony speaks for itself. It is powerful and I am so glad you were willing to voluntarily come in today

and that's why, Mr. Chairman, I am so pleased that you held this hearing today and show yet another example of why this committee must continue this investigation into these matters, and I'm proud to yield back.

JAMES COMER:
Gentleman yields back--

JOSEPH ZIEGLER:
Can I say something real quick regarding what he just--

JAMES COMER:
Yes.

JOSEPH ZIEGLER:
So one of the topics that was brought up over here regarding the 99 page memo, that there was discretion given in there. From what I understand discretion, there is also language that I have seen included in DOJ tax memos that references the need to charge the felony--you have to charge the felony, essentially.

So I would ask Congress when Mr. Weiss comes to testify here, at that point in time, what did that memo say? In August when he got it from his team, what did that memo say? Did it approve felony and misdemeanor charges? And then what happened to that after? That, I think, is crucial for you guys to understand.

NICK LANGWORTHY:
Thank you. Just got a little time. Mr. Shapely, do you have anything else that you'd like to add?

GARY SHAPELY:
Yeah, just to add on to that, the Department of Justice Tax division has a policy called a Major Account Policy and that basically mirrors what Special Agent Ziegler is saying. They actually teach it when they come out to speak to agents and provide training to agents. And that Major Account Policy is that they have to charge a felony.

They can't just plead away the felony just to get out of a potential trial. They can't just rely on charging a misdemeanor or giving someone a misdemeanor when there's a felony charges on the table. And as we've said all along, we've shown all along that these prosecutors agreed with multiple felonies and none of them were charged.
JOSEPH ZIEGLER:
And I have one more thing to add to that. We were always, and I go back to last spring. David Weiss is going to do the right thing. He is absolutely going to do the right thing. Let's hold off. We're moving forward. We get to August, and we get approval or recommended approval for the felony and misdemeanor charges.

So how do we end up where we're at today? I just don't know.

JAMES COMER:

Gentleman, do you yield your last 30 seconds?

NICK LANGWORTHY:
I would be glad to.

JAMES COMER:
And we were told the same thing about Mr. Weiss as well. So we share your disappointment. Mr. Ziegler, you said there were foreign documents related to this matter, related to the investigation?

JOSEPH ZIEGLER:
Yes.

JAMES COMER:
Would you provide those documents to the committee?

JOSEPH ZIEGLER:
Yeah. I can provide those documents to the Ways and Means Committee.

JAMES COMER:
Thank you.

JOSEPH ZIEGLER:
Just like a normal process for obtaining foreign documents, correspondent bank requests, so you can actually request those corresponding wires and that's a step that you can take in getting foreign money transfers.

JAMES COMER:
Would you also provide the full Rob Walker transcript?

JOSEPH ZIEGLER:
So I will consult with my attorney, and we will turn that over to the House Ways and Means Committee.

JAMES COMER:
Thank you. Thank you. Chair now recognizes Mr. Burleson from Missouri.

ERIC BURLISON:
Thank you, Mr. Chair. Good news, I'm the last one.

JAMES COMER:
Next to last.

ERIC BURLISON:
Next to last. Oh. So I want to reiterate, thank you for your bravery. Thank you for what you're doing. I think the American people should be pissed. They should be very angry about this. No one gets away with not paying hundreds of thousands of dollars in taxes and having just blown over or being turned into a misdemeanor charge, especially when you have other criminal activity involved.

And you know what's funny, this hearing, no one denied the facts that he's guilty of this stuff, right? We all know he's guilty. The question is, I think the question at hand is, to what extent was his father aware? In a way it's kind of like Schrodinger's cat, either he was aware of what's going on and he knew what his son was doing, and he was involved or he wasn't, or maybe maybe he was completely clueless, absent-minded, whatever, unaware of what his family was doing.

But one or the other is the truth. You can't come to any other conclusion other than that. And the question is, the problem is, you were not able to determine or lift that box, the Schrodinger's cat box and determine is the cat dead or not, was Joe Biden truly involved or not. So Mr. Shapley, or Mr. Ziegler, throughout the investigation, what investigative steps that would have involved Joe Biden would you have liked to have pursued but were unable to?

JOSEPH ZIEGLER:
So I guess in my testimony, I talked about the atmosphere when we're interviewing witnesses and talking about specific areas or specific, being the campaign, that we were prevented. There was rolling eyes at us. I mean, it was a very harsh environment to be in.

ERIC BURLISON:
And you were directly turned down as well?

JOSEPH ZIEGLER:
So there were situations to where I was not able to ask certain questions, yes.

ERIC BURLISON:
So you weren't able to lift the box and find out what's underneath?

JOSEPH ZIEGLER:
There were certain--in our investigation, you want to follow the facts. That's a part of our job as you follow the evidence, and you work the case.

ERIC BURLISON:
So I know that it was tipped off about the storage unit before you were able to actually search it. Can you say what you were looking for, what evidence? Because you've built up to this point and then now you know, there's strong indication that there's something there.

JOSEPH ZIEGLER:
So I believe in Gary's testimony, there was that he moved his prior office, so he being Hunter, moved his prior office into that storage unit.

ERIC BURLISON:
And so this was off computers, files?

JOSEPH ZIEGLER:
Yeah, I don't know what specifically would have been in there.

ERIC BURLISON:
OK. Besides any tax crimes or violations, what other violations were being investigated by any other agencies?

JOSEPH ZIEGLER:
So those aren't in the confines of our testimony, what other charges are being invested--any offshoots.

ERIC BURLISON:
Were there other agencies that were working with you that were working on other?

JOSEPH ZIEGLER:
Yeah, there was. FBI was working in this case with us.

ERIC BURLISON:
OK. But you can't speak to whether that was a foreign agent registration act or?

JOSEPH ZIEGLER:
I cannot speak to that.

ERIC BURLISON:
OK. My other--

JOSEPH ZIEGLER:
What I can tell you is not only do we investigate tax crimes, but we also investigate money laundering. So any instances of money laundering, us as IRS agents, we are allowed to investigate those crimes.

ERIC BURLISON:
OK.

GARY SHAPLEY:
So Mr. Congressman, if I could add. So in my transcript, I do say that there's a FARA issue at play during the investigation.

ERIC BURLISON:
OK. So there was a FARA issue, a Foreign Agent Registration Act issue has that been

pursued?

JOSEPH ZIEGLER:
We are not a part of the investigation anymore. And I mean, that's our whole point of a special counsel. If there's these offshoot investigations, we're going to just rely on the same thing to happen.

ERIC BURLISON:
In your investigations, you knew that there was foreign bank accounts or foreign money wires. Are you aware if the Biden family has or they own foreign bank accounts, and do you have the ability to get access to those?

JOSEPH ZIEGLER:
So any records that I would have related to that, I can turn over to the House Ways and Means Committee and then they could vote to release that.

ERIC BURLISON:
Thank you. Thank you. I yield back the remainder of my time.

JAMES COMER:
Were you all ever given access to the form 1023 that alleged Joe Biden and Hunter Biden were a part of a bribery scheme with Ukraine? The reason I ask that is because that allegation is consistent--the way that the oligarch claimed he gave the Bidens the bribe is consistent with what we've seen in Romania and other countries where they set up all these shell companies and then they launder the money through the shell companies back down to different Biden family members.

So I wondered if you knew about that form before it became public?

GARY SHAPLEY:
So I can speak to that. So on my original transcript, I wouldn't have been able to say that I knew anything about 1023, but I provided a supplement after I saw open source information from the former Attorney General Bill Barr, that said that he saw this document and they sent it to Delaware for further investigation and that the team, as far to the best of my knowledge, never saw that document.

JAMES COMER:
So the team that was in charge of investigating the Biden family for tax crimes never received the FBI document that alleged Joe Biden was involved in a bribery scheme?

GARY SHAPLEY:
For the IRS investigators on the case, the answer is no.

JAMES COMER:
Is that odd? I mean, everybody knew you were investigating the Bidens for at least tax

evasion.

GARY SHAPLEY:
Generally speaking, if there was any types of money coming in and there's a criminal tax investigation ongoing, I don't see how that information could be withheld from the investigators.

JOSEPH ZIEGLER:
And I can tell you and I can provide this in my testimony, but there is things that are contained on that document that could further corroborate other information that we might be having an issue corroborating because it could be regarding a foreign official. So if we have information regarding that in a document or a witness, we can further corroborate later evidence.

And like I said, if that's something that we have, we can turn that over to the House Ways and Means Committee.

JAMES COMER:
Thank you. Thank you. Chair recognizes Ms. Luna from Florida.

ANNA PAULINA LUNA:
Mr. Shapley, did the FBI first learn of the Delaware computer shop processing a laptop that allegedly belonged to Hunter Biden and contained evidence of potential crimes in October of 2019?

GARY SHAPLEY:
Did the FBI first learn of it?

ANNA PAULINA LUNA:
Yes.

GARY SHAPLEY:
I don't know if I speak about who first learned of it.

ANNA PAULINA LUNA:
OK. The answer would be yes but thank you. And isn't it true that the FBI verified the laptop's authenticity in November of 2019 by matching the device number against Hunter Biden's iCloud account?

GARY SHAPLEY:
Yeah, I believe that's in my transcript and that's accurate.

ANNA PAULINA LUNA:
Correct. Transcript 12. The FBI analyzed the computer, correct? There was a report that the FBI [Inaudible] team analysis had taken place?

GARY SHAPLEY:
Can you point to just a page in my transcript, so that I--

ANNA PAULINA LUNA:
Page 12.

GARY SHAPLEY:
OK. Page 12.

ANNA PAULINA LUNA:
Or transcript 12.

GARY SHAPLEY:
So could you repeat the question, please?

ANNA PAULINA LUNA:
Just isn't it true that the FBI verified the laptop's authenticity in November of 2019 by matching the device number against Hunter Biden's iCloud account?

GARY SHAPLEY:
Yes, that's correct.

ANNA PAULINA LUNA:
OK. And they performed an FBI [Inaudible] team analysis?

GARY SHAPLEY:
Yes. Yes.

ANNA PAULINA LUNA:
Mr. Ziegler, did you see this report?

JOSEPH ZIEGLER:
I don't think that I talked about that in my transcript.

ANNA PAULINA LUNA:
Correct. I'm assuming that that was probably very frustrating being that you were conducting an investigation?

GARY SHAPLEY:
So I can speak to this, again, because I did contemporaneously document a long meeting about the laptop and Special Agent Ziegler confirmed in that and it was released in House Ways and Means Committee testimony, that he pointed out individual pieces of data that he was provided and then he asked why he hadn't seen other pieces of data, and that's when

Assistant United States Attorney Wolf told them that prosecutors were withholding information from the investigators.

JOSEPH ZIEGLER:
And I think what's important with withholding, they never said what they were withholding, so I think that is important.

ANNA PAULINA LUNA:
So to my understanding, the US attorney said that you haven't seen it because for a variety of reasons they kept it from the agents? So they kept this information from you, I think it's important to know, correct?

GARY SHAPLEY:
That's correct.

ANNA PAULINA LUNA:
OK. Isn't it relevant evidence for you and your team to review, Mr. Ziegler, that this type of evidence would help you to conduct your investigation?

JOSEPH ZIEGLER:
So in everyday normal investigation, you would want to know--you're the investigators. We're the ones that are supposed to process the information and provide the relevant information to the prosecutors. So we should know absolutely everything that we're looking at because we might testify to it one day.

ANNA PAULINA LUNA:
So it's safe to say that it's not a normal practice to withhold evidence from agents reviewing a case.

JOSEPH ZIEGLER:
It's not a normal practice to withhold and not tell us what you're withholding from us.

ANNA PAULINA LUNA:
Do you know who made that decision to withhold information from the agents?

JOSEPH ZIEGLER:
That, I do not know and it's not in my transcript.

ANNA PAULINA LUNA:
OK. Mr. Shapley and your team are learning about the existence of this information, and you are being denied information at the same time, this is October 2020, correct, time frame?

GARY SHAPLEY:
Yes.

ANNA PAULINA LUNA:
At that same time, did you remember Hunter Biden's laptop being discussed or rather suppressed by the media?

GARY SHAPLEY:
I generally remember the discussion of the laptop. I think everybody heard about the laptop. I don't know if I knew about the media suppressing it.

ANNA PAULINA LUNA:
So I think it's important to note that the FBI learns about the laptop in 2019. That's 2019, not 2020. And in fact, the FBI authenticated the laptop in November of 2019, then takes possession of the laptop, does analysis, but these analyzes, and information are not provided to you guys, the IRS agents conducting the case.

Mind you, the folks running the nuts and bolts of the criminal tax fraud case. They're learning about all this information and yet at the same time being denied access to it. Meanwhile, the media is actively working to suppress that. And at the same time, 51 national security officials sign on to a letter saying that, of which the FBI has authenticated, saying that it is Russian disinformation.

This is mind you, Joe Biden's son, which I think it's important to note that many of my colleagues try to make this about race and saying that there's a two-tiered justice system for Black and Brown people. And yet, we are investigating according to their terms a man of White privilege who is being aided and abetted by this administration and being criminally covered for by the Department of Justice.

And yet, somehow that's not supposed to be a topic of discussion. I have 41 seconds left. Would you guys like to say anything for the record so the American people can know what's really happening in this country?

JOSEPH ZIEGLER:
So I do have something, so there's two things. I believe that AUSA Lesley Wolf and US attorney David Weiss would say phenomenal things about my work, and I know they have said that. They have said that we did a great job in this investigation. I want to make that clear to everyone, that we're not disgruntled.

We're not out here to get people. We're here for accountability and that we learn from this. That's the most important part of why we're here.

ANNA PAULINA LUNA:
Well, you are doing great, and I know that you are not conservative. I know you're not a Republican, but I will say this, thank you for at least bringing faith back to some part of the IRS so that people understand that just because your last name is Biden does not mean that you're held above the law, so thank you.

Chairman, I yield my time.

JAMES COMER:

The gentlelady yields back and that concludes our questions. Again, I want to thank you all for being here. I'm going to yield to the much improved ranking member, Ms. Ocasio-Cortez from New York, for closing statement.

ALEXANDRIA OCASIO-CORTEZ:
I'll take the Gold Star. Thank you, Chairman, and I'd like to thank our witnesses here today. Once again, we acknowledge fully that this is not easy and that your respect, rather your service and your public service here is respected and acknowledged and valued, so thank you. Thank you for your testimony.

I think it is important for us to summarize much of what we heard and saw today and overall, what this matter is about. A US attorney handpicked by Attorney General Barr has for four years investigated together with a dozen agents and at least four prosecutors from his office and the tax division of the Department of Justice, the son of President Biden.

Hunter Biden has been charged with a felony and two misdemeanors and he is pleading guilty to several crimes and submitting to sentencing by an appointed judge, a Trump appointed judge. However, we are also seeing today is an effort to find some issue with this prosecution, this existing prosecution. This is a person who has admitted to crimes, and finding evidence of political interference, a very serious charge.

So much of what we saw today honed in on a conversation, the testimony honed in on a conversation that one of today's witnesses was involved in, in which Mr. Sharply heard Mr. Weiss to say that he was denied special counsel status. That account had been contradicted by the US attorney Weiss who has reiterated several times that he had full authority to bring any charges in any district and had received assurances from the Department of Justice that if he needed special attorney status, not counsel, but rather attorney status to bring those charges, it would be granted.

So we are left here with two possible options for this story, that either Mr. Weiss who was appointed by President Donald J. Trump and trusted by Attorney General Barr, also serving under Trump, was lying to protect the Biden administration or he respectfully disagreed with the charges that today's two witnesses wanted to bring as professionals, in their professional opinion.

Disagreement over charges is not uncommon. The IRS criminal tax counsel attorneys have disagreed in charging decisions, as we heard here today, 90 percent of the time. And in this particular case, reviewing attorneys at IRS and the tax division raised issues with the proposed charges and the witnesses described how Mr. Weiss expressed some concerns about the charges.

In fact, in some of the testimony, we saw Mr. Shapley recognized with regard to at least one of the charges which he himself recommended he could, and I am quoting from testimony, quote, see some issues with that that would preclude it from being charged. Now, I understand why the two witnesses who testified here today are disappointed after five years of investigation.

I believe you all are honorable serving professionals, truly, and that Mr. Weiss disagreed with this analysis of facts. There was absolutely frustration to not, quote, have a seat at the table, that Mr. Weiss made his decision about how to charge in this case, and he did charge. And that was a decision that he as the US attorney in charge of the case was empowered to make.

The question though, I believe that is very important to address, is why we are holding these hearings today despite what we have seen as deliberate lobbying for this hearing by a political candidate, Donald J. Trump. What we also saw today was the revival of certain conspiracy theories around Ukraine first promoted by Rudy Giuliani during Trump's first impeachment in 2019 and his reelection campaign.

We did not bring that up. That was first brought up by the Republican side that required addressing here today. Chairman Comber started this hearing by asking these witnesses about Burisma and other members of the committee again raised the specter of these debunked conspiracy theories. It has been debunked time and time again, including by Trump's own Department of Justice.

But that being said, this is the problem with bringing these conspiracy theories into this committee. They beget more. It does not stop. And today, we have gotten a new conspiracy theory, one that requires us to believe that David Weiss, a Trump appointed US attorney trusted by Trump appointed attorney General Barr has somehow been complicit in abetting and concealing a deep state conspiracy to protect Hunter Biden on behalf of the Biden administration when they were selected by Donald Trump.

This is a theory which has apparently been proven unsuccessful given that Hunter Biden is now criminally charged and facing sentencing by a Trump appointed judge. Today also marked a new low when pornographic images were paraded in this hearing room. Chairman Comber, last October, you told Time Magazine that you were not interested in the sordid details of Hunter Biden's life.

You were quoted as saying, quote, that's counter to a credible investigation and I agree. Sadly, that is a reflection of how low some individuals here have been willing to go in their efforts to attack the president and his family. And frankly, I don't care who you are in this country, no one deserves that.

It is abuse. It is abusive. If Republicans truly want to get to the facts here and they want to understand why Mr. Weiss decided to charge Hunter Biden the way he did, let's hear from Mr. Weiss. But until then, we must move on from these theories and focus on the issues that matter to the American people, like ending the scourge of gun violence that is plaguing our country, confronting and combating the climate crisis and standing up for our constitutional rights and yes, going after the enormous amount of inequity and injustice in our tax system.

And with that, I yield back to the chair.

JAMES COMER:
Gentlelady yields back. Before I close, I want to ask for unanimous consent to enter into the record three letters from myself, Judiciary Chair Jordan and Ways and Means Chair Smith to the director of Secret Service, director of the IRS and the Attorney General, requesting more information pertaining to our investigation.

Without objection, so ordered. As well as entering into the record, the two bank memorandums that we've already submitted to our friends in the media that we're trying to teach financial literacy to. I'd like to enter those two memorandums into the record. Again, I want to thank you all so much for what you've done today.

I can't imagine what you've been through. I apologize for what you have been through. This is what this committee is all about. The mission for the House Oversight Committee is to

identify and root out waste fraud, abuse and mismanagement in the federal government. To do that, we depend on whistleblowers, whistleblowers coming forward and telling their story, and that's what you all have done.

And to think that there are people on the committee who have tried to question your credibility, it's a pretty low mark for the history of the House Oversight Committee. So again, thank you. And what we've learned today, let's just go back six months when this investigation started when we became the majority.

The laptop according to many of my colleagues on the other side of the aisle and many of our friends in the media, was Russian disinformation. And what we now know is the laptop contains many of the financial records, the financial documents, the communications between both the president, as well as other members of his family with many of these associates, with many of these foreign nationals.

So there's a clear path of evidence. I say that investigating the Biden family influence peddling is like investigating a bleeding bear through a snowstorm. There's so much evidence laying around. We've confirmed today what we've been saying in this committee for several months, that the Bidens took in over $10 million, $17.3 million to be exact, from adversaries.

We have no earthly idea what they did to receive that money. I think that's concerning to every American. We have evidence that Hunter Biden spoke to his father about his businesses and that Hunter used his father's name to shake down the Chinese Communist Party backed person. We saw that in the WhatsApp message that you all released.

We've seen that in other emails and correspondence from the laptop. We learned, unfortunately, that these brave and credible whistleblowers have been retaliated against at the IRS and intimidated by the Biden's shady legal team and their lapdogs in the press. And for that, I apologize, and I hope that that does not deter other brave and credible whistleblowers from coming forward.

You know, all roads lead to Joe Biden, the big guy, the guy who was set to go in business with the Chinese Communist Party linked entity that wired money to the Biden family, as well as to Gal Luft who was mentioned earlier by one of my colleagues on the other side of the aisle. Joe Biden was even set to share office space, according to an email, with this Chinese Communist Party backed entity, and that's a concern.

That should be a concern to every American because whether you're a Republican or Democrat, whether you're rural or urban, one thing that we can agree on is that Americans detest public corruption. That's why we have an IRS. That's why we have an Irish criminal division. That's why we have an oversight committee.

That's why we have an ethics committee. That's why we're supposed to have a judicial system in America that provides equal justice for all, but we have to work together, and we have to be honest, and we have to respect our checks and balances. And what we learned today as troubling as anything is that your investigation that you spent years of your life on, that we've spent six months investigating, where you see a pattern of suspicious activity, where money flows from shady foreign companies and from shady foreign nationals through shell companies that are then laundered.

And that's according to six different banks in the suspicious activity reports, laundered down in incremental payments to the Biden family for things that we have no idea what they did to

receive the money. And as part of that years' long investigation, the FBI is sitting on the whole time a document that alleges Joe Biden and Hunter Biden took a $5 million bribe from a Ukrainian oligarch where there are bank records that show that the Bidens were receiving money from this entity.

There was already evidence there to show that. Now, I don't know whether that allegation is true or not. I know the FBI never investigated and what we know from today, they never communicated with the IRS criminal division that spent years investigating this. So there's two things that's happening here with the oversight committee with respect to the president of the United States.

There's the investigation of the Biden corruption and there's the investigation of the cover up. Again, I want to thank you all for the work that you have done over the years. We appreciate that. The American people appreciate that. The taxpayers appreciate that, and we look forward to receiving the additional information through the Ways and Means Committee through the proper process as we continue our investigation.

With that, and without objection, all members will have five legislative days within which to submit materials and to submit additional written questions for the witnesses, which will be forwarded to the witnesses for their response. If there is no further business, without objection, the committee stands adjourned.

**List of Panel Members**

PANEL MEMBERS:
REP. JAMES COMER (R-KY.), CHAIRMAN

REP. JIM JORDAN (R-OHIO)

REP. MICHAEL TURNER (R-OHIO)

REP. PAUL GOSAR (R-ARIZ.)

REP. VIRGINIA FOXX (R-N.C.)

REP. GLENN GROTHMAN (R-WIS.)

REP. GARY PALMER (R-ALA.)

REP. CLAY HIGGINS (R-LA.)

REP. PETE SESSIONS (R-TEXAS)

REP. ANDY BIGGS (R-ARIZ.)

REP. NANCY MACE (R-S.C.)

REP. JAKE LATURNER (KAN.)

REP. PATRICK FALLON (R-TEXAS)

REP. BYRON DONALDS (R-FLA.)

REP. KELLY ARMSTRONG (R-N.D.)

REP. SCOTT PERRY (R-PA.)

REP. WILLIAM TIMMONS (R-S.C.)

REP. TIM BURCHETT (R-TENN.)

REP. MARJORIE TAYLOR GREENE (R-GA.)

REP. LISA MCCLAIN (R-MICH.)

REP. LAUREN BOEBERT (R-COLO.)

REP. RUSSELL FRY (R-S.C.)

REP. ANNA PAULINA LUNA (R-FLA.)

REP. CHUCK EDWARDS (R-N.C.)

REP. NICK LANGWORTHY (R-N.Y.)

REP. ERIC BURLISON (R-MO.)

REP. JAMIE RASKIN (D-MD.), RANKING MEMBER

REP. ELEANOR HOLMES NORTON (D-D.C.)

REP. STEPHEN LYNCH (D-MASS.)

REP. GERRY CONNOLLY (D-VA.)

REP. RAJA KRISHNAMOORTHI (D-ILL.)

REP. RO KHANNA (D-CALIF.)

REP. KWEISI MFUME (D-MD.)

REP. ALEXANDRIA OCASIO-CORTEZ (D-N.Y.)

REP. KATIE PORTER (D-CALIF.)

REP. CORI BUSH (D-MO.)

REP. JIMMY GOMEZ (D-CALIF.)

REP. SHONTEL BROWN (D-OHIO)

REP. MELANIE STANSBURY (D-N.M.)

REP. ROBERT GARCIA (D-CALIF.)

REP. MAXWELL FROST (D-FLA.)

REP. SUMMER L. LEE (D-PA.)

REP. GREG CASAR (D-TEXAS)

REP. JASMINE CROCKETT (D-TEXAS)

REP. DAN GOLDMAN (D-N.Y.)

REP. JARED MOSKOWITZ (D-FLA.)

INTERNAL REVENUE SERVICE SUPERVISORY SPECIAL AGENT GARY SHAPLEY

INTERNAL REVENUE SERVICE CRIMINAL INVESTIGATOR WHISTLEBLOWER X

Source: **CQ Transcripts**